# Exhibit G

```
1      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT, LAW DIVISION
2
   -------------------------------------------------
3
   JYRAN MITCHELL,
4
               Plaintiff,
5
      vs.                           No. 2018 L 011501
6
   VILLAGE OF MATTESON, a municipal
7  corporation, and MATTESON POLICE
   OFFICER DOMINIC BATES, in his
8  individual capacity, and as employee
   of VILLAGE OF MATTESON; ILLINOIS
9  STATE TROOPER MATTHEW DUMAIS, in his
   individual capacity; and ILLINOIS
10 STATE TROOPER EDUARDO REYES, in his
   individual capacity,
11
               Defendants.
12
   -------------------------------------------------
13

14

15              DEPOSITION OF DOMINIC BATES

16                  September 4, 2019

17                     1:05 p.m.

18

19

20

21

22 REPORTED BY:  Leslie R. Pingley
                 FACTS Reporting, Inc.
23               12179 Undercliff Street Northwest
                 Minneapolis, Minnesota 55433-6727
24

25
```

Page 2

1      Deposition of Dominic Bates, taken on,
2  September 4, 2019, at the Edina Library,
3  5280 Grandview Square, Edina, Minnesota,
4  commencing at 1:05 p.m., before Leslie R.
5  Pingley, a Notary Public in and for the County
6  of Dakota, State of Minnesota.
7
8
9              A P P E A R A N C E S
10
11  For the Plaintiff:
12     MR. DEVLIN J. SCHOOP
        Henderson Parks, LLC
13      140 South Dearborn
        Suite 1020
14      Chicago, Illinois 60603
        PHONE: 312.262.2914
15
16  For Defendant Dominic Bates:
17     MR. MICHAEL J. MCGRATH
        Odelson Sterk, Ltd.
18      3318 West 95th Street
        Evergreen Park, Illinois 60805
19      PHONE: 708.424.5678
20  For Defendant Matthew Dumais (via telephone):
21     MR. RICHARD POSKOZIM
        Assistant Illinois Attorney General
22      100 West Washington
        Floor 13
23      Chicago, Illinois 60601
        PHONE:  312.824.3276
24
25

Page 3

1              I N D E X
2
3   EXAMINATION                    Page
4   Mr. Schoop ................. 4, 231
    Mr. McGrath .................... 223
5
6   OBJECTIONS BY:
7   Mr. McGrath ... 48, 49, 54, 93, 107,
    109, 110, 119, 121, 122, 124, 131,
8   151, 161, 163, 174, 196, 210, 214,
    215, 239
9   Mr. Schoop .............. 223, 228
10
    REQUESTS
11
    FOR PRODUCTION .............. (NONE)
12  FOR INFORMATION ............. (NONE)
    INSTRUCTION NOT TO ANSWER .....(NONE)
13
14  REPORTER'S CERTIFICATE .......... 240
15
            E-X-H-I-B-I-T-S
16
    EXHIBIT                      MARKED
17
18  Nos. 1 -10 ........................ 4
19
20
21
22
23
24
25

Page 4

1            P-R-O-C-E-E-D-I-N-G-S
2
3    (Deposition Exhibit Nos. 1 through 10
4  Marked for Identification)
5
6          DOMINIC BATES
7
8    A witness in the above-entitled
9    action, after having been first duly
10   sworn, testifies and says as follows:
11         EXAMINATION
12  BY MR. SCHOOP:
13  Q. Sir, could you please state and spell
14    your first and last name for the record?
15  A. Dominic Bates, D-O-M-I-N-I-C  B-A-T-E-S.
16  Q. Okay.  Let the record reflect that this
17    is the discovery deposition taken of
18    Mr. or Officer, I guess we'll clarify
19    that in a second, Defendant Dominic Bates
20    in the lawsuit captioned Jyran Mitchell
21    vs. Village of Matteson, et al., Case
22    No. 2018 L 11501.  Currently pending in
23    the Circuit Court of Cook County, Law
24    Division.
25       Officer Bates, and for the time being

Page 5

1    I am going to refer to you as Officer
2    Bates, my name is Devlin Schoop.  I'm a
3    lawyer and I'm a lawyer that's
4    representing the plaintiff in this
5    lawsuit of Mr. Jyran Mitchell.
6       Before we begin, let me ask you a
7    couple of preliminary questions.  Have
8    you ever given a deposition before?
9  A. No, sir.
10  Q. Okay.  All right.  So have you ever
11    testified in court before?
12  A. Yes, Sir.
13  Q. So deposition testimony is fairly similar
14    to court testimony.  The obvious
15    difference is is there's no jury here and
16    no judge.  The lawyers, the witness, and
17    the court reporter, we're all supposed to
18    sort of police ourselves, no pun
19    intended.
20      The best way for us to do that is, as
21    best as possible at the beginning of the
22    deposition, just sort of agree or
23    understand what are typically considered
24    universal rules for a deposition.
25      First and foremost, Leslie Pingley is

Page 6

1  our court reporter today. Leslie's job
2  is to literally take down everything that
3  is said today, my questions, your answers
4  to my questions.
5     The first basic rule is all of your
6  answers, all of your responses, have to
7  be verbal, audible.
8  A. Sure.
9  Q. Leslie can't record nods of the head,
10    shrugs of the shoulder, uh-huh, huh-uh,
11    don't translate into yes or no, so if you
12    mean to say yes say yes. If you mean to
13    say no say no. Okay?
14 A. Yes, Sir.
15 Q. The other thing is this, is that we both
16    can't talk simultaneously. Leslie, I'm
17    sure, is a wonderful court reporter, but
18    it's physically impossible to do us both
19    at the same time, so I am going to ask
20    you to please let me finish with my
21    question before you begin to answer my
22    question and I'm going to do my level
23    headed best to wait for you to finish
24    with your answer before I ask my next
25    question. Do you understand?

Page 7

1  A. Yes, Sir.
2  Q. Officer, at any point in time before you
3     begin to answer my question, if you are
4     not sure about what I am asking you, I am
5     asking you to please seek clarification
6     before you answer my question. Because
7     this is what's going to happen, if I ask
8     you a question and you answer the
9     question, as I actually asked it, I am
10    going to assume that you understood my
11    question, that you understood my question
12    as it was asked, and that you intended to
13    give the answer that you actually give to
14    the question as it was asked. Okay?
15 A. Sure.
16 Q. Is there any reason why you would be
17    unable to give us your less than best
18    testimony today? For example, are you
19    suffering from a cold, taking any
20    medication that would impair your ability
21    to understand questions and answer
22    questions truthfully?
23 A. No, sir.
24 Q. All right. So let me just ask you, first
25    of all, how would you prefer to be

Page 8

1  addressed today, Officer Bates, Agent
2  Bates? I understand your employment has
3  changed. I don't want to be
4  disrespectful. I was going to just call
5  you Officer Bates.
6  A. That works.
7  Q. So Officer Bates, first and foremost, I
8  am going to show you what has been
9  previously marked as Exhibit No. 1. I
10 will give that to you.
11    Officer Bates, Exhibit No. 1, are
12 your Answers to Interrogatories,
13 Defendant Bates Answers to
14 Interrogatories. I am going to direct
15 your attention to the last page of the
16 Interrogatories. This is not numbered,
17 but it's my Page 4. At the bottom at the
18 back page there's the name Dominic Bates
19 in bold print and there's a handwritten
20 signature beneath that name, Dominic
21 Bates. Is that your signature?
22 A. Yes, Sir.
23 Q. Did you review your Answers to
24    Interrogatories to make sure they were
25    accurate before signing them?

Page 9

1  A. Yes, Sir.
2  Q. Did you believe that your answers to
3     these interrogatories were accurate?
4  A. Yes.
5  Q. Do you think they are complete?
6  A. Yes, Sir.
7  Q. Do you still believe that they are
8     complete and accurate today?
9  A. Yes, Sir.
10 Q. Is there any change in circumstances that
11    would need you to answer any of these
12    questions differently or to qualify them
13    or modify them in any way?
14 A. I'll double check, but I believe no.
15 Q. For example, I notice the first question
16    was asking you to identify your badge
17    number when you were still at the
18    Matteson Police Department. That's still
19    Star #216, correct?
20 A. Yes.
21 Q. That didn't change. Your birth date
22    didn't change, correct?
23 A. No, sir.
24 Q. But possibly your height. You're still
25    six foot three?

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 10..13

Page 10

1  A. Yes.
2  Q. Are you still, I will say approximately,
3     220 pounds?
4  A. Approximately.
5  Q. That was in response -- that was your
6     answers in response to Interrogatory
7     No. 1, correct?
8  A. Yes, Sir.
9  Q. Now, with respect to Interrogatory 2, you
10    mentioned -- you answered that you worked
11    previously -- you were employed as a
12    police officer at the Village of
13    Matteson, 4900 Village Commons in
14    Matteson, Illinois, and that you were
15    employed there from September 28, 2015,
16    until November 29, '18; is that correct?
17 A. That is.
18 Q. And you also said that you left that
19    employment to become employed at the
20    Bureau of Alcohol, Tobacco, and Firearms,
21    correct?
22 A. Yes, Sir.
23 Q. I take it, you are still then in law
24    enforcement, correct?
25 A. Yes, Sir.

Page 11

1  Q. Now, prior to working -- well, I will
2     come back to that.
3        With respect to Interrogatory No. 3,
4     you answered the question no when you
5     were asked have you ever been sued in
6     your capacity as a police officer or a
7     law enforcement agent. Is that still
8     correct today?
9  A. Yes, Sir.
10 Q. To your knowledge, at least?
11 A. Yes, Sir.
12 Q. As of 1:00 today on September 4th, you
13    haven't been served or given notice of
14    another Complaint and Summons, correct?
15 A. No, Sir.
16 Q. With respect to your answer to
17    Interrogatory No. 5, when you were asked
18    to identify -- well, there were lots of
19    things that you were asked to identify
20    with respect to Interrogatory No. 4, you
21    were specifically asked about an incident
22    involving yourself, a gentleman named
23    Jyran Mitchell that occurred on
24    February 2nd, 2018.
25        Now, before I get into this

Page 12

1     interrogatory, as you sit here today, do
2     you have an independent recollection of
3     events happening on February 2nd, 2018?
4  A. Yes, Sir.
5  Q. Okay. And did you have -- still have
6     that same independent recollection when
7     you were answering this Interrogatory
8     No. 4?
9  A. Yes, Sir.
10 Q. As you sit here today, do you believe
11    that besides yourself, Officer Dominic
12    Bates, Star #216, that other individuals
13    that were present at 612 Goldenrod Circle
14    when you interacted, and I will use the
15    phrase interacted, we will get into the
16    specifics later the nature of that
17    interaction, that you, Illinois State
18    Trooper Dumais or Dumais, I don't know if
19    I am saying that correctly, I apologize,
20    a Trooper Reyes, a Matteson Police
21    Officer Brnicky, Star #239, and a woman
22    that you believed to be Jyran Mitchell's
23    grandmother, a woman that you believed to
24    be Jyran Mitchell's mother, and a
25    gentleman that you believe to be Jyran

Page 13

1     Mitchell's father, you and all those
2     individuals identified in answer to
3     Interrogatory No. 5 were the only people
4     that were physically present during that
5     incident, or do you believe there might
6     have been other people present?
7  A. I believe there were other people that
8     were present.
9  Q. Apart from the people that you have
10    identified as being present in response
11    to Interrogatory No. 5, who else was
12    present?
13 A. I have no idea what their names were, who
14    they were. I believe they were friends
15    or family.
16 Q. And why do you believe these people were
17    friends or family?
18 A. The nature of what they were saying to
19    us, how they were interacting with us.
20 Q. Okay. Is there any specific things that
21    they were saying or doing or interacting
22    with you that lead you to believe they
23    were friends and family?
24 A. Yes. When who we believe to be
25    Mr. Mitchell's father showed up, he was

Exhibit G

DOMINIC BATES, 09/04/2019                    Page 14..17

Page 14

1   making statements as police were
2   profiling black people, all black people
3   look alike, and these individuals that
4   also were there were making the same such
5   statements.
6   Q.  Did you ever get the names or the
7       identities of the individuals besides
8       Mr. Mitchell's -- the gentleman you
9       believe to be Mr. Mitchell's father?
10  A.  No.
11  Q.  Apart from these individuals that you
12      generally described, was there anybody
13      else present -- when I say present at the
14      scene, I mean the Goldenrod Circle
15      location?
16  A.  Not that I can recall.
17  Q.  Okay.  Okay.
18  A.  I think that's it.
19  Q.  I am going to ask you a very broad
20      question.  I want you to listen very
21      carefully because it could probably save
22      us a lot of time.
23          At any point in time on February 2nd,
24      2018, were you, Dominic Bates, personally
25      present in an attempt to traffic stop on

Page 15

1   or about Interstate 294 that was
2   effectuated by Illinois State Trooper
3   Dumais?
4   A.  No.  Excuse me.  No, sir.
5   Q.  I wasn't expecting you to say that you
6       were, but just so we're clear, you were
7       never there physically present for the
8       traffic stop, correct?
9   A.  That is correct, Sir.
10  Q.  You did not participate in that traffic
11      stop?
12  A.  That's correct, Sir.
13  Q.  Now, is it fair to say that you did,
14      however, receive a dispatch call asking
15      you to assist Officer Dumais to respond
16      at a location at 612 Goldenrod Circle in
17      Matteson?
18  A.  That is correct.
19  Q.  Now, is it fair to say that on
20      February 2nd, 2018, the first time that
21      you had any interaction with Illinois
22      State Trooper Dumais was when you and he
23      were both at Goldenrod Circle?
24  A.  That is correct.
25  Q.  So you and he were complete strangers?

Page 16

1   A.  Correct.
2   Q.  Prior to you meeting him at the location?
3   A.  Yes, Sir.
4   Q.  Okay.  And your role that day on
5       February 2nd, 2018, I take it that you
6       were an assisting officer, correct?
7   A.  That is correct.
8   Q.  Prior to February 2, 2018, had you ever
9       been dispatched to a similar call where
10      you were asked to assist a State Trooper
11      conducting some form of investigation?
12  A.  I'm sure.  Being asked to assist happens
13      very frequently.
14  Q.  Well, my question is this:  I'm not
15      asking about asking to assist a law
16      enforcement officer generally.  I'm
17      asking specifically about State Troopers.
18      Have you ever gotten a call to assist a
19      State Trooper specifically?
20  A.  I would say yes, but I can't answer
21      definitively.
22  Q.  Is it fair to say that you believe that
23      you have, but you can't remember a
24      specific incident?
25  A.  That's fair.

Page 17

1   Q.  Okay.  Now, when you are dispatched, I'm
2       just asking generally, whether it's a
3       State Trooper or another law enforcement
4       agency, is it fair to say that the -- is
5       it Village of Matteson or City of
6       Matteson?
7   A.  Village, Sir.
8   Q.  The Village of Matteson that's a suburb
9       in the Chicagoland area, correct?
10  A.  Yes, Sir.
11  Q.  And south suburbs have many
12      municipalities, whether they are villages
13      or cities; is that correct?
14  A.  Yes, Sir.
15  Q.  And sometimes -- if you know, sometimes
16      law enforcement agencies are asked to
17      assist other law enforcement agencies,
18      correct?
19  A.  Yes, Sir.
20  Q.  Is it fair to say that prior to you
21      resigning from your employment -- you did
22      resign from your employment at the
23      Village of Matteson Police Department,
24      correct?
25  A.  Yes, Sir.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 18..21

Page 18

1  Q. And that was a voluntary resignation,
2     correct?
3  A. Yes, Sir.
4  Q. And is it fair to say that you had on
5     more one occasion assisted other
6     law enforcement agencies in an
7     investigatory -- in investigations?
8  A. Yes, Sir.
9  Q. Now, so this time on February 2nd, 2018,
10    was not the first time that you were
11    assisting another agency to perform an
12    investigation, correct?
13 A. That's correct, Sir.
14 Q. When you typically performed your role as
15    an assisting law enforcement officer,
16    what's the nature of your assist? Let me
17    be real clear with you. Are there
18    specific delineated parameters which you
19    can and cannot do when you're assisting
20    another agency?
21 A. Do you mean in terms of what you are and
22    are not allowed to do?
23 Q. Yes.
24 A. Not specifically. It's not definitive
25    this is what you can and cannot do.

Page 19

1  Q. So there's not a specific Illinois
2     statute or Village of Matteson ordinance
3     or Illinois State Police work ordinance
4     or rule or regulation that says as an
5     assisting officer you're limited to only
6     doing this or you're prevented from doing
7     that?
8  A. Not to my knowledge.
9  Q. Okay. So let me -- before we get into
10    the real meat of the matter, what, if
11    anything, did you do to prepare for
12    today's deposition?
13 A. Read through the reports.
14 Q. When you said the reports plural, which
15    reports did you read through?
16 A. The Illinois State Police report and my
17    report that I had written.
18 Q. Okay. And you do agree that you did, in
19    fact, prepare an incident report
20    concerning the February 2nd, 2018,
21    incident involving you, the troopers, and
22    Mr. Mitchell, correct?
23 A. Yes, Sir.
24 Q. Now, did anybody assist you in preparing
25    that report?

Page 20

1  A. No, sir.
2  Q. Did you review any materials to draft
3     that report?
4  A. How do you mean?
5  Q. Okay. For example, did you ever -- do
6     you understand that there was dash cam
7     video from the Illinois State Trooper's
8     vehicle that captured what happened at
9     the traffic stop at I294? Do you
10    understand that?
11 A. Yes.
12 Q. Did you ever watch that video before
13    preparing your incident report?
14 A. No.
15 Q. Have you ever watched that traffic video?
16 A. No, sir.
17 Q. Is there any particular reason why? Let
18    me be really clear. During the course of
19    today's deposition I am not asking you to
20    divulge any conversations that you had
21    between you and your legal counsel.
22    Okay? What I am asking -- in this
23    specific question what I am asking about
24    did you review the video, I'm asking did
25    you review that State Trooper's dash cam

Page 21

1     video before preparing your report, the
2     Village of Matteson incident report?
3  A. I did not.
4  Q. Is there a particular reason why you
5     didn't?
6  A. No.
7  Q. Okay. And you said that you also
8     reviewed the State Trooper's report; is
9     that correct?
10 A. Yes, Sir.
11 Q. Did you review that State Trooper's
12    report before preparing your report?
13 A. No, sir.
14 Q. All right. And what else -- you said you
15    reviewed reports to prepare for your
16    deposition. Apart from the State
17    Trooper's report and your report, are
18    there any documents that you reviewed to
19    prepare for today's deposition?
20 A. I don't believe so.
21 Q. Okay. Did you watch any video to prepare
22    for today's deposition?
23 A. No, sir.
24 Q. Did you listen to any audio of -- for
25    example, cell phone footage that purports

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 22..25

Page 22

1    to have been taken at the 612 Goldenrod
2    Circle address on or about February 2nd,
3    2018?
4  A. No, sir.
5  Q. Has it ever been described to you by
6     anybody?
7  A. No, sir.
8  Q. So no one has ever told you the contents
9     of what might have transpired either in
10    the dash cam video from the road side
11    traffic stop or of any audio or video
12    made at the Goldenrod Circle address?
13 A. Trooper Dumais, I believe, at that scene
14    he -- I believe he told me about the
15    traffic stop in and of itself and he
16    might have told me a little bit about
17    what would have been on the traffic stop
18    video, but I didn't actually physically
19    observe the video or listen to anything.
20 Q. And you believe that Trooper Dumais told
21    you that at the scene at Goldenrod
22    Circle?
23 A. Yes, I believe it was at the scene.
24        MR. POSKOZIM: I'm sorry to
25    interrupt. I couldn't make out all of

Page 23

1    that last answer. Could you either speak
2    up or move the phone slightly?
3        THE WITNESS: I apologize,
4    Sir. I was just stating that at the
5    scene of 612 Goldenrod I believe that
6    Trooper Dumais had verbally told me what
7    the traffic stop was about and/or what
8    was on the dash camera at the traffic
9    stop.
10       MR. POSKOZIM: Thank you.
11 BY MR. SCHOOP:
12 Q. Now, apart from conversations that you
13    might have had with your lawyers or
14    possibly your spouse, and I don't want to
15    know about what you discussed with your
16    spouse, and I don't want to know what you
17    talked about with your lawyers, have you
18    discussed this pending litigation with
19    anybody?
20 A. Yes, Sir.
21 Q. Who is that?
22 A. Multiple people.
23 Q. Well, who are they?
24 A. I discussed it with Trooper Dumais.
25 Q. When did you discuss the litigation --

Page 24

1    the lawsuit with Trooper Dumais?
2  A. It's been a few times that we have
3     discussed it.
4  Q. When is the earliest time that you recall
5     discussing the litigation with Trooper
6     Dumais?
7  A. I believe when the lawsuit was officially
8     a lawsuit.
9  Q. So when the lawsuit was filed, you
10    believe that you spoke with Trooper
11    Dumais about the lawsuit?
12 A. Yes, Sir.
13 Q. And did you have more than one
14    conversation with Trooper Dumais about
15    the lawsuit?
16 A. Yes.
17 Q. Were these face-to-face conversations,
18    telephone conversations?
19 A. Telephone.
20 Q. Okay. And who initiated the telephone
21    contact, you or Trooper Dumais?
22 A. I don't know. I don't recall.
23 Q. Okay. And the first time that Trooper
24    Dumais talked to you about the lawsuit,
25    what did he say to you and what did you

Page 25

1    say to him?
2  A. It just -- I think it was just do you
3     know we are getting sued, are you aware
4     of the fact that we're getting sued. I
5     think -- I don't think he was aware of
6     that at that time, so I might have
7     contacted him the very first time.
8  Q. How did you become aware of the lawsuit?
9  A. I was informed about it from somebody
10    from my police department, I believe.
11 Q. Were you still living in Illinois when
12    you were served with the complaint and
13    summons?
14 A. Yes. Actually, I don't think I was ever
15    formally served with the complaint and
16    summons.
17 Q. Well, how did you become aware of it
18    then?
19 A. I think just maybe the police department
20    was served and maybe I received it that
21    way.
22 Q. You said that you had more than one
23    conversation with Trooper Dumais about
24    the lawsuit. When's the second time that
25    you spoke with Trooper Dumais?

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 26..29

Page 26

1  A.  I don't know.
2  Q.  Would it have been in calendar year 2018?
3  A.  Most likely.
4  Q.  So if the lawsuit is filed in October of
5      2018, I will just represent that it was,
6      all your conversations with Trooper
7      Dumais were after the lawsuit had been
8      filed, correct?
9  A.  Correct.
10 Q.  Did any of those conversations with
11     Trooper Dumais happen in calendar year
12     2019?
13 A.  Yes, they did.
14 Q.  The during the course of those
15     conversations, what did you say to
16     Trooper Dumais and what did he say to
17     you?
18 A.  It was just more of where are you in the
19     process.  I have been subpoenaed for a
20     deposition or have you been subpoenaed
21     for a deposition, just kind of where we
22     were at in the process.
23 Q.  Did you and he ever discuss what happened
24     on the evening of February 2, 2018?
25 A.  Yes, Sir.

Page 27

1  Q.  During these phone conversations?
2  A.  Yes, Sir.
3  Q.  And so you told him what you saw, he told
4      you what he saw, things of that nature?
5  A.  Yes, Sir.
6  Q.  So your sort of re-living the events and
7      talking about those events with each
8      other on the phone?
9  A.  I guess.
10 Q.  Well, why do you say you guess?
11 A.  I wouldn't necessarily say re-living the
12     events.  How do you mean re-living?
13 Q.  You were giving hey, I remember this and
14     do you remember that, things of that
15     nature, correct?
16 A.  Yes, Sir.
17 Q.  So you were sort of trying to
18     re-encapsulate the actual minutes and
19     moments that you saw, correct?
20 A.  Fair to say, yes.
21 Q.  Were you ever concerned that having a
22     conversation with a co-defendant that's
23     also a law enforcement officer might
24     create the perception that you might be
25     getting your stories straight?

Page 28

1  A.  It's not -- no.
2  Q.  I am only asking you were you ever
3      concerned about it?
4  A.  No, sir.
5  Q.  Never crossed your mind?
6  A.  No, sir.
7  Q.  Now, did you have any other conversations
8      with Trooper Dumais apart from what you
9      have already testified to?
10 A.  Not that I can recall.
11 Q.  Did you ever talk about comparing police
12     reports, incident reports, things of that
13     nature?
14 A.  No, sir.
15 Q.  All right.  You said that you had
16     conversations with other people besides
17     your lawyers and your wife.  You told me
18     about Trooper Dumais.
19         Who else did you discuss the lawsuit
20     with?
21 A.  People in my police department.
22 Q.  When you say your police department,
23     you're referring to the Village of
24     Matteson Police Department?
25 A.  Yes, Sir.

Page 29

1  Q.  Who at the Village of Matteson Police
2      Department did you discuss the lawsuit
3      with?
4  A.  I guess it would be safe to say the
5      majority of the officers there.
6  Q.  When you say the majority of the officers
7      there, do you mean the majority of the
8      officers at the Village of Matteson
9      Police Department that were at the scene
10     that night or just the people employed at
11     the Village of Matteson Police
12     Department?
13 A.  People employed.
14 Q.  Who would those people employed be?
15 A.  I honestly couldn't tell you off the top
16     of my head.
17 Q.  You can't tell me even one name?
18 A.  Officer Ray Murray.
19 Q.  Officer Ray Murray, who was he?
20 A.  He was a coworker.  We worked together.
21 Q.  Was he ever your field training officer?
22 A.  He was not.
23 Q.  What about the police -- chief of police?
24 A.  Yes, I had spoken to him about the
25     lawsuit.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 30..33

Page 30

1  Q.  Who was the chief of police?
2  A.  Michael Jones.
3  Q.  And what did you discuss with Chief Jones
4     about the lawsuit?
5  A.  I think just -- I think I discussed with
6     him what happened that evening and just
7     told him that there was a lawsuit and we
8     just kind of discussed the lawsuit.
9  Q.  Okay.  So when you say that you just
10    discussed the lawsuit and you just
11    discussed what happened that night with
12    the Village of Matteson Police Chief
13    Michael Jones, you're telling me that you
14    discussed with the chief your version or
15    what you thought -- you perceived had
16    happened that night, correct?
17 A.  Correct.
18 Q.  When I say what happened that night, I'm
19    talking about your personal observations
20    of what happened at 612 Goldenrod Circle,
21    correct?
22 A.  Correct.
23 Q.  Did you ever talk to -- at any time did
24    you ever have a conversation with police
25    chief -- Village of Matteson Police Chief

Page 31

1     Michael Jones before the lawsuit was
2     filed concerning what happened at
3     Goldenrod Circle?
4  A.  I don't recall.  I may have.  I don't
5     recall.
6  Q.  Did anyone from the Village of Matteson,
7     the Village of Matteson itself, either
8     the Village president or mayor, I don't
9     know what they are called, but anybody
10    from the actual governmental entity, unit
11    of government, whether it's alderman,
12    village trustee, ever ask you questions
13    about what happened that night?
14 A.  I don't believe so.
15 Q.  To your knowledge, did the Village of
16    Matteson Police Department ever conduct
17    an after action incident investigation to
18    determine whether or not any of your
19    conduct was inappropriate?
20 A.  I am not sure.  I am not aware.
21 Q.  Were you ever personally interviewed for
22    such a purpose, to your knowledge?
23 A.  What do you mean by personally
24    interviewed?
25 Q.  Did anybody ever sit down and say, hey,

Page 32

1     Dominic, what happened that night, we
2     need to know what happened?  Did they
3     ever take a statement from you, ask to
4     get your version of what happened apart
5     from looking at your incident report?
6  A.  I am not sure if a formal statement was
7     ever done, but my supervisor that night
8     asked me what happened.
9  Q.  Who was your supervisor on February 2nd,
10    2018?
11 A.  Officer Blair Brnicky.
12 Q.  And that's the same Officer Brnicky that
13    you identified in your Interrogatory
14    Answers as being present at the scene?
15 A.  Yes, Sir.
16 Q.  Now, apart from Officer Blair Brnicky --
17    did you ever talk to Officer Blair
18    Brnicky about the lawsuit itself after it
19    was filed?
20 A.  I don't recall.
21 Q.  But you do recall talking to Trooper
22    Dumais, Officer Ray Murray, and Police
23    Chief Michael Jones, correct?
24 A.  Yes.
25 Q.  I didn't ask you.  What did you discuss

Page 33

1     with Officer Murray about the lawsuit?
2  A.  Just that I was being sued.  Yes, that I
3     was being sued.
4  Q.  Did you ever discuss the actual events
5     that happened that night?
6  A.  I believe I did, yes.
7  Q.  Did you take any notes of any of these
8     conversations that you had with either
9     Chief Jones, Officer Murray, Officer
10    Brnicky, or Trooper Dumais?
11 A.  No.
12 Q.  Did you ever have a conversation with
13    State Trooper Reyes about the incident?
14 A.  No, sir.
15 Q.  How about a conversation with State
16    Trooper Reyes about the actual lawsuit
17    itself?
18 A.  No, Sir.
19 Q.  Why is it that you ended up talking with
20    Officer Dumais, but not -- I'm sorry.
21    Why is it that you ended up talking to
22    State Trooper Dumais, but not State
23    Trooper Reyes?
24 A.  Trooper Reyes was not present when
25    anything transpired.

Exhibit G

Urlaub Bowen & Associates, Inc.   312-781-9586

DOMINIC BATES, 09/04/2019                                        Page 34..37

Page 34

1  Q.  When you say Trooper Reyes was not
2      present, what do you mean?
3  A.  Trooper Reyes did not show up, if I
4      recall correctly, until after
5      Mr. Mitchell was released from handcuffs.
6  Q.  Okay.  Just so we're clear, it might save
7      us some questions here, but I want to
8      make sure this is accurate, it's your
9      testimony that on the evening of
10     February 2nd, 2018, to the best of your
11     recollection of the events, Trooper
12     Reyes, Eduardo Reyes, did not actually
13     appear at 612 Goldenrod Circle until
14     after Jyran Mitchell was released from
15     handcuffs and allowed to leave?
16 A.  It was right around that time.  It might
17     have been after Mr. Mitchell was removed
18     from the back of Trooper Dumais' squad
19     car or it was around when he was removed
20     from handcuffs, but it was around that
21     time.
22 Q.  I am going to ask the question, break it
23     down just to make sure.
24 A.  Okay.
25 Q.  At any point in time on February 2nd,

Page 35

1      2018, did you see Trooper Reyes touch
2      Jyran Mitchell?
3  A.  I did not, no, sir.
4  Q.  Did you ever see Trooper Reyes remove
5      Jyran Mitchell from the residence at
6      612 Goldenrod Circle?
7  A.  No, sir.
8  Q.  Did you see Trooper Reyes touch
9      Mr. Mitchell, Jyran Mitchell, in any way,
10     shape, or form, have physical contact
11     with him?
12 A.  Not that I can recall.
13 Q.  Now, I am going to ask you some other
14     questions just to try and streamline this
15     process here.  I am going to ask you
16     about prior encounters with the Mitchell
17     family or with the Goldenrod Circle
18     residence.  Okay?
19 A.  Yes.
20 Q.  When I say prior, I want to make sure
21     we're on the same page in terms of
22     definitions here.  When I mean prior
23     encounters I mean before February 2nd,
24     2018.  Okay?
25 A.  Yes, Sir.

Page 36

1  Q.  So before February 2nd, 2018, had you
2      ever seen Jyran Mitchell?
3  A.  I don't believe so.
4  Q.  You have no recollection of doing that?
5  A.  No, sir.
6  Q.  And you have no recollection of arresting
7      Jyran Mitchell?
8  A.  That is correct, Sir.
9  Q.  How about Jyran's older brother Shawn
10     Mitchell, Jr.  To your best recollection,
11     did you ever meet or encounter Shawn
12     Mitchell, Jr. before February 2nd, 2018?
13 A.  Not that I recall, Sir.
14 Q.  To your knowledge, have you ever
15     encountered Shawn Mitchell, Jr. ever?
16 A.  I don't believe so.
17 Q.  Okay.  Is there anything that would be
18     able to confirm or refresh your
19     recollection?  For example, an incident
20     report, arrest report, things of that
21     nature?
22 A.  Nothing like that.  I know that I have
23     never arrested him.
24 Q.  You seem very confident of that fact.
25     Why are you so confident?

Page 37

1  A.  I just would -- I would know if there
2      were reports that I had written about
3      arresting Mr. Mitchell.
4  Q.  And why are you so confident of that?
5      Let me ask the question this way:  Did
6      you ever conduct a search of your arrest
7      reports to see after the February 2nd,
8      2018, incident to determine whether you
9      had any prior interaction with
10     Mr. Mitchell?  When I say Mr. Mitchell, I
11     mean either Shawn Mitchell, Jyran
12     Mitchell, or any other member of the
13     Mitchell family?
14 A.  I don't believe that I did, Sir.
15 Q.  Prior to February 2nd, 2018, did you have
16     any interaction with Jyran Mitchell's
17     grandmother, Ms. Carolyn Mitchell?
18 A.  I don't believe so, Sir.
19 Q.  And before --
20 A.  Let me take that back.  I may have.  I
21     believe there was a house fire on her
22     block at one point.  I believe somebody
23     from around there came out to talk to us.
24     That might have been it.
25 Q.  Do you know for a fact whether it was

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 38..41

Page 38

1    Carolyn Mitchell?
2  A.  It very well might not have been anybody
3      from that residence.  I was just saying I
4      was in the area and somebody from there
5      came to come talk to us.
6  Q.  When did that house fire on the block
7      happen?
8  A.  I have no idea.
9  Q.  You believe it was before February 2nd,
10     2018?
11 A.  I don't know.  I think.  I am not sure.
12 Q.  Have you ever -- again, temporal context
13     is before February 2nd, 2018, had you
14     ever been dispatched to assist other
15     officers to any calls at the address of
16     Goldenrod Circle?
17 A.  I don't know.  I don't recall.
18 Q.  All right.  Let's talk about same line of
19     questions but the time frame after
20     February 2nd, 2018.  Had you ever had any
21     encounters with Jyran Mitchell after
22     February 2, 2018?
23 A.  No, sir.
24 Q.  How about with Jyran Mitchell's father,
25     Shawn Mitchell, Sr.?

Page 39

1  A.  I don't believe so.
2  Q.  Now, I forgot to ask you about Shawn
3      Mitchell, Sr.  Mr. Mitchell, Sr., being
4      Jyran Mitchell's father, did you have any
5      interaction with him before February 2nd,
6      2018?
7  A.  I don't believe so.
8  Q.  How about Jyran Mitchell's mother,
9      Cherryl Mitchell?  Had you ever had any
10     interaction with Cherryl Mitchell before
11     February 2nd, 2018?
12 A.  I don't believe so.
13 Q.  How about after February 2nd, 2018, for
14     both Jyran's mother and father, any
15     interaction, to your best recollection?
16 A.  I don't believe so.
17 Q.  If you had ever arrested them or had some
18     type of interaction with them, would
19     there be an incident report reflecting
20     that?
21 A.  Yes.
22 Q.  And have you ever been in your official
23     capacity while you're still working for
24     the Village of Matteson Police
25     Department, had you ever been dispatched

Page 40

1      to any type of radio calls at the 612
2      Goldenrod Circle residence after February
3      2nd, 2018?
4  A.  I do not believe so.
5  Q.  Now, you would agree that you were,
6      however, dispatched for assistance on
7      February 2nd, 2018, correct?
8  A.  That's correct.
9  Q.  And that dispatch call is the basis for
10     this lawsuit and you understand it's at
11     issue in this lawsuit, correct?
12 A.  Yes, Sir.
13 Q.  Now, let's talk about February 2nd, 2018.
14     Officer Bates, I am going to try to break
15     it down as much as possible.  You might
16     be inclined to want to jump ahead, but it
17     might be cleaner for us if we try to
18     compartmentalize things so we don't
19     confuse anything.
20 A.  Yes, Sir.
21 Q.  So you would agree that you were on duty
22     on February 2nd, 2018, correct?
23 A.  Yes, Sir.
24 Q.  And your Star number was 216?
25 A.  Yes, Sir.

Page 41

1  Q.  Did you ever have any other Star number
2      while you were employed at the Village of
3      Matteson Police Department?
4  A.  No, sir.
5  Q.  Now, you already confirmed your dates of
6      employment.  When you first were hired at
7      the Village of Matteson Police
8      Department, I meant to ask you this
9      earlier, but this is good time to do it,
10     I know it's different at different police
11     departments, so this is not any type of
12     gotcha, I am just trying to get the
13     context, were you hired by the Village --
14     you did attend some form of police
15     training academy, correct?
16 A.  Yes, Sir.
17 Q.  Where did you attend your police training
18     academy?
19 A.  Cook County Sheriff's Police Academy.
20 Q.  Did you attend the Cook County Sheriff's
21     Police Academy -- was that -- were you
22     hired by the Village of Matteson Police
23     Department before you attended the
24     academy or after?
25 A.  Before, Sir.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 42..45

Page 42

1  Q. So you were hired first and then you went
2     to the academy?
3  A. Yes, Sir.
4  Q. Is it fair to say the Village of Matteson
5     gave you sort of conditional employment
6     and then you had to successfully complete
7     the Cook County Sheriff's training?
8  A. That's fair. We were on probationary
9     status, probationary, conditional, yes,
10    Sir.
11 Q. And you did successfully complete the
12    sheriff's training academy, correct?
13 A. Yes.
14 Q. After you successfully completed the
15    sheriff's training academy, you then
16    became a full-time police officer for the
17    Village of Matteson Police Department as
18    a probationary officer, correct?
19 A. Yes, Sir.
20 Q. How long was your probationary officer
21    period?
22 A. I believe it was a year and a half from
23    day of hire, 18 months.
24 Q. That's from date of hire, so that would
25    have also included the time that you were

Page 43

1     at the sheriff's department, correct, or
2     sheriff's training academy?
3  A. Yes, Sir.
4  Q. When you were a probationary officer,
5     were you assigned to what's called a
6     field training officer?
7  A. Yes, Sir.
8  Q. Who was your field training officer?
9  A. I had three field training officers, Sir.
10 Q. Is it fair to say you never had a
11    permanent assigned -- did you rotate?
12 A. We did rotate, but I did have a primary
13    field training officer.
14 Q. Who was your primary?
15 A. Officer Tony Vasquez.
16 Q. You know, I know, I'm sure Mr. McGrath
17    knows, but for people that might be
18    hearing this testimony later, what
19    generally does a field training officer
20    do?
21 A. You're assigned tasks, depending on what
22    phase you are in the process. You have
23    to complete those tasks, show -- they
24    teach you basically how to do the job,
25    perform the job, certain tasks.

Page 44

1  Q. So let me summarize. I get what you're
2     saying. Is it fair to say a field
3     training officer is assigned to a
4     probationary or rookie officer to show
5     that officer how to actually perform the
6     duties and responsibilities of a police
7     officer in the actual real -- in real
8     time?
9  A. Yes.
10 Q. Actually going out on patrol and things
11    of that nature?
12 A. Yes, Sir.
13 Q. This is sort of like in-service field
14    training, correct?
15 A. Yes, Sir.
16 Q. This is no longer the classroom stuff.
17    This is the real deal, correct?
18 A. Yes, Sir.
19 Q. Now, before you resigned from the Village
20    of Matteson Police Department you
21    yourself became a field training officer,
22    correct?
23 A. Yes, Sir.
24 Q. Were you still a field training officer
25    at the time that you resigned from the

Page 45

1     Matteson Police Department?
2  A. Yes, Sir.
3  Q. How many officers did you train?
4  A. I officially trained two. There were --
5     there was, I think, once or twice where I
6     filled in for a day here or there when an
7     officer was on vacation or called in
8     sick.
9  Q. Now, when you -- let's just briefly go
10    back to your training, at the sheriff's
11    training. Was it Cook County Sheriff's
12    police training?
13 A. Sure.
14 Q. The training academy, correct?
15 A. Yes, that's what it's called.
16 Q. Now, you had formal classroom training
17    concerning basic laws that law
18    enforcement officers had to be familiar
19    with, correct?
20 A. Yes, Sir.
21 Q. For example, the Illinois compiled
22    statutes concerning criminals, certain
23    types of crimes, things of that nature;
24    is that correct?
25 A. Yes.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 46..49

Page 46

1  Q.  You were also taught basic legal concepts
2     such as probable cause, correct?
3  A.  Yes, Sir.
4  Q.  Now, as a police officer -- and you are
5     now currently a law enforcement officer
6     for the Drug Enforcement Agency, correct?
7  A.  No, sir.
8  Q.  What's your capacity at the DEA?
9  A.  I am not with the DEA, Sir.
10 Q.  I thought you were with the DEA.
11 A.  No, Sir.
12           MR. MCGRATH:  ATF.
13 BY MR. SCHOOP:
14 Q.  I'm so sorry.  I'm so sorry.  You're
15    absolutely correct.  Let me rephrase
16    that.
17        You're currently employed with the
18    Federal Bureau of Alcohol, Tobacco, and
19    Firearms, correct?
20 A.  And Explosives, yes, Sir.
21 Q.  And it's commonly referred to as ATF,
22    correct?
23 A.  Yes, Sir.
24 Q.  I apologize.  I confused my federal
25    branches.

Page 47

1        You would agree the ATF is a law
2     enforcement agency, correct?
3  A.  Yes, Sir.
4  Q.  And the ATF requires -- you have to
5     comply with all applicable constitutional
6     rules about search and seizure, things of
7     that nature?
8  A.  Respectfully, I cannot disclose any of
9     that information.
10 Q.  You can't --
11          MR. MCGRATH:  Just to cut to
12    the chase, he was advised by counsel or
13    attorneys with the AFT not to get into
14    details with the ATF.
15          MR. SCHOOP:  You know what,
16    fair enough.
17 BY MR. SCHOOP:
18 Q.  I think I already know the answer and I
19    think we all pretty much know the answer,
20    but I am not trying to play catch you.  I
21    get this is what you're doing with the
22    ATF.  It's not necessarily directly, so I
23    am not trying to do that.
24 A.  Yes, Sir.
25 Q.  I will move on.  Let put it this way:

Page 48

1     When you were still employed by the
2     Village of Matteson Police Department,
3     you would agree that you did have to
4     comply with all Illinois Supreme Court
5     Rules, U.S. Supreme Court precedence,
6     concerning probable cause, search and
7     seizure, arresting people, correct?
8  A.  Yes, Sir.
9  Q.  And you were expected to know basic
10    information about what a police officer
11    can and cannot do concerning how they
12    engage the public, correct?
13 A.  Yes, Sir.
14 Q.  For example, you know as a reasonably
15    trained police officer that you can not
16    arrest somebody without probable cause,
17    correct?
18 A.  Yes, Sir.
19 Q.  Can you just briefly describe what is
20    probable cause?
21          MR. MCGRATH:  Object to the
22    form of the question.  It asks for a
23    legal conclusion.
24          MR. SCHOOP:  I appreciate
25    it's asking for a legal conclusion, but

Page 49

1     Officer Bates was a police officer.  I
2     think I can ask a police officer do you
3     know what probable cause is.
4          MR. MCGRATH:  Same objection,
5     but answer.
6          THE WITNESS:  Respectfully, I
7     am not a lawyer.  I can't definitively
8     say what constitutes probable cause.
9     It's all a case-by-case situation.  Just
10    generally, just if there's enough facts
11    to believe -- lead a reasonable person to
12    believe that a crime has been committed
13    you would take enforcement action.
14 BY MR. SCHOOP:
15 Q.  Fair enough.  I know you're not a lawyer
16    and I am not trying to quibble with you.
17    I accept that definition.  I am going to
18    ask you, would you also agree that
19    probable cause is based on the totality
20    of the circumstances?
21 A.  That's fair, yes, Sir.
22 Q.  It's based on all the circumstances that
23    a reasonably trained police officer knew
24    at the time, correct?
25 A.  Yes, Sir.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 50..53

Page 50

1   Q.  And you would also agree that police
2       officers can't ignore certain facts,
3       correct?
4   A.  Yes, Sir.
5   Q.  And you would also agree that they have
6       to have probable cause to believe that a
7       crime was committed, correct --
8   A.  Yes, Sir.
9   Q.  -- before they can arrest a person,
10      correct?
11  A.  Yes, Sir.
12  Q.  They also -- an officer would also have
13      to have probable cause to believe that
14      the person that they are arresting
15      actually committed a crime, correct?
16  A.  Yes, Sir.
17  Q.  So it's not just that a crime has been
18      committed, but the person that you're
19      actually trying to arrest committed that
20      crime, correct?
21  A.  Yes, Sir.
22  Q.  Now, you also realize -- did you also
23      receiving training about search warrants,
24      that you cannot just enter a person's
25      home to arrest them unless you have a

Page 51

1       search warrant to enter that home?
2   A.  There's exigency.
3   Q.  So you do understand that there are what
4       are called exceptions to the warrant
5       requirement to enter a home, correct?
6   A.  Yes, Sir.
7   Q.  I think you just named one, which would
8       be exigent circumstances, correct?
9   A.  Yes, Sir.
10  Q.  What do you understand exigent
11      circumstances to mean?
12  A.  Again, I am not a lawyer.  I don't have
13      the legal definition of it.  Just a
14      situation that requires immediate action.
15  Q.  So let me give you an example.  Let's say
16      that you were chasing someone that had
17      just opened fire on several children in a
18      playground and you saw the person with an
19      AR-15, you see the person trying to run
20      into a house, do you believe that that
21      would be exigent circumstances where you
22      could try to run into the house to stop
23      them?
24  A.  Yes, Sir.
25  Q.  Can you think of any other type of

Page 52

1       exigent circumstances that would -- that
2       you have experienced in your own personal
3       experience, I am not going to ask you
4       about ATF, in your capacity as a Village
5       of Matteson police officer, have you ever
6       personally experienced or witnessed any
7       exigent circumstances that required
8       either you or other officers of the
9       Village of Matteson Police Department to
10      enter a person's private residence
11      without a search warrant?
12  A.  Yes, Sir.
13  Q.  When was that?
14  A.  There's been several times, Sir.
15  Q.  When is the first time that you ever
16      recall that happening?
17  A.  The very first time was 2015, 2016.  It
18      was a -- I guess the specifics of the
19      incident?
20  Q.  Just generally.
21  A.  We received a call for a domestic, either
22      a fight or argument, something along
23      those lines.  Myself and my sergeant
24      arrived on the scene.  You could
25      physically or you could hear them, the

Page 53

1       subjects, physically fighting inside the
2       house.  We knocked on the door.  Somebody
3       answered the door covered in blood and
4       then slapped the door shut.  The sergeant
5       forced his way into the residence.
6   Q.  At that point you thought that based on
7       the totality of the circumstances, you
8       thought that someone was physically
9       assaulting somebody or battering somebody
10      else in the residence?
11  A.  Yes, Sir.
12  Q.  Based on that circumstance, you thought
13      that that was an emergency circumstance
14      to enter the premises, correct?
15  A.  Well, my sergeant was the one who kicked
16      the door.
17  Q.  But you did go assist your sergeant in
18      entering the premises?
19  A.  Yes, Sir.
20  Q.  And you and your sergeant did not have a
21      search warrant in that circumstance,
22      correct?
23  A.  That's correct.
24  Q.  Now, apart from hearing someone being
25      battered inside a house, you would agree

Exhibit G

Page 54

1   that battery, physically beating somebody
2   up, assaulting either with closed fists
3   or a weapon, that would be considered a
4   felony, correct?
5          MR. MCGRATH:  Objection.  It
6   calls for a legal conclusion.
7          THE WITNESS:  Again, certain
8   types of battery could constitute felony
9   charges.  Other types could constitute
10  misdemeanor.
11  BY MR. SCHOOP:
12  Q.  Let's put it this way:  I think we could
13     all agree, and I am not trying to play
14     lawyer gotcha, and I fully appreciate
15     you're not a lawyer, you would agree that
16     someone physically beating somebody up
17     causing them to bleed is way more serious
18     then, say, parking tickets, correct?
19  A.  Yes, Sir.
20  Q.  Or say noise violations, correct?
21  A.  Yes, Sir.
22  Q.  Or speeding tickets, correct?
23  A.  Yes, Sir.
24  Q.  Or not paying -- skipping out on a
25     restaurant tab, that's a crime, correct?

Page 55

1   A.  Yes, Sir.
2   Q.  But it's not as serious as beating
3      somebody else up, correct?
4   A.  Yes, Sir.
5   Q.  Now, you said that -- let's just go back
6      to February 2nd, 2018.  Before you
7      received the dispatch call to go to
8      Goldenrod Circle you were on duty.  Were
9      you wearing a police uniform?
10  A.  Yes, Sir.
11  Q.  Could you please describe for us in as
12     much detail as you can remember, what did
13     your Village of Matteson police uniform
14     consist of?
15  A.  My shirt, which was clearly identified
16     with my Village of Matteson police
17     patches on the left and right shoulder,
18     my outer vest carrier which had my badge
19     displayed, my name plate displayed, my
20     radio, OC spray, pepper spray.  I had my
21     gun belt, which just commonly we call a
22     gun belt because your gun is on it.  It
23     has handcuffs, extra magazines, taser, as
24     well as patrol pants.  My whole uniform
25     was blue, dark blue, navy blue, and my

Page 56

1   boots, black patrol boots.
2   Q.  Did you have what's called a body worn
3      camera?
4   A.  No, sir.
5   Q.  And you mentioned your pepper spray, your
6      belt, your vest.  Was this a bullet
7      resistant vest?
8   A.  Yes.
9   Q.  Kevlar?
10  A.  I believe so.  Honestly, I am not sure.
11     I believe so.
12  Q.  And you mentioned that you had a badge?
13  A.  Yes, Sir.
14  Q.  Was this a sewn in badge or metal badge?
15  A.  Metal badge, Sir.
16  Q.  And it had your Star number on it?
17  A.  Yes, Sir.
18  Q.  Did you have a name plate with your name
19     on it?
20  A.  Yes, Sir.
21  Q.  Now, you mentioned the extra clip for
22     your weapon.  Did you also have a service
23     weapon?
24  A.  Yes, Sir.
25  Q.  What kind of service weapon did you have?

Page 57

1   A.  Glock 21.
2   Q.  And were you taser certified?
3   A.  Yes, Sir.
4   Q.  Did you receive that taser certification
5      while at Village of Matteson or while you
6      were still in the training academy?
7   A.  At the police training academy.
8   Q.  Okay.  And what kind of vehicle -- were
9      you in a vehicle that night?
10  A.  Yes, Sir.
11  Q.  Now, were you patrolling alone or with a
12     partner?
13  A.  By myself, Sir.
14  Q.  What was -- was this a marked or unmarked
15     Village of Matteson police vehicle?
16  A.  Marked vehicle.
17  Q.  And can you just typically -- generally
18     describe what is your Village of Matteson
19     marked vehicle equipped with?
20  A.  For the -- generally most of them are the
21     black and white vehicles with Matteson
22     police displayed on the sides, and a spot
23     light, and light bar on the top of the
24     vehicle.
25  Q.  Okay.  So when you say a light bar, like

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 58..61

Page 58

1    they have the Mars lights?
2 A.  They are newer now, but yes, Sir.
3 Q.  I'm dating myself, I guess.
4       When you -- back on February 2nd,
5    2018, did your Village of Matteson squad
6    vehicle, was it equipped with a dash cam?
7 A.  I don't believe so.  The only reason I
8    say that is because at that time period
9    our department was having a lot of issues
10   with squad cars and we were -- a lot of
11   us were moving around in squad cars that
12   were not assigned to us because a lot of
13   them were broken.
14 Q.  To your knowledge, were there any Village
15   of Matteson police cars equipped with
16   dash cams?
17 A.  I believe they were equipped, yes.  As
18   far as operational, no.
19 Q.  To your knowledge, was there -- to your
20   knowledge, the squad vehicle that you
21   were using that night, and that was the
22   same quad that would have been present at
23   612 Goldenrod Circle, correct?
24 A.  Yes, Sir.
25 Q.  To your knowledge, was any dash cam

Page 59

1    footage created while you were at that
2    call?
3 A.  No, sir.
4 Q.  And you're sure of that?
5 A.  Yes, Sir.
6 Q.  Was your vehicle equipped with some
7    portable data device or a computer where
8    you could get on to law enforcement
9    databases like LEADS or NCIC?
10 A.  Yes, Sir.
11 Q.  And was that operational that night?
12 A.  Yes, Sir.
13 Q.  Did you actually use it that night?
14 A.  Yes.  Yes, Sir.
15 Q.  Now, what time was your shift scheduled
16   to start that day?
17 A.  Do you recall the day of the week that
18   February 2nd was?
19 Q.  I don't.
20 A.  It just depends then.  I can tell you
21   during the week I was normally 2:00 p.m.
22   to 2:00 a.m. and then Fridays and
23   Saturdays I was 4:00 p.m. to 4:00 a.m.
24 Q.  Do you believe that you started your
25   scheduled shift on time?

Page 60

1 A.  Yes, Sir.
2 Q.  When would your scheduled shift typically
3    end?
4 A.  Again, it just depends on the day of the
5    week.
6 Q.  Depending on the day, can you give us the
7    approximate time, start and end time?
8 A.  If it was during the week, if it was
9    Monday through Thursday, it would be
10    2:00 p.m. to 2:00 a.m.
11 Q.  Okay.
12 A.  If it was a Friday Saturday -- I'm sorry,
13   Sunday through Thursday 2:00 p.m. to 2:00
14   a.m.  If it was Friday or Saturday it
15   would be 4:00 p.m. to 4:00 a.m.
16 Q.  Now, what is ISPERN, I-S-P-E-R-N?
17 A.  I believe it stands for Illinois State
18   Police Emergency Radio Network.
19 Q.  Have you ever reviewed anything from
20   ISPERN before?
21 A.  What do you mean reviewed?
22 Q.  Well, did you -- does your -- is your
23   vehicle equipped with the ability to
24   receive messages from ISPERN?
25 A.  Most vehicles are.

Page 61

1 Q.  So when you say most vehicles, do you
2    mean most Village of Matteson vehicles or
3    all police vehicles, to your knowledge?
4 A.  Most -- that's tough to say.
5 Q.  When I say most police vehicles, I mean
6    most police vehicles inside the
7    jurisdiction of the State of Illinois?
8 A.  Yes, I believe so.  I can't speak for
9    other departments.
10 Q.  Fair enough.  Let's put it this way:  To
11   your knowledge, were Village of Matteson
12   police vehicles equipped with the ability
13   to receive messages from the Illinois
14   State Police through ISPERN?
15 A.  If the radio is not broken, then yes.
16 Q.  To your knowledge, was your vehicle's
17   radio broken on February 2nd, 2018?
18 A.  It was not.
19 Q.  So you didn't have to put in any request
20   for a radio fix or maintenance of the
21   vehicle?
22 A.  No, sir.
23 Q.  I believe you told me earlier at no
24   time prior to being dispatched on
25   February 2nd, 2018, did you ever actually

Exhibit G

Page 62

1   watch the dash cam video of the I294
2   traffic stop by Officer Dumais, correct?
3   A.  That's correct.
4   Q.  Have you ever watched that traffic stop
5   video after February 2nd, 2018?
6   A.  No, sir.
7   Q.  Now, I am going to show you -- since we
8   marked them, I am just going to show them
9   to you.  I am going to show you what's
10  been previously marked as Exhibit No. 4.
11  It appears to be a Village of Matteson
12  Personnel Action Report.
13     Officer Bates, taking a look at this,
14  this appears to be a police department
15  personnel form confirming that you were
16  employed, hired by the police department
17  on September 28, 2015; is that correct?
18  A.  Yes, Sir.
19  Q.  And you were hired as a probationary
20  police officer, correct?
21  A.  Yes, Sir.
22  Q.  So you know and then my next question --
23  I am going to show you what's previously
24  marked as Exhibit No. 5.  Exhibit No. 5
25  also appears to be a Village of Matteson

Page 63

1   Personnel Action Report reflecting that
2   you had received a salary increase and as
3   of June 19, 2017, you had been assigned
4   as a field training officer; is that
5   correct?
6   A.  Yes, Sir.
7   Q.  To save some time, I am going to show you
8   what's been previously marked as Exhibit
9   No. 6.  Exhibit No. 6 appears to be a
10  letter of resignation addressed to Chief
11  Jones and Deputy Chief Debeikis authored
12  apparently by Officer Dominic Bates, Star
13  #216, dated November 19, 2018.  Officer,
14  you will notice in the bottom right-hand
15  corner there are numbers that say
16  Matteson and then there's the word
17  Matteson and then it's followed by
18  several numbers.  I will just represent
19  to you that it reflects that these
20  documents were produced in the lawsuit by
21  the Village itself.
22  A.  Okay.
23  Q.  They are Village of Matteson documents.
24  A.  Yes, Sir.
25  Q.  Is this a letter of resignation that you

Page 64

1   authored?
2   A.  Yes, Sir.
3   Q.  Is this letter of resignation -- is it
4   true and accurate?
5   A.  Yes, Sir.
6   Q.  What I mean by true and accurate, was
7   this, in fact, a voluntary resignation?
8   A.  Yes, Sir.
9   Q.  As you sit here today, is it your
10  testimony that you did, in fact,
11  voluntarily resign from the Village of
12  Matteson and that you were not
13  involuntarily separated for any reason?
14  A.  Yes, Sir.  Voluntary, correct.
15  Q.  Voluntary?
16  A.  Yes, Sir.
17  Q.  Let me put it in real plain English, the
18  Village of Matteson Police Department or
19  the Village of Matteson did not fire you,
20  correct?
21  A.  They did not, Sir.
22  Q.  And then, Officer Bates, I am going to
23  now show you what was previously marked
24  as Exhibit No. 7.
25     MR. SCHOOP:  Mr. Poskozim, I

Page 65

1   will make sure to send you a complete set
2   of all the exhibits.
3      MR. POSKOZIM:  Okay.
4   BY MR. SCHOOP:
5   Q.  Exhibit No. 7 was previously Bates
6   labeled Matteson 67 through Matteson 68.
7   It's a two page document or appears to be
8   a two page document.  Have you ever seen
9   this document before, Mr. Bates or
10  Officer Bates?
11  A.  I don't believe.
12  Q.  Well, as I said before, this was -- I
13  represented that this was produced to the
14  plaintiff by the Village of Matteson.
15  Have you ever seen anything remotely
16  similar to it, like on a computer
17  terminal?
18  A.  Probably on a computer terminal, yes,
19  Sir.
20  Q.  Now, have you ever actually seen a
21  dispatch from ISPERN or communication
22  from the Illinois State Police on your
23  computer terminal reflecting information
24  from the State Police?
25  A.  In a roundabout way, if I may.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 66..69

Page 66

1  Q. Yes, please.
2  A. When an ISPERN message is sent out, from
3     my understanding of it, the Illinois
4     State Police will send that message to
5     dispatch centers and the dispatch center
6     can then send that message to our
7     terminals. In that sense, yes, I have
8     gotten a message or an ISPERN message.
9  Q. If I understand your testimony correctly,
10    ISPERN or the State Police will send an
11    ISPERN message from its terminal to the
12    Village of Matteson and the Village of
13    Matteson in turn will transmit to radio
14    terminals in the cars?
15 A. Our radio and our dispatch is run by an
16    independent place called South Com or
17    South Communications and they will send
18    it to --
19        MR. POSKOZIM: I am again
20    having some trouble hearing the answers.
21    If you wouldn't mind keeping your voice
22    up.
23        THE WITNESS: From my
24    understanding of how the system works,
25    Illinois State Police dispatch will send

Page 67

1     a message through, I think, LEADS to
2     other dispatch facilities or centers and
3     then those dispatch centers will send it
4     to our terminals, so South Com would send
5     it to us or whatever agencies they
6     dispatch for.
7  BY MR. SCHOOP:
8  Q. When you say our or us, you're referring
9     to the Village of Matteson Police
10    Department?
11 A. The Village of Matteson Police
12    Department, but in regards to ISPERN
13    messages, they would also send it to the
14    other three agencies that they dispatch
15    for as well.
16 Q. Okay. Now, I am going to direct your
17    attention to Exhibit No. 7. Now, let's
18    just do simple yes or no. Do you recall
19    ever receiving this particular ISPERN
20    message that's Bates labeled Matteson 67
21    and continues on to Matteson 68?
22 A. This itself does not appears to be an
23    ISPERN message.
24 Q. Okay. Let me rephrase the question. Is
25    this an ISPERN message, to your

Page 68

1     knowledge?
2  A. I don't believe so.
3  Q. Do you know what it is? When I say what
4     this is, I mean Exhibit No. 7?
5  A. Yes.
6  Q. What is it? What is Exhibit No. 7?
7  A. It appears that it was, judging by the
8     names that are here next to the dates,
9     that appears to be one of the
10    dispatchers, so that would have been
11    something -- this second response where
12    it says State Response: M/1251 3G1I and
13    so forth, where it says all terminals,
14    District of Chicago, that in and of
15    itself appears to be an ISPERN message.
16 Q. Is it fair to say at the very beginning
17    at the top at the 20:27:50 hours on
18    February 2nd, 2018, next to that it says
19    G. Ranieri?
20 A. Yes, Sir.
21 Q. Do you know who G. Ranieri is?
22 A. She's a dispatcher, Sir.
23 Q. And she's a dispatcher for who?
24 A. South Com, Sir.
25 Q. So this document, Exhibit No. 7, is a

Page 69

1     dispatch from South Com?
2  A. It would appear that way, yes.
3  Q. South Com is relating a message from the
4     Illinois State Police to Village of
5     Matteson, correct?
6  A. They would be, yes, Sir.
7  Q. It would include -- one of the
8     respondents would include the Village of
9     Matteson, correct?
10 A. Yes, Sir.
11 Q. The next line says State Response and
12    then I believe it says SOS, standing for
13    Secretary of State, correct?
14 A. I'm sorry, on the same first -- yes --
15    20:27:50, the very first display at the
16    top? Are you saying this SOS?
17 Q. Yes, right below it says State Response?
18 A. Yes, Sir.
19 Q. And then it says M/SC02?
20 A. Yes, Sir.
21 Q. The next line reads SOS and then has
22    several digits?
23 A. Yes, Sir.
24 Q. Below that it has AL 68377, correct?
25 A. Yes, Sir.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 70..73

Page 70

1  Q. Then it says the name Shawn Mitchell --
2     mult owner, correct?
3  A. Yes, Sir.
4  Q. It has an address at 612 Goldenrod
5     Circle, correct?
6  A. Yes, Sir.
7  Q. It identifies -- I think this is a
8     vehicle index or vehicle identification
9     number and then it has -- mentions black
10    black 2013 Jaguar sedan?
11 A. Yes, Sir.
12 Q. Then further on down after the entry of
13    20:28:16, which appears to be a timestamp
14    for the date of February 2nd, 2018, it
15    says attention ISPERN number 0023,
16    correct?
17 A. Yes, Sir.
18 Q. Below it says wanted, fleeing to
19    elude/poss, P-O-S-S, I think it means
20    possible DUI, correct?
21 A. Yes, Sir.
22 Q. And then it reads I294 SB. Do you
23    believe that stands for southbound?
24 A. Yes.
25 Q. From 111 Worth 2019?

Page 71

1  A. Yes.
2  Q. Now, 111, does that mean 111th Street?
3  A. I would assume so. I don't know.
4  Q. Okay. Do you know what Worth means?
5  A. I believe the Village of Worth.
6  Q. Okay.
7  A. The town of Worth.
8  Q. The Village of Worth is actually right
9     off of 294, at certain sections of 294,
10    correct?
11 A. I believe so, yes, Sir.
12 Q. It also reads black Jaguar, IL slash and
13    it has a license plate number AL68377,
14    correct?
15 A. Yes.
16 Q. Now, did you receive this ISPERN message
17    before being dispatched to Goldenrod
18    Circle?
19 A. I want to say yes.
20 Q. Would you have actually seen the
21    information as it's listed on this
22    Exhibit No. 7?
23 A. That's tough. I don't recall. Each
24    dispatcher has a different way of sending
25    ISPERN messages out. I don't know what

Page 72

1     information would have came with it.
2  Q. Now, how would -- when an ISPERN message
3     is received in your vehicle, does it
4     display on your computer?
5  A. No, sir. Well, let me --
6  Q. Take your time.
7  A. ISPERN messages are first received --
8     ISPERN messages are broadcast and
9     received first by radio and then what
10    happens is, again from my understanding,
11    is once that ISPERN message is put out,
12    the Illinois State dispatcher transcribes
13    that message on to a computer and then
14    sends that message out on a computer to
15    all the other dispatching agencies.
16 Q. Is it fair to say that ISPERN messages
17    are transmitted two ways?
18 A. Yes, Sir.
19 Q. First verbally over the radio and then
20    followed by an actual written,
21    typewritten on a computer screen, that
22    can be flashed on your computer screen in
23    your vehicle; is that right?
24 A. If it's sent to you, yes.
25 Q. If it's sent to you. When you say if

Page 73

1     it's sent to you, you mean if it's
2     transmitted to your jurisdiction,
3     correct?
4  A. Yes, Sir.
5  Q. So if an ISPERN message is sent to the
6     Village of Matteson, you would have been
7     able to access it on your computer in
8     your car, assuming that your vehicle's
9     computer is working?
10 A. I would have had to either ask for the
11    message to be sent to me or a dispatcher
12    would just send it to me. I can't just
13    go and access it if I wanted to.
14 Q. Why is that?
15 A. I don't know. Technology.
16 Q. All right. Now, did you ever actually
17    hear this audio dispatch?
18 A. Yes, Sir.
19 Q. And when you received the audio dispatch,
20    what did you understand that you were
21    going to be responding to?
22 A. Which audio dispatch?
23 Q. The ISPERN message about assisting
24    Officer -- Trooper Dumais?
25 A. The ISPERN was not for the assist Officer

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 74..77

Page 74

1    Dumais.
2  Q.  What was the ISPERN message?
3  A.  The ISPERN message was just notifying
4      agencies of this vehicle that had fled
5      from an officer on I294 southbound.
6  Q.  Did you receive a subsequent ISPERN
7      message?
8  A.  No.
9  Q.  Okay.  So how did you come to go to
10     locate yourself, your vehicle, to 612
11     Goldenrod Circle, if it wasn't in
12     response to an ISPERN message?
13 A.  I received a dispatch from our dispatch
14     center.
15 Q.  From the Village of Matteson Police
16     Department?
17 A.  Well, South Com, who dispatches for
18     Village of Matteson.
19 Q.  Is it fair to say South Com is the
20     delegated dispatching service for the
21     Village of Matteson?
22 A.  Yes, Sir.
23 Q.  I understand why you might want to keep
24     the distinction clear, but they were your
25     dispatchers, correct?

Page 75

1  A.  Yes, Sir.
2  Q.  So you would receive calls or call out
3      for assistance using that dispatching
4      service, correct?
5  A.  For the most part, yes, Sir.
6  Q.  Okay.  All right.  When you received the
7      dispatch call, were you informed that the
8      ISP was going to 612 Goldenrod Circle to
9      locate a person who had fled a traffic
10     stop?
11 A.  Yes, Sir.
12 Q.  And dispatch -- were you informed that
13     the type of vehicle being sought was a
14     black 2013 Jaguar; is that correct?
15 A.  I believe so.  I don't recall
16     specifically.
17 Q.  Is there anything that would refresh your
18     recollection?
19 A.  My report might.
20 Q.  As you sit here today, do you have a
21     specific independent recollection of the
22     Village of Matteson dispatcher telling
23     you that you were going to be looking for
24     a black Jaguar?
25 A.  I want to say yes, but that just goes off

Page 76

1      of traditional previous stuff for
2      requesting an assist.
3  Q.  Were you also told that the black Jaguar
4      or were you told that the black Jaguar
5      was registered to an individual named
6      Shawn Mitchell?
7  A.  That I don't recall.
8  Q.  Do you recall being given the license
9      plate number for a Jaguar?
10 A.  I believe so.
11 Q.  Is there anything that would refresh your
12     recollection?
13 A.  When you say dispatch putting that
14     message --
15 Q.  When you -- I don't mean to cut you off.
16 A.  No, you're fine.
17 Q.  I want to make sure you understand my
18     question.
19 A.  Yes, Sir.
20 Q.  You said earlier in your testimony that
21     you were dispatched by the Village of
22     Matteson with the dispatcher?
23 A.  Yes, Sir.
24 Q.  What I am asking you is I am trying to
25     understand what you recall, as you sit

Page 77

1      here today on September 4, 2019, what you
2      were specifically told about the specific
3      nature of the dispatch call.  For
4      example, were you told that you were
5      looking for a black Jaguar?
6  A.  I believe so.
7  Q.  Do you remember being told the name of
8      the person that owned the Jaguar?
9  A.  That I don't believe.
10 Q.  Do you remember being given a physical
11     description of the person that was
12     suspected of driving the Jaguar?
13 A.  That I don't recall.
14 Q.  Do you remember being given the name
15     Shawn Mitchell as possibly being the
16     possible suspect driving the black
17     Jaguar?
18 A.  Again, that I don't recall.
19 Q.  Do you recall -- do you remember ever
20     getting any type of physical description
21     of the suspect?
22 A.  I think it just said male black maybe.
23 Q.  Well, I am asking you to your best
24     recollection what was the physical
25     description that was related to you in

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 78..81

Page 78
1     the dispatch call?
2  A. I don't know.  I don't recall.
3  Q. You do believe it at least contained male
4     black?
5  A. Again, I don't know.
6  Q. You have no independent recollection?
7  A. I mean, I am trying to think back as to
8     that -- what it was, that ISPERN message
9     that came out and the dispatch that came
10    out subsequent.  I don't recall there
11    being a description at all.
12 Q. Now, where were you when you actually
13    received the dispatch call to go to 612?
14 A. In my assigned zone, I believe.
15 Q. Which is generally what?
16 A. Our zone rotations change shift by shift.
17    For that specific day I was responsible
18    for the middle section of town.
19 Q. When you say your zone, you're
20    essentially policing a certain beat
21    within the Village of Matteson?
22 A. Yes, Sir.  Yes, Sir.
23 Q. And was 612 Goldenrod Circle within your
24    beat?
25 A. I believe it was that night.

Page 79
1  Q. So you weren't asked to go outside your
2     beat or your zone?
3  A. I would have to check the zone
4     assignments to be 100 percent positive
5     that day, but I believe that that was my
6     assigned zone.
7  Q. Now, when you arrived at the scene at
8     612 Goldenrod Circle, what did you first
9     observe?
10 A. One vehicle in the driveway.
11 Q. Okay.  And what was that vehicle?
12 A. If I recall, it was a black Chevrolet.
13 Q. Chevy Malibu?
14 A. I believe so, Sir.
15 Q. Did you see any other law enforcement
16    vehicles present?
17 A. I don't believe so.
18 Q. So is it fair to say that when you first
19    arrived at the scene, you were the only
20    law enforcement officer on the scene?
21 A. I believe that's correct.
22 Q. So Trooper Dumais was not there?
23 A. I don't believe he was there yet, Sir.
24 Q. So are you fairly confident that you were
25    the first person to arrive, law

Page 80
1     enforcement officer to arrive?
2  A. I believe so.
3  Q. When you first arrived at the scene it's
4     your testimony that the only vehicle that
5     you saw parked at 612 Goldenrod Circle
6     was a Chevy Malibu, correct?
7  A. Yes, Sir.
8  Q. The Chevy Malibu, what color was it?
9  A. Black.
10 Q. You're sure about that?
11 A. At that time of night it appeared black,
12    Sir.
13 Q. Which is a great segway to my next
14    question.  What was the weather like that
15    night?
16 A. The weather, I believe it was clear.
17 Q. So it was February, correct?
18 A. Yes, Sir.
19 Q. Was there snow on the ground?
20 A. No, sir.
21 Q. Was it cold?
22 A. I'm sure.
23 Q. Let me put it to you this way: Relatively
24    speaking, it wasn't sub zero
25    temperatures?

Page 81
1  A. No, sir.
2  Q. Do you remember what the temperature was
3     approximately that night?
4  A. No.
5  Q. Was it above 20 degrees, do you think?
6         MR. MCGRATH:  If you know.
7  BY MR. SCHOOP:
8  Q. Let me put it this way: When you got
9     outside your car could you see your
10    breath?
11 A. I don't know.
12 Q. If you don't remember that's fine.
13 A. Yeah.
14 Q. But it was February, correct?
15 A. Yes, Sir.
16 Q. When you got out of -- now, when you got
17    to the scene, did you park your squad?
18 A. Yes, Sir.
19 Q. Where did you park your squad?
20 A. I believe a couple of houses north of
21    that address.
22 Q. And why did you do that?
23 A. Just something we do.  Officer safety
24    purposes, plus the trooper wasn't there
25    yet.

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                          Page 82..85

Page 82

1  Q. Is it fair to say you wanted to know your
2     complete circumstances before you walk
3     into a situation?
4  A. Yes, Sir.
5  Q. Now, did you see anybody outside the
6     house? When I say the house, I'm
7     referring to Goldenrod Circle.
8  A. When I first pulled up?
9  Q. Yes.
10 A. No, sir.
11 Q. Now, when you first pulled up and you
12    parked a couple of houses down,
13    approximately how many houses away were
14    you?
15 A. Two to three.
16 Q. Okay. Is this sort of like a cul-de-sac
17    area?
18 A. It eventually gets into a cul-de-sac but
19    it's a straight street first and then
20    into a cul-de-sac.
21 Q. Obviously Matteson is a suburb, correct?
22 A. Yes, Sir.
23 Q. Approximately how much space is there
24    between the different houses? These are
25    all residential houses, correct?

Page 83

1  A. Yes, Sir.
2  Q. Not like multi-unit buildings, correct?
3  A. Yes, Sir.
4  Q. You're saying yes, they're all
5     residences?
6  A. All residences, yes, Sir.
7  Q. I am not going to hold you to an exact
8     number here. I am just looking for an
9     approximate distance. About how much
10    space is there between the different
11    houses?
12 A. I have never -- I don't know.
13 Q. But they are not standing right on top of
14    each other?
15 A. No, sir.
16 Q. Now, approximately how long were you
17    waiting in your squad before Trooper
18    Dumais arrived?
19 A. I don't know.
20 Q. Okay. I take it was officer -- was
21    Trooper Dumais the first law enforcement
22    officer to arrive at the scene after you?
23 A. I believe so, Sir.
24 Q. When he arrived -- when Trooper Dumais
25    arrived at the scene, what, if anything,

Page 84

1     did you and he discuss?
2  A. I believe he said that the -- a vehicle
3     had fled from him on a traffic stop. He
4     believed the driver was intoxicated and
5     as we were walking up he stated that he
6     believed that the black Chevy Malibu was
7     the vehicle that had fled from him.
8  Q. Let's back up for a second. I forgot to
9     ask you this. When Trooper Dumais first
10    arrived, did he pull up and park near
11    you?
12 A. I don't recall where he parked. It was
13    close by, I believe.
14 Q. So you don't know if he parked behind you
15    or if he parked closer to the house?
16 A. I think -- I think he parked closer to
17    the house.
18 Q. To your knowledge -- now, Trooper Dumais,
19    he was the same State Trooper who
20    attempted the earlier traffic stop?
21 A. That is what he stated.
22 Q. Okay. Did he say that he had dash cam
23    video of the actual stop?
24 A. I don't recall if immediately he stated
25    that or after he stated it, but at some

Page 85

1     point he did state that.
2  Q. So you're aware at some point that night
3     that Trooper Dumais' vehicle was dash cam
4     equipped, correct?
5  A. Yes, Sir.
6  Q. To your knowledge, did Trooper Dumais
7     have any type of body worn camera on his
8     person?
9  A. No, sir.
10 Q. He did not or you just didn't see one?
11 A. I believe he had a microphone for his
12    dash cam, but I don't think he had a
13    camera.
14 Q. Now, but you do agree that he parked his
15    squad, you don't remember exactly where,
16    but you and he talked before you both
17    approached the house?
18 A. We did talk, yes.
19 Q. Now, you both talked and you both did
20    approach the house, correct?
21 A. Yes, Sir.
22 Q. Let's talk about the conversation first.
23    You believe you spoke with Trooper Dumais
24    before approaching the house, correct?
25 A. We did speak, I do know that.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 86..89

Page 86

1  Q.  You're sure about that?
2  A.  Yes, Sir.
3  Q.  What did Trooper Dumais say to you during
4      that conversation before you approached
5      the house?
6  A.  I mean, again, it was -- I believe it was
7      just -- I tried to stop this vehicle.  I
8      believe this person was DUI.
9  Q.  You're telling me now in your own words
10     what Trooper Dumais was saying to you?
11 A.  I believe this is what he was saying,
12     correct.
13 Q.  Let me make sure you understand what I
14     mean.  When we read the transcript when
15     you're saying I and I and I, I want to
16     make sure what you're relating to us is
17     what Trooper Dumais was saying to you --
18 A.  Correct.
19 Q.  -- and not what you were saying to
20     Trooper Dumais.
21 A.  Yes, Sir.  It was what Trooper Dumais was
22     saying to me, Sir.
23 Q.  So Trooper Dumais told you that he
24     attempted to initiate a traffic stop?
25 A.  Yes, Sir.

Page 87

1  Q.  Trooper Dumais also told you that he
2      believed that the person was a possible
3      DUI?
4  A.  Yes, Sir.
5  Q.  Did Trooper Dumais tell you why he
6      thought that?
7  A.  I don't recall if he did.
8  Q.  Okay.  What else do you recall Trooper
9      Dumais telling you when you and he were
10     talking before approaching the house?
11 A.  I think just -- I think he might have
12     seen the vehicle in the driveway before
13     he approached and said I think that's the
14     car that ran, that's the car that ran.
15 Q.  Now, you were -- you did receive the
16     ISPERN earlier --
17 A.  Correct.
18 Q.  -- before Trooper Dumais showed up at the
19     Goldenrod Circle, correct?
20 A.  Yes, Sir.
21 Q.  Now, you did hear that ISPERN had
22     identified the car that fled as being a
23     black Jaguar, correct?
24 A.  Correct.
25 Q.  Now you saw a Chevy Malibu parked.  Now,

Page 88

1      the Malibu you told me earlier, that was
2      a black car, correct?
3  A.  Yes, Sir.
4  Q.  You do know there's a difference between
5      a Jaguar and Chevy Malibu, correct?
6  A.  Yes, Sir.
7  Q.  Did you ever ask Trooper Dumais about the
8      discrepancy between the vehicle
9      description, the ISPERN versus him saying
10     he thought that the Chevy Malibu was the
11     car he saw earlier?
12 A.  No, sir, I don't recall.
13 Q.  Is there a particular reason why you
14     didn't?
15 A.  I wasn't the one who effected the traffic
16     stop and through my experience and
17     training I have known that people like to
18     switch license plates when they run from
19     the police.  Again, it wasn't my stop.  I
20     didn't see the vehicle.
21 Q.  What was the license plate number that
22     was related in the ISPERN?
23 A.  Going off the exhibit, it was A Adam L
24     Lincoln 68377.
25 Q.  And that was not the license plate number

Page 89

1      on the Chevy Malibu that was parked in
2      the driveway; correct?
3  A.  Yes, that is correct.
4  Q.  And the Chevy Malibu didn't reflect the
5      ISPERN that was described of a black
6      Jaguar, correct?
7  A.  Correct.
8  Q.  Now -- and you did not discuss that
9      discrepancy with Trooper Dumais, correct?
10 A.  No, sir.
11 Q.  But it's your testimony that Trooper
12     Dumais told you that he thought that the
13     Chevy Malibu was the car that fled from
14     him, correct?
15 A.  I believe that is correct, yes, Sir.
16 Q.  You believe that's correct or you're
17     certain that's correct?
18 A.  Yes, that's correct.
19 Q.  Okay.  Officer Bates, I am going to be
20     really clear with you about something.  I
21     am not trying to play gotcha.  I want to
22     make sure what you to believe is really
23     true.
24 A.  From my recollection, I do believe I
25     remember him saying that's the car that

Urlaub Bowen & Associates, Inc.  312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 90..93

Page 90

1    ran.
2    Q.  Okay.  That's what Trooper Dumais said to
3        you?
4    A.  Correct.
5    Q.  Now, did you have -- now, your car, your
6        Village of Matteson vehicle, was it
7        equipped with computer software where you
8        could have run the plates of the Chevy
9        Malibu?
10   A.  Yes, Sir.
11   Q.  Did you do that before approaching the
12       house?
13   A.  I don't believe I did.
14   Q.  Why not?
15   A.  I just didn't.
16   Q.  And you did not see any other vehicle
17       parked in the driveway at 612 Goldenrod
18       Circle apart from the black Chevy Malibu,
19       correct?
20   A.  Correct.
21   Q.  Was it a 2017, to your knowledge?  Let me
22       put it to you this way:  Without looking
23       at any documents, do you have an
24       independent recollection of the Malibu --
25       the year of the Malibu?

Page 91

1    A.  Not the year, no.
2    Q.  But you do know it was a Chevy Malibu?
3    A.  Yes, Sir.
4    Q.  Did you see anybody inside the Chevy
5        Malibu?
6    A.  No, sir.
7    Q.  Please don't take offense by this
8        question.  You can tell the difference
9        between a Jaguar and a Malibu, correct?
10   A.  Yes, Sir.
11   Q.  Now, you and Trooper Dumais, you both
12       approach 612 Goldenrod Circle, correct?
13   A.  Yes, Sir.
14   Q.  Now, as you were both approaching the
15       house, did you and he have any discussion
16       about who would take the lead in the
17       investigation?
18   A.  I don't believe so.
19   Q.  Is it fair to say that you were, in fact,
20       conducting an investigation to determine
21       if the person that had fled the traffic
22       stop was, in fact, in Goldenrod Circle,
23       correct?
24   A.  What do you mean when you say you?
25   Q.  Well, you were assisting Trooper Dumais,

Page 92

1        correct?
2    A.  Yes.
3    Q.  And Trooper Dumais had reported that
4        someone had fled a traffic stop and he
5        thought it was a possible DUI, correct?
6    A.  Yes, Sir.
7    Q.  And he had run, according to him,
8        according to what you had understood, he
9        had run the plates of the vehicle and you
10       understood the person that owned the
11       vehicle lived at that residence, that was
12       your understanding of the situation,
13       correct?
14   A.  Yes, Sir.
15   Q.  And it was his hope to be able to locate
16       the person that had fled, so that he
17       could possibly continue his
18       investigation --
19   A.  Yes, Sir.
20   Q.  -- and possibly effectuate an arrest,
21       correct?
22   A.  Yes, Sir.
23   Q.  It was your duty that night or your role
24       to assist him in that investigation,
25       correct?

Page 93

1    A.  Yes, Sir.
2    Q.  So that's what you understood you were
3        doing as you were approaching the house,
4        correct?
5    A.  Yes, Sir.
6    Q.  And as you were doing that, assisting
7        Trooper Dumais with his investigation,
8        you didn't have a search warrant to enter
9        612 Goldenrod Circle, correct?
10   A.  Yes, Sir.
11   Q.  And you didn't have a search warrant to
12       enter a garage or the curtilage of the
13       house at Goldenrod Circle, correct?
14   A.  Yes, Sir.
15           MR. MCGRATH:  Objection to
16       the form of the question.  Curtilage?
17   BY MR. SCHOOP:
18   Q.  The side of the house, into the basement,
19       things of that nature, that's what I
20       meant by curtilage.
21   A.  Right.
22   Q.  Did you ever see Trooper Dumais run the
23       license plates for the Chevy Malibu
24       before approaching?
25   A.  I did not.

                                                      Exhibit G

DOMINIC BATES, 09/04/2019                              Page 94..97

Page 94

1  Q. Now, when you got to the door at 612
2     Goldenrod Circle, was there anybody
3     outside of the house?
4  A. No, sir.
5  Q. So is it fair to say that you and Trooper
6     Dumais -- did you knock on the door,
7     press the bell?
8  A. I don't recall.
9  Q. Do you remember if there was a door bell?
10 A. I don't recall.
11 Q. Do you remember anything about the actual
12    doorway itself at the Goldenrod Circle
13    residence?
14 A. I believe there was a storm door, like a
15    glass door.
16 Q. Now, do you remember Trooper Dumais
17    knocking on the door?
18 A. Yes, Trooper Dumais.
19 Q. So Trooper Dumais, was he standing in
20    front of -- between you and the door?
21 A. Yes.
22 Q. So you are standing behind Trooper
23    Dumais?
24 A. Yes, Sir.
25 Q. And it's your testimony that Trooper

Page 95

1     Dumais knocked on the door?
2  A. Knocked, rang the doorbell, one of the
3     two.
4  Q. Okay. Do you remember if there was a
5     doorbell?
6  A. No, I don't recall.
7  Q. You're sort of guessing it was either
8     knocking or the doorbell?
9  A. Sure.
10 Q. Okay. Well, I don't want you to guess
11    here. Do you have an independent
12    recollection of Trooper Dumais knocking
13    on the door?
14 A. I don't recall.
15 Q. But is it fair to say, though, he did
16    attempt --
17 A. In some way.
18 Q. -- to make his presence known to anybody
19    who might be inside the house?
20 A. Yes, Sir.
21 Q. As you and Trooper Dumais were actually
22    approaching the house, did you believe
23    that anybody was inside the house?
24 A. It's tough to say.
25 Q. Did you observe any lights on, porch

Page 96

1     lights, or lights on inside the house?
2  A. I don't believe there were any porch
3     lights on.
4  Q. Were there curtains or the windows open?
5  A. I don't recall.
6  Q. Well, it was February. I am not saying
7     the actual glass windows were open, but
8     do you remember seeing any blinds or
9     could you look inside the house?
10 A. I don't recall. I don't think the blinds
11    were open, but I don't --
12 Q. Listen very carefully to this next
13    question. As you and Trooper Dumais were
14    approaching, did you and Trooper Dumais
15    have any conversation where you or he
16    expressed any concerns for your physical
17    safety walking as you were walking to the
18    house?
19 A. I don't recall.
20 Q. Is that the kind of thing that you're
21    likely to forget?
22 A. What do you mean?
23    MR. POSKOZIM: I'm sorry, you
24    cut out a few times during that question.
25    Could you repeat that?

Page 97

1  BY MR. SCHOOP:
2  Q. As you and Trooper Dumais were physically
3     walking towards the front door to
4     initiate contact with anybody that might
5     be inside, did you and he have any
6     specific conversation expressing any
7     concern for your personal safety?
8  A. I don't recall.
9  Q. Do you remember feeling that concern for
10    your personal safety?
11 A. I don't believe so, no.
12 Q. Now, whether he knocked on the door or
13    rang a bell, is it fair to say Trooper
14    Dumais got somebody to come to the door?
15 A. Yes, Sir.
16 Q. Who is the first person that came to the
17    door?
18 A. It was an older female that came to the
19    door.
20 Q. Just so we're clear, older
21    African-American female, correct?
22 A. Yes, Sir.
23 Q. Can you describe her for me?
24 A. I just remember she was older, maybe 50s,
25    60s. She was five foot six. She was

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 98..101

Page 98

1    shorter. I think she had gray and black
2    hair.
3    Q. Is it fair to say that she was an older
4       woman?
5    A. Yes, Sir.
6    Q. Did you feel at any point in time
7       threatened by this older woman that
8       answered the door?
9    A. No, sir.
10   Q. Did she ever threaten you specifically?
11   A. No, Sir.
12   Q. Did she ever call you any names?
13   A. Not that I recall, Sir.
14   Q. Now, when this older black woman answered
15      the door, what, if anything, did you say
16      to her?
17   A. Nothing.
18   Q. Is it fair to say that Trooper Dumais was
19      taking the lead?
20   A. Yes, Sir.
21   Q. So as taking the lead, Trooper Dumais
22      would have been talking to this woman,
23      correct?
24   A. Yes, Sir.
25   Q. Did Trooper Dumais identify himself as a

Page 99

1       state trooper?
2    A. I don't recall.
3    Q. Do you remember specifically identifying
4       yourself as a Village of Matteson police
5       officer?
6    A. I don't believe I did.
7    Q. But you were in uniform?
8    A. Yes, Sir.
9    Q. And Trooper Dumais, he was in a State
10      Trooper uniform, correct?
11   A. Yes, Sir.
12   Q. Now, what did Trooper Dumais say to this
13      woman? Did he initiate the conversation
14      with her?
15   A. Yes, Sir.
16   Q. And they did have a conversation,
17      correct?
18   A. Yes, Sir.
19   Q. What do you recall Trooper Dumais saying
20      to initiate the conversation with this
21      woman?
22   A. I believe he stated that he was looking
23      for Shawn, asking where Shawn was, and
24      that Shawn had just ran from him on a
25      traffic stop.

Page 100

1    Q. Do you recall, what, if anything, this
2       woman said in response to Trooper Dumais?
3    A. I believe she said Shawn is not home or
4       Shawn isn't here.
5    Q. Do you remember her saying anything else?
6    A. I don't recall.
7    Q. When I say anything else, I mean in
8       response to that specific question that
9       Trooper Dumais posed to her?
10   A. I don't believe. I don't recall.
11   Q. What, if anything, did Trooper Dumais say
12      after the woman had told him that Shawn
13      was not there?
14   A. I believe he was stating that Shawn -- he
15      knows Shawn lives there. Shawn just ran
16      from him, is Shawn's car in the garage.
17   Q. Now, there was an attached garage to the
18      house, correct?
19   A. Yes, Sir.
20   Q. But the garage door was closed, correct?
21   A. Yes.
22   Q. So you could not see inside the garage,
23      correct?
24   A. Correct.
25   Q. Did you and Trooper Dumais discuss the

Page 101

1       possibility maybe there was a black
2       Jaguar parked in the garage?
3    A. I believe he might have suggested it.
4    Q. When do you believe he might have
5       suggested that?
6    A. Maybe while we were walking up to the
7       house.
8    Q. So that might have been a detail that you
9       and he discussed when you were walking to
10      the house?
11   A. Yes.
12   Q. Now, do you remember earlier I asked you
13      what you and he discussed, so is this now
14      a new detail that you didn't remember?
15   A. I guess so, yes, Sir.
16   Q. So this is what I would like you to do:
17      When I am asking you these questions,
18      when I ask you what was or wasn't said, I
19      need you to really exhaust your memory
20      before you start to commit. Okay?
21   A. Yes, Sir.
22   Q. Now it's your testimony that when you and
23      Trooper Dumais approached the house that
24      you discussed the possibility that there
25      was a black Jaguar parked in the garage,

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 102..105

Page 102

1    correct?
2    A.  Sir, to be honest, I don't recall
3       specifically when that discussion was
4       had.  I just recalled that it had
5       happened.
6    Q.  So you don't know if it happened before
7       you saw the woman, you don't know if it
8       happened after you eventually released
9       Jyran Mitchell.  You just discussed with
10      Trooper Dumais at some point that maybe
11      there was a Jaguar parked in that garage?
12   A.  I believe it was before Jyran came to the
13      front door, but I just don't recall when
14      during walking up, while we were
15      approaching the house, if we were in the
16      driveway.  I don't recall specifically.
17   Q.  Now, you said that Jyran Mitchell came to
18      the door.  Before we get into Jyran
19      Mitchell coming to the door, let's be
20      clear about one thing.  Approximately how
21      long were you and Trooper Dumais at the
22      doorway talking to this black woman, the
23      older woman, approximately how long
24      before Jyran Mitchell came to the door?
25   A.  I would say less than a minute.

Page 103

1    Q.  So a minute or less?
2    A.  I would say so, yes.
3    Q.  So not more than a minute?  It was a
4       minute or less?
5    A.  Approximately.
6    Q.  Okay.  Approximately.  Now, during that
7       approximately one minute Trooper Dumais
8       said I know Shawn is here, his car is
9       here, where is Shawn, he fled from me,
10      and the woman said that Shawn's not here,
11      correct?
12   A.  Along those lines, yes, Sir.
13   Q.  Is there anything else that was said by
14      Trooper Dumais to the woman or by the
15      woman to Trooper Dumais apart from what
16      we have already discussed during that
17      approximate one minute time period before
18      Jyran Mitchell came to the door?
19   A.  Not that I recall.
20   Q.  And while Trooper Dumais was having that
21      conversation, you were standing right
22      behind Trooper Dumais on the front
23      walkway?
24   A.  Yes, Sir.
25   Q.  Okay.

Page 104

1    A.  I believe so.
2    Q.  And the woman was standing -- was she
3       standing in the threshold of her doorway?
4    A.  Yes, Sir.
5    Q.  So she was in her house, correct?
6    A.  Yes, Sir.
7    Q.  She was not outside her house, but inside
8       her house?
9    A.  Correct.
10   Q.  Now, you said -- you now call him Jyran
11      Mitchell.  Now, did you know that this
12      young man that appeared at the doorway --
13      at that point in time when he appeared,
14      did you know him to, in fact, be Jyran
15      Mitchell?
16   A.  No, sir.
17   Q.  So you had no idea who he was?
18   A.  That's correct.
19   Q.  So when this young man you did not know
20      at the time appeared in the doorway, was
21      he standing behind his grandmother, next
22      to his grandmother?
23   A.  I believe initially he came from behind
24      and then was standing next to her.
25   Q.  Now, as this young man appeared, what was

Page 105

1    he wearing?
2    A.  I don't recall specifically.
3    Q.  Okay.  He was dressed, though, correct?
4    A.  I believe.  Yes, he wasn't naked, no,
5       Sir.
6    Q.  What I mean -- well, I didn't mean to
7       suggest that he was naked.  What I mean
8       is this:  Was he wearing like a jacket?
9    A.  I don't believe he was wearing a jacket.
10   Q.  Was he wearing shoes?
11   A.  I don't recall.
12   Q.  Was he wearing socks?
13   A.  Again, I don't recall.
14   Q.  So you don't remember if he was wearing
15      shoes.  You don't remember if he was
16      wearing socks, and you don't remember if
17      he was wearing a jacket?
18   A.  Correct.
19   Q.  Do you remember if he was wearing shorts,
20      a t-shirt?
21   A.  I think he was wearing shorts and he
22      might have had -- I don't recall
23      specifically a shirt.  He might not have
24      had a shirt on.
25   Q.  Okay.  Now, when this young man appeared

                                                              Exhibit G

DOMINIC BATES, 09/04/2019                    Page 106..109

Page 106

1   standing behind his grandmother, did he
2   say anything to his -- say anything,
3   whether it was -- the comment was
4   directed towards his grandmother, to the
5   trooper, to you?  Do you remember him
6   saying anything?
7   A.  Him and Trooper Dumais had a
8      conversation.
9   Q.  Who initiated this conversation, the
10     young man or Trooper Dumais?
11  A.  I believe it was Trooper Dumais.
12  Q.  You used the word conversation.  How did
13     Trooper Dumais initiate this
14     conversation?
15  A.  I believe when Jyran came to the door I
16     believe Trooper Dumais said you're Shawn,
17     you just ran from me.
18  Q.  Okay.  So --
19          MR. POSKOZIM:  Sorry, I
20     missed that.  What was that?
21          THE WITNESS:  I believe the
22     trooper said you're Shawn, you just ran
23     from me, or something along those lines,
24     you're Shawn, you just ran from me.
25          MR. POSKOZIM:  Thank you.

Page 107

1   BY MR. SCHOOP:
2   Q.  So Trooper Dumais did not ask the young
3      man, who you later learned was Jyran
4      Mitchell, Trooper Dumais never asked this
5      young man to identify himself?
6   A.  Not at that point.  Not at that time.
7   Q.  Is it fair to say Trooper Dumais assumed
8      the young man that stood at the door was
9      Shawn Mitchell?
10          MR. MCGRATH:  Objection.
11     Form of the question.  Calls for
12     speculation.
13  BY MR. SCHOOP:
14  Q.  Well, did you hear Trooper Dumais ask
15     this young man, hey, who are you?
16          MR. MCGRATH:  Objection.
17     Asked and answered.  You can answer.
18          THE WITNESS:  I don't recall
19     specifically if he said hey, who are you.
20  BY MR. SCHOOP:
21  Q.  Did Trooper Dumais ever ask the young man
22     who appeared at the door to identify
23     himself?
24  A.  I don't believe so.
25  Q.  In fact, I believe your testimony was

Page 108

1   Trooper Dumais said you are Shawn, you
2   ran from me?
3   A.  I believe that's correct.
4   Q.  And you believe that those were the first
5      words that Trooper Dumais said to the
6      young man as he appeared in the doorway,
7      correct?
8   A.  I am not sure about first words, but I
9      know that they were spoken.  I believe
10     they were spoken.
11  Q.  So you have no independent recollection
12     of the first words uttered by Trooper
13     Dumais when the young man appeared in the
14     doorway?
15  A.  No.
16  Q.  But you don't remember Trooper Dumais
17     ever asking the young man what's your
18     name when he was at the doorway?
19  A.  I don't believe he did.  I don't know.  I
20     don't think so.
21  Q.  I'm asking for your best recollection.
22     Is it fair to say Trooper Dumais did not
23     ask the young man to identify himself?
24  A.  I don't recall.
25  Q.  Did you remember Trooper Dumais ever

Page 109

1   asking the young man to produce a form of
2   identification, such as a driver's
3   license, a state ID, student
4   identification card, things of that
5   nature?
6   A.  He did later on.
7   Q.  I'm not asking about later on.  We will
8      get to later on.  At the moment that he
9      was standing at the door and you're
10     behind him and he's standing next to his
11     grandmother, did Trooper Dumais say,
12     young man, can you show me some ID?
13  A.  I don't believe he did.
14  Q.  As you sit here today, do you wish he
15     had?
16          MR. MCGRATH:  Objection.
17     Form of the question.
18  BY MR. SCHOOP:
19  Q.  Please answer the question.  As you sit
20     here today, do you wish he had?
21  A.  Sure.
22  Q.  Why?
23  A.  I just -- I don't know.
24  Q.  Isn't it fair to say that had the young
25     man shown you and Trooper Dumais some

Exhibit G

Page 110

1   identification clearing identifying
2   himself as Jyran Mitchell you guys would
3   have realized he was not Shawn Mitchell,
4   isn't that why you wish he had asked the
5   question?
6           MR. MCGRATH:  Objection.
7   Form of the question.  Foundation.
8   Incomplete hypothetical.
9           MR. SCHOOP:  You can object
10  all you want, and that's his right and
11  that's his job.  I am not arguing with
12  Mr. McGrath.
13  BY MR. SCHOOP:
14  Q.  My question still stands.  Could you
15      please answer it?
16  A.  I mean, sure.
17  Q.  Thank you.  Now, you would agree that the
18      woman that was standing at the doorway,
19      she did not fit in any way, shape or form
20      the physical description that was
21      provided in the dispatch, correct?
22  A.  Yes, Sir.
23  Q.  But the young man was a black male,
24      correct?
25  A.  Yes, Sir.

Page 111

1   Q.  And the dispatch did identify a black
2       male, correct?
3   A.  I believe so, Sir.
4   Q.  Now, the young man, how did he actually
5       walk out of the house?  Did he walk out
6       of the house?
7   A.  Yes, Sir.
8   Q.  How did he walk out of the house?
9   A.  How do you mean?
10  Q.  Well, did he just voluntarily walk out of
11      the house or did somebody ask him to step
12      out of the house?
13  A.  He voluntarily came out of the house.
14  Q.  So it's your testimony that neither you
15      nor Trooper Dumais asked Mr. Mitchell to
16      step out of the house?
17  A.  Correct.  The Trooper said that the stop
18      was on video.
19  Q.  Okay.
20  A.  Jyran stated that he wanted to see it and
21      the Trooper stated come to my squad car
22      and watch it and that is when Jyran
23      exited the house.
24  Q.  So, let's be clear, it's your testimony
25      that Jyran Mitchell walked out of the

Page 112

1   house after Jyran Mitchell was told by
2   Trooper Dumais that Trooper Dumais had a
3   dash cam video showing the traffic stop,
4   correct?
5   A.  Yes.
6   Q.  And Trooper Dumais told Jyran that he
7       believed that Jyran was the one that fled
8       the traffic stop, correct?
9   A.  Yes.
10  Q.  And it's your testimony that you heard
11      Jyran Mitchell demand to see the video?
12  A.  Correct.
13  Q.  And that's when Trooper Dumais said,
14      well, if you want to see the video you
15      have to step out of the house and come to
16      my squad car --
17  A.  Correct.
18  Q.  -- to watch it?
19  A.  Correct.
20  Q.  And so apparently, if I understand your
21      testimony correct, Jyran Mitchell
22      accepted the invitation to go watch the
23      video; is that correct?
24  A.  Correct.
25  Q.  Now, is it your testimony that it was

Page 113

1   actually an invitation to try to figure
2   out if this was really what happened?
3   A.  That was my understanding at the time,
4   Yes, Sir.
5   Q.  Now, is it also your testimony that it
6       was not the situation where Trooper
7       Dumais or you were trying to lure
8       Mr. Mitchell out of his house because you
9       knew you could not lawfully enter the
10      house and grab him because there were no
11      exigent circumstances to arrest him on
12      the spot, even if you honestly believed
13      that he was the individual that fled that
14      traffic stop?
15  A.  Can you rephrase the question?
16  Q.  Well, you told us earlier -- you
17      described a circumstance where if you had
18      an exigent circumstance you could run
19      into the house and you could arrest
20      somebody?
21  A.  Correct.
22  Q.  You didn't have any exigent circumstances
23      on February 2nd, 2018, that would require
24      you or Trooper Dumais to run into the
25      house and physically detain Mr. Mitchell,

Exhibit G

DOMINIC BATES, 09/04/2019                          Page 114..117

Page 114

1    correct?
2  A. That's correct.
3  Q. He hadn't shot anybody, correct?
4  A. To our knowledge, no.
5  Q. He hadn't raped anybody, correct?
6  A. To our knowledge, no.
7  Q. He wasn't running around the Village of
8     Matteson with an AR-15 or 17 threatening
9     to kill anybody, correct?
10 A. To our knowledge, no.
11 Q. In fact, to your knowledge, the person in
12    the Jaguar had just fled a traffic stop,
13    correct?
14 A. Yes, Sir.
15 Q. So you didn't have a -- you didn't have
16    exigent circumstances that would allow
17    you to go into the house without a search
18    warrant, correct?
19 A. Correct.
20 Q. No matter how good of a thought you might
21    have believed that this young man might
22    have been the one that fled, you couldn't
23    walk through that threshold and grab him,
24    correct?
25 A. What --

Page 115

1  Q. You couldn't walk through the threshold
2     at 612 Goldenrod Circle, detain him,
3     place him in handcuffs, and place him in
4     handcuffs unless you had a search warrant
5     to enter, correct?
6  A. Yes, Sir.
7  Q. Thank you. Back to my original question.
8     My original question was --
9  A. Can I interrupt you?
10 Q. I'm sorry. There's no question pending.
11    Do you need to take a break?
12 A. I really got to use the bathroom.
13       MR. SCHOOP: We will take a
14    break.
15    (A recess was had in the proceedings)
16 BY MR. SCHOOP:
17 Q. Officer Bates, before we took the break I
18    was asking you questions about Jyran
19    Mitchell, the individual that we now know
20    to have been Jyran Mitchell, on
21    February 2nd, 2018, as he was standing in
22    the doorway of the 612 Goldenrod Circle
23    residence.
24       Now, you said that Trooper Dumais was
25    taking the lead in terms of interacting

Page 116

1     with Jyran's grandmother and later
2     talking with Jyran; is that correct?
3  A. Yes, Sir.
4  Q. Is that a fair characterization of
5     Trooper Dumais' role and your roles
6     respectively that night?
7  A. Yes, Sir.
8  Q. He was the lead officer, you were the
9     backup?
10 A. Yes, Sir.
11       MR. POSKOZIM: You were
12    cutting in and out a little bit right
13    now. Is there any way I could be moved a
14    little closer?
15       MR. SCHOOP: The witness was
16    or I was?
17       MR. POSKOZIM: The witness.
18       MR. SCHOOP: We're moving the
19    phone closer to him. Okay?
20       MR. POSKOZIM: Perfect.
21 BY MR. SCHOOP:
22 Q. So it's fair to say that you were
23    assisting Trooper Dumais and that he was
24    taking the lead, correct?
25 A. Yes, Sir.

Page 117

1  Q. He was taking the lead in talking to
2     people, interacting with people, things
3     of that nature, correct?
4  A. Yes, Sir.
5  Q. Now, you had an opportunity to observe
6     the young man that was in the doorway,
7     correct?
8  A. Yes, Sir.
9  Q. At the time that you observed the young
10    man, did you detect any odor of alcohol
11    on him?
12 A. No, sir.
13 Q. Did he appear to have glassy eyes,
14    bloodshot eyes, things of that nature?
15 A. I wasn't close enough to really make
16    those determinations.
17 Q. As a police officer, had you ever
18    conducted a DUI investigation or
19    subjected anybody to field sobriety
20    tests?
21 A. Yes, Sir.
22 Q. So you are familiar with what are called
23    the HGN or horizontal gaze nystagmus test
24    and the other standard field sobriety
25    tests from the National Highway

Exhibit G

DOMINIC BATES, 09/04/2019                                Page 118..121

Page 118

1  **Transportation Safety Administration,**
2  **correct?**
3  A. Yes, Sir.
4  **Q. Also know as NHTSA, correct?**
5  A. Yes, Sir.
6  **Q. You did know on February 2nd that slurred**
7  **speech, glassy eyes, odor of alcohol on a**
8  **person's breath, those are cues or**
9  **indicia of alcohol consumption, correct?**
10 A. Yes, Sir.
11 **Q. Did you notice any of those cues or**
12 **indicia while you were observing this**
13 **young man in the doorway?**
14 A. No, sir.
15 **Q. Okay. And you did understand that**
16 **Trooper Dumais said that he was trying to**
17 **initiate that original traffic stop on**
18 **the basis -- one of the bases was a**
19 **possible DUI investigation, correct?**
20 A. Yes, Sir.
21 **Q. But the young man standing before you, he**
22 **didn't have any indications of alcohol**
23 **consumption, correct?**
24 A. Not that I could observe from where I
25 was.

Page 119

1  **Q. And he wasn't asked to provide any**
2  **personal identification in the form of a**
3  **driver's license or a photo ID before**
4  **being invited to step out of his house,**
5  **correct?**
6        MR. MCGRATH: Objection.
7  Asked and answered.
8        THE WITNESS: I don't believe
9  so.
10 BY MR. SCHOOP:
11 **Q. Trooper Dumais did not make that request,**
12 **correct?**
13 A. Prior to him coming out of the house,
14 correct.
15 **Q. Trooper Dumais did offer, though, to have**
16 **Mr. Mitchell come out and watch the video**
17 **in his car, correct?**
18 A. Yes, Sir.
19 **Q. Now, when -- you would agree Mr. Mitchell**
20 **then stepped out of his house?**
21 A. Yes, Sir.
22 **Q. Now, listen very careful to this next**
23 **question. At any time did you pull**
24 **Mr. Mitchell out of his house?**
25 A. No, sir.

Page 120

1  **Q. At any time did you see Trooper Dumais**
2  **physically pull Mr. Mitchell out of his**
3  **house?**
4  A. No, sir.
5  **Q. So it's your testimony that Mr. Mitchell**
6  **voluntarily stepped out of his house; is**
7  **that correct?**
8  A. Yes.
9  **Q. Now, at the moment that Mr. Mitchell had**
10 **stepped past the threshold of his doorway**
11 **and was outside his house, what happened?**
12 A. When he exited the residence, the woman
13    who we believe to be grandmother, I heard
14    her say Shawn, grab a coat, and then he
15    exited the house and Trooper Dumais then
16    went to go detain Jyran, and that's when
17    I stepped in to assist.
18 **Q. Let's back up. It's your testimony that**
19 **the young man that you know now to be**
20 **Jyran Mitchell stepped out of his house**
21 **after Trooper Dumais invited him to come**
22 **watch the video, correct?**
23 A. Correct.
24 **Q. He was doing so voluntarily, correct?**
25 A. Correct.

Page 121

1  **Q. You can't remember exactly what he was**
2  **wearing, you don't remember if he was**
3  **wearing shoes, you don't remember if he**
4  **was wearing socks. You don't even**
5  **remember if he was wearing a shirt. But**
6  **you do remember him voluntarily accepting**
7  **Trooper Dumais' offer to go watch the**
8  **video, correct?**
9  A. Correct.
10 **Q. It's your testimony he voluntarily**
11 **stepped out of the house to do so,**
12 **correct?**
13 A. Correct.
14 **Q. It's also your testimony that you heard**
15 **his grandmother call him Shawn?**
16 A. That is what I heard, yes, Sir.
17 **Q. You heard his grandmother Carolyn call**
18 **him Shawn?**
19 A. Yes, Sir.
20 **Q. You're certain of that?**
21 A. That's what I heard, Sir.
22 **Q. How old was -- did she look like she was**
23 **80 or 90 and senile?**
24 A. No, Sir.
25        MR. MCGRATH: Objection.

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 122..125

Page 122

1    Form of the question.
2  BY MR. SCHOOP:
3    **Q. Once you heard that -- did Trooper**
4    **Dumais, to your knowledge, did he hear**
5    **her say that, too?**
6         MR. MCGRATH:  Objection.
7    Calls for speculation.
8  BY MR. SCHOOP:
9    **Q. I am asking do you know?**
10  A. I believe he did.
11   **Q. Why do you believe that Trooper Dumais**
12   **might have heard her say or -- call or**
13   **refer to Jyran as Shawn?**
14  A. Based off of him -- when Jyran exited the
15   house, based off of the trooper then
16   wanting to go detain him.
17   **Q. Okay.**
18  A. I just -- we might have discussed it
19   afterwards, too, where he said she did
20   say Shawn.
21   **Q. So let me be really clear.  As Shawn was**
22   **walking out of the -- excuse me, as Jyran**
23   **was walking out of the house, the young**
24   **man, let's refer to him as the young man,**
25   **did the young man ever try to run?**

Page 123

1  A. No.  No, sir.
2    **Q. Let's put it this way:  I want to be real**
3    **precise now.  I've been trying to be, but**
4    **I want to make sure we're real clear.  At**
5    **any time before Trooper Dumais or you**
6    **attempted to detain the young man, did**
7    **the young man ever try to run?**
8  A. Run like past us?
9    **Q. Yes, like flee the area.**
10  A. No, Sir.
11   **Q. Did you ever see the young man sort of**
12   **double back and try to run inside the**
13   **house and refuse to come out?**
14  A. He came outside and I think he like
15   stutter stepped.
16   **Q. When you say stutter step, describe that**
17   **for me.**
18  A. I believe it was after grandma said
19   Shawn, grab a coat, and then he stopped
20   walking like he was going to come towards
21   the vehicle.
22   **Q. Did you ever document that stutter step?**
23  A. I don't know.  I don't believe so.
24   **Q. Okay.  Well, you would agree that that's**
25   **an important fact, right?**

Page 124

1  A. Not necessarily.
2    **Q. Well, if grandma called him Shawn and**
3    **said Shawn, grab his coat, and he**
4    **suddenly stutter stepped like he was**
5    **going to double back and try to flee,**
6    **wouldn't that cause you to think that**
7    **maybe he was, in fact, Shawn and he was**
8    **maybe trying to flee?**
9         MR. MCGRATH:  Object to the
10   form of the question.  It's compound.
11   Incomplete.  Calls for speculation.
12        MR. POSKOZIM:  I am not
13   hearing any answers.  Are there verbal
14   answers being given?
15        MR. MCGRATH:  Just
16   objections.
17        MR. SCHOOP:  Not yet.  Just
18   the objections.
19        MR. POSKOZIM:  Okay.
20        THE WITNESS:  At that point
21   we didn't -- my interpretation of it
22   wasn't that he was fleeing.  It was that
23   he was going to get a coat and wear a
24   coat.
25  BY MR. SCHOOP:

Page 125

1    **Q. When you said the stutter step, you**
2    **didn't think that -- you didn't perceive**
3    **the young man to be running?  He's trying**
4    **to get a coat?**
5  A. Yes, Sir.
6    **Q. Okay.  Fair enough.  Okay.  Fair enough.**
7    **Did Trooper Dumais allow this young man**
8    **to get his coat?**
9  A. No, sir.
10   **Q. In fact, Trooper Dumais tried to detain**
11   **him, correct?**
12  A. Yes, Sir.
13   **Q. After the young man was physically**
14   **outside the house, Trooper Dumais detains**
15   **him and you assisted Trooper Dumais in**
16   **detaining the young man, correct?**
17  A. Yes, Sir.
18   **Q. Now, we have been very vague and generic**
19   **with this word detained.  How**
20   **specifically -- let's focus first on**
21   **Trooper Dumais and then we will talk**
22   **about you.  How specifically -- was this**
23   **a physical detention?**
24  A. What do you mean by physical detention?
25   **Q. When you stop somebody, you can stop**

Urlaub Bowen & Associates, Inc.    312-781-9586              Exhibit G

DOMINIC BATES, 09/04/2019                           Page 126..129

Page 126

1  someone as a law enforcement officer, you
2  can stop people lots of different ways,
3  correct?
4  A. Yes, Sir.
5  Q. For example, if I was walking away you
6     could ask me to just stop walking,
7     correct?
8  A. Yes, Sir.
9  Q. And ask me to come back, correct?
10 A. Yes, Sir.
11 Q. You could also ask me -- you could also
12    lay a hand on me and physically prevent
13    me from walking away, correct?
14 A. Yes, Sir.
15 Q. You used the phrase detain. Did Officer
16    Dumais in effectuating his detention of
17    the young man, did he physically grab
18    him?
19 A. Yes, Sir.
20 Q. How did you see -- describe the --
21    describe how Trooper Dumais grabbed the
22    young man?
23 A. It appeared to be what was taught to us
24    in the police academy, the standard law
25    enforcement grasp. It would be one hand

Page 127

1     on a wrist and one hand on the back of
2     the arm or elbow.
3  Q. So was Shawn -- excuse me, was Jyran
4     facing Trooper Dumais as Trooper Dumais
5     was grabbing him or was his back turned
6     to Trooper Dumais?
7  A. That I don't remember. That I don't
8     recall.
9  Q. So you can't remember if they were
10    face-to-face or if Jyran's back was
11    facing Trooper Dumais?
12 A. Yes, I don't recall.
13 Q. Do you remember which wrist Trooper
14    Dumais grabbed? Let me strike that. You
15    described in your testimony and
16    answering, you described Trooper Dumais
17    doing a standard law enforcement
18    technique. Thank you for that
19    characterization, but I want you to
20    specifically tell me to your best
21    recollection which portion -- which part
22    of Trooper Dumais' body, I'm assuming his
23    hand, did he use to physically touch or
24    detain Jyran Mitchell?
25 A. I believe it was -- I believe he had

Page 128

1     Jyran's right arm. I believe.
2  Q. So Trooper Dumais grabbed Jyran's right
3     arm?
4  A. Correct.
5  Q. But you can't remember if Trooper Dumais
6     was facing Jyran or Jyran's back was
7     turned towards Trooper Dumais?
8  A. That is correct.
9  Q. Which of Trooper Dumais' hands did he use
10    to grab Jyran's right arm?
11 A. Both hands.
12 Q. So Trooper Dumais used his left and right
13    hand to grab Jyran's arm, correct?
14 A. Yes, I believe so.
15 Q. Which portion of Jyran's arm did Trooper
16    Dumais grab? Was it above the elbow or
17    below the elbow?
18 A. I believe he had one hand on the wrist,
19    on Jyran's wrist, and the other hand
20    on -- above Jyran's elbow, I believe.
21 Q. So two hand grab by Trooper Dumais of
22    Jyran's arm, one above -- one at the
23    wrist, and one above the elbow?
24 A. Correct.
25 Q. Do you remember which hand that Trooper

Page 129

1     Dumais used to grab his wrist?
2  A. No.
3  Q. You don't remember which hand Trooper
4     Dumais used to grab above the elbow?
5  A. No, sir.
6  Q. What else did -- what other -- what other
7     physical techniques did Trooper Dumais
8     use to physically restrain or detain
9     Mr. Mitchell apart from the two hand arm
10    grab that you described for us today?
11 A. I don't -- I don't recall.
12 Q. You have no recollection whatsoever?
13 A. I remember him --
14 Q. Him?
15 A. I remember Trooper Dumais going to
16    physically detain Jyran and then I think
17    he told him to put his hands behind his
18    back and then that's when I stepped up to
19    assist Trooper Dumais with effecting the
20    detainment.
21 Q. So it's your testimony that you heard
22    Trooper Dumais do the two hand grab to
23    Jyran's right arm, one hand on the wrist,
24    one hand above Jyran's elbow, and at the
25    same time Trooper Dumais is

Exhibit G

DOMINIC BATES, 09/04/2019                           Page 130..133

Page 130

1    simultaneously giving him a command to
2    stop?
3  A. I wouldn't say stop, but I believe he
4    said put your hands behind your back. I
5    believe he did.
6  Q. Okay. Now, apart from possibly saying
7    put your hands behind his back, what
8    other verbal commands did Trooper Dumais
9    give Mr. Mitchell as he was grabbing his
10   arm, right arm?
11 A. I don't recall. He might have told him
12   he's under -- I don't recall.
13 Q. Were you about to say he might have said
14   you're under arrest?
15 A. Yes, he might have, but I can't
16   definitively state that he said that.
17       MR. POSKOZIM: I'm sorry,
18   Officer, but I'm just consistently losing
19   the last half of what you're saying. If
20   you could just try to keep your voice at
21   about the same level.
22       THE WITNESS: Yes, Sir. I
23   can't speak definitively, because I don't
24   recall 100 percent what he said.
25 BY MR. SCHOOP:

Page 131

1  Q. Well, that's an important detail,
2    correct?
3        MR. MCGRATH: Objection.
4    Form of the question.
5  BY MR. SCHOOP:
6  Q. If you're going to place somebody under
7    arrest as a law enforcement officer, you
8    remember when you're going to place
9    somebody under arrest, correct?
10       MR. MCGRATH: Objection.
11   Form of the question.
12       THE WITNESS: You do
13   remember, but you don't have to advise
14   someone that they are under arrest.
15 BY MR. SCHOOP:
16 Q. I understand that, but my question is did
17   Trooper Dumais say you are under arrest?
18 A. Again, I don't -- I don't recall.
19 Q. Okay.
20 A. Definitively I don't recall.
21 Q. So maybe he did, maybe he didn't, you
22   just don't remember either way?
23 A. Yes, Sir.
24 Q. You did say, though, as Trooper Dumais
25   did the hand grab or arm grab with his

Page 132

1    two hands of Jyran Mitchell that you then
2    stepped in to assist, correct?
3  A. Yes, Sir.
4  Q. Now, as Jyran was getting grabbed, did he
5    do anything -- when Jyran was being
6    grabbed by Trooper Dumais, what, if
7    anything, did he do in response?
8  A. Initially I think he looked at Trooper
9    Dumais and then I stepped in to grab the
10   other arm and then he just began pushing
11   away, trying to push away from us, pull
12   away from us, jerk and pull again, pull
13   away, push off of us.
14 Q. Let me make sure I got this straight.
15       MR. MCGRATH: Were you
16   finished with your answer?
17       THE WITNESS: Sure. Yes.
18 BY MR. SCHOOP:
19 Q. So before you stepped in you believe that
20   maybe Trooper Dumais said Jyran was under
21   arrest and you remember Trooper Dumais
22   grabbing his arm. You don't remember
23   Jyran ever saying I didn't do it, it's
24   not me?
25 A. I believe he did say -- I know he said

Page 133

1    for sure I am not resisting, I am not
2    resisting, and I believe he said I am
3    not -- yeah, I believe he said it wasn't
4    me or I am not Shawn or something along
5    those lines.
6  Q. So you remember the young man
7    affirmatively saying out loud I am not
8    resisting, I am not resisting as Trooper
9    Dumais was grabbing him?
10 A. I remember him saying I am not resisting,
11   I am not resisting, as both of us were
12   attempting to place him in to custody and
13   he was actively resisting.
14 Q. Okay. I am trying to break it down to
15   make sure we got the chronology straight.
16   Before you stepped in, my question is
17   before, we're going to try to break it up
18   step-by-step.
19 A. Okay.
20 Q. Before you stepped in to assist Trooper
21   Dumais my question is did Jyran Mitchell
22   say anything to Trooper Dumais as Trooper
23   Dumais went hands-on on Jyran Mitchell?
24 A. I don't believe he did. Not at that
25   time.

Exhibit G

DOMINIC BATES, 09/04/2019                    Page 134..137

Page 134

1  Q. Your best recollection, Jyran Mitchell
2     was silent and said nothing?
3  A. He said nothing immediately upon Trooper
4     Dumais grabbing him. He did not say
5     anything right away.
6  Q. So when Trooper Dumais went hands-on and
7     grabbed Jyran's right arm above and below
8     the elbow, it's your recollection that
9     Jyran said nothing immediately at that
10    point in time?
11 A. I believe so.
12 Q. But if I understood your testimony
13    correctly, and you correct me if
14    misstating it, it's your belief that as
15    you stepped in to assist Trooper Dumais
16    that Jyran Mitchell started to utter
17    words to the effect that I am not
18    resisting, I am not resisting, but then
19    in your description he began to resist
20    the attempts to detain him?
21 A. He was physically resisting attempts to
22    detain him prior to making those
23    statements.
24 Q. Prior to making what statement?
25 A. I am not resisting.

Page 135

1  Q. Okay. So you're saying that Jyran
2     Mitchell was attempting to resist being
3     detained by Office Dumais and you?
4  A. That is correct.
5        MR. POSKOZIM: I couldn't
6     hear any of that last question and
7     answer.
8  BY MR. SCHOOP:
9  Q. It's your testimony that Jyran Mitchell
10    was attempting to physically resist being
11    detained by yourself, Officer Bates, and
12    by Trooper Dumais; is that your
13    testimony?
14 A. Yes, Sir.
15 Q. In your own words, Officer Bates, and
16    just so we're clear, was Mr. Mitchell
17    exhibiting that resistance before you
18    stepped in or as you were stepping in?
19 A. I believe it was as I was stepping in or
20    shortly thereafter.
21 Q. Now, in your own words, describe for us
22    how is Mr. Mitchell resisting?
23 A. He was pushing off of us, attempting to
24    pull his arms away from us, twisting,
25    turning, taking --

Page 136

1  Q. I'm sorry. Go ahead.
2  A. Taking steps, attempting to pull away,
3     just things of that nature.
4  Q. For how long did this twisting and
5     pulling that you just described, how long
6     did that proceed?
7  A. When you say that, are you talking about
8     the entire encounter before he was placed
9     in handcuffs?
10 Q. You tell me. I wasn't there.
11 A. The duration of us attempting to detain
12    him to actual detainment was a short
13    period of time.
14 Q. Five seconds, ten seconds, a minute?
15 A. I would say less than 20 seconds.
16 Q. Okay. So this is very quick?
17 A. Yes, Sir.
18 Q. Now, according to your testimony, you
19    said Mr. Mitchell was resisting the
20    detention. Apart from what you have
21    already told us, did he do anything else
22    as a form of resistance in your words?
23 A. The physical -- aside from everything
24    else that I previously stated, are you
25    meaning like trying to attempt to strike?

Page 137

1  Q. I am asking you. You told us before he
2     did the twisting and the pulling. I'm
3     asking you did Jyran Mitchell do anything
4     else that you observed that you
5     considered to be resisting apart from
6     what you have already told us?
7  A. Apart from all the physical resistance,
8     no, I think that was it.
9  Q. The physical resistance was the physical
10    resistance you just described in your
11    testimony?
12 A. Yes, Sir.
13 Q. Jyran Mitchell, just to avoid any
14    confusion later, Jyran Mitchell didn't
15    form a fist and punch you, correct?
16 A. He did not, no, Sir.
17 Q. He didn't attempt to try to punch Trooper
18    Dumais, correct?
19 A. I did not see that, no, sir.
20 Q. He didn't try to knee strike you or kick
21    you or spit in your face, correct?
22 A. No, sir.
23 Q. He didn't try to bite you, did he?
24 A. No, sir.
25 Q. It's the twisting that you described,

Exhibit G

DOMINIC BATES, 09/04/2019                          Page 138..141

Page 138
1    correct, the twisting and the pulling?
2  A.  The twisting, the pulling, the pushing,
3      attempting to walk.
4  Q.  How did he push?
5  A.  We had both of his arms and he was trying
6      to push us off of him.
7  Q.  So was he at that point facing you and
8      the officers?
9  A.  No, but from where we were at, we were
10     both -- from my recollection, we were
11     both behind and to the sides of Jyran and
12     when we were trying to gain physical
13     control over his arms is when he was
14     trying to push us off of him with his
15     arms that we were trying to gain control
16     over.
17 Q.  So his arms would have been behind his
18     back or to his side?
19 A.  At this point I think we were trying to
20     get his hands and his arms behind his
21     back.  They were not behind his back at
22     that point.
23 Q.  And you're saying it was at that point
24     that he was pushing his arms back to push
25     you off of him?

Page 139
1  A.  It's tough to say how -- exactly where
2      his arms were when he was pushing us, but
3      I remember the counterforce of him trying
4      to get us off of him.
5  Q.  Now, where was his grandmother while all
6      of this was going on?
7  A.  I believe when we first attempted to
8      detain him she was still in the doorway,
9      and then I think when the -- when the
10     tussle, if you want to call it that,
11     moved to the -- out in like the grass
12     area or the front walkway, I believe she
13     then came out of the house and I think
14     she was out of the house.
15 Q.  Did she say anything?
16 A.  I believe she did, but I don't recall
17     what it was.
18 Q.  Well, she was screaming, wasn't she?
19 A.  I don't recall.
20 Q.  You don't recall her saying words to the
21     effect leave my grandson alone, that's
22     not him, he's not Shawn?
23 A.  She might have.  I just don't recall.  I
24     was focusing on Jyran.
25 Q.  Now, what else happened?  How was

Page 140
1      Jyran -- he was physically taken down,
2      correct?
3  A.  No.
4  Q.  So it's your testimony that Mr. Jyran
5      Mitchell was never taken down to the
6      ground?
7  A.  That is correct.
8  Q.  So he was never laid down on the ground
9      in any way, shape, or form?
10 A.  No, sir.
11 Q.  Just so we're clear, it's your testimony
12     that Trooper Dumais did not do anything
13     that might be considered an emergency
14     take down or taking him down --
15     Mr. Mitchell down to the ground?
16 A.  Not that I saw.
17         MR. POSKOZIM:  What was that
18     question?
19 BY MR. SCHOOP:
20 Q.  To the best of your recollection, you did
21     not see Trooper Dumais perform what might
22     be called an emergency take down, pulling
23     Mr. Mitchell down to the ground?
24 A.  I did not see that.
25 Q.  Did you perform such a technique on

Page 141
1      Mr. Mitchell?
2  A.  No, sir.
3  Q.  At any point in time did you kick
4      Mr. Mitchell's leg out from beneath him
5      or strike his knee in any way, shape, or
6      form?
7  A.  No, sir.
8  Q.  You're sure about that?
9  A.  Yes, Sir.
10 Q.  Did you see Trooper Dumais do anything of
11     that nature?
12 A.  No, sir.
13 Q.  And you were the only two law enforcement
14     officers that were present at the moment
15     where this incident got physical,
16     correct?
17 A.  Yes, Sir.
18 Q.  And you're sure there was no other law
19     enforcement officers present besides you
20     and Trooper Dumais?
21 A.  Yes, Sir.
22 Q.  So Officer Brnicky was not present?
23 A.  No, Sir.
24 Q.  Trooper Reyes was not present?
25 A.  During that incident, no, Sir.

Exhibit G

DOMINIC BATES, 09/04/2019                    Page 142..145

Page 142

1  Q.  That specific question is focused on the
2      actual physical altercation?
3  A.  Yes, Sir.
4  Q.  Now, you said that the altercation lasted
5      approximately 20 seconds, correct?
6  A.  Around there, sure.
7  Q.  Now, how did it end?  How did the
8      altercation finally end or conclude?
9  A.  Mr. Mitchell was -- he ended up being
10     bent over at the waist and his arms -- we
11     got his arms behind his back and Trooper
12     Dumais placed him in to custody and then
13     Trooper Dumais walked him back to his
14     squad car where he then placed him in the
15     rear of his squad car.
16 Q.  Now, when Mr. Mitchell was placed in the
17     back of Trooper Dumais' squad car, was
18     there anybody else in the squad car?
19 A.  No.
20 Q.  At any point in time while Mr. Mitchell,
21     and please listen very carefully to this
22     question, it might save us some
23     questions, at any point in time after
24     Trooper Dumais put Mr. Mitchell in the
25     back of Trooper Dumais' squad car, did

Page 143

1      you ever get inside Trooper Dumais' squad
2      car?
3  A.  No, sir.
4  Q.  Okay.  Did Trooper Dumais ever get inside
5      his squad car?
6  A.  I believe he did.
7  Q.  And Mr. Mitchell was in the back of
8      Trooper Dumais' squad car, correct?
9  A.  I believe so.
10 Q.  Did Trooper Dumais' squad car, did it
11     have one of those partitions?
12 A.  If I remember --
13 Q.  Just so the question is clear, when I am
14     saying one of those partitions, I mean a
15     partition between -- that would separate
16     the back of the squad car from the front
17     of the squad car?
18 A.  If I recall correctly, yes.
19 Q.  And was Mr. Mitchell handcuffed behind
20     his back or in front of his back?
21 A.  Behind his back.
22 Q.  Excuse me, in front or behind?
23 A.  Behind his back.
24 Q.  And was Mr. Mitchell saying anything as
25     he was being taken to Trooper Dumais'

Page 144

1      squad car?
2  A.  He may have.  I don't recall.
3  Q.  And once Mr. Mitchell was in the back of
4      Trooper Dumais' squad car, where were
5      you?
6  A.  I think I was in the front of his squad
7      car or I was close by where they were as
8      he was placing Jyran in to the rear of
9      the vehicle.
10 Q.  Once Jyran was actually inside Trooper
11     Dumais' squad car, where did you stand?
12     I'm assuming that you were standing
13     somewhere.
14 A.  Yes, I was.  I just don't recall where.
15 Q.  But did you not get inside Trooper
16     Dumais' vehicle, correct?
17 A.  Correct.
18 Q.  Now, Trooper Dumais got in the front of
19     his squad vehicle, correct?
20 A.  I believe so.
21 Q.  Did you observe Trooper Dumais having any
22     words or conversation with Mr. Mitchell
23     while they were both in the squad car?
24 A.  I believe they were -- they were talking
25     about something.

Page 145

1  Q.  Could you see them?
2  A.  I could see them.
3  Q.  Let's break it down in to parts.
4  A.  Okay.
5  Q.  You could see them in the car, correct?
6  A.  Yes, Sir.
7  Q.  Dumais in the front, Mitchell in the
8      back, correct?
9  A.  Yes, Sir.
10 Q.  Mitchell is in handcuffs, correct?
11 A.  Yes, Sir.
12 Q.  Could you see them talking?
13 A.  I believe they were, yes, Sir.
14 Q.  Now, you seem like you were hesitant.
15     Why did you believe that they were
16     talking?
17 A.  I wasn't sure if Trooper Dumais was on
18     the radio, if he was talking to Jyran
19     Mitchell, if he was talking out loud.  I
20     believe he was talking to Jyran.
21 Q.  How long, approximately, were Trooper
22     Dumais and Mr. Mitchell in the squad?
23 A.  I do not know.  It was a short period of
24     time.  It was probably maybe over a
25     minute, two minutes.

Exhibit G

Page 146

1  Q. Two minutes?
2  A. Maybe less. I don't know.
3  Q. So maybe a minute, maybe two, but
4     sometime between one to two minutes?
5  A. I don't know. I can't definitively say.
6     I just know it wasn't an extended period
7     of time. It wouldn't have been anything
8     longer than five minutes, I can
9     definitively say that.
10 Q. So you're definitely sure not more than
11    five, possibly one to two?
12 A. Sure. Yes, Sir.
13 Q. Okay. You could not -- could you or
14    couldn't you hear anything that they were
15    saying while they were inside the car?
16 A. I could not.
17 Q. You heard absolutely nothing that was
18    said by or between Trooper Dumais or
19    Mr. Mitchell while they were inside the
20    trooper's car, right?
21 A. I think I could hear muffled
22    conversation, but as far as anything
23    substantial, I couldn't -- I didn't know
24    what they were discussing.
25 Q. So what they may or may not have been

Page 147

1     discussing was a complete mystery to you?
2  A. Yes, Sir.
3  Q. At some point, I take it, Trooper Dumais
4     got out of his vehicle, correct?
5  A. That's correct.
6  Q. As Trooper Dumais got out of his vehicle,
7     did you ask him any questions?
8  A. I don't believe so.
9  Q. As Trooper Dumais got out of his vehicle,
10    what did you see him do, if anything?
11 A. He then got -- he went over to the --
12    where Jyran was placed in the rear of his
13    vehicle and removed Jyran from the
14    vehicle, asked Jyran to step out.
15 Q. Did Jyran step out?
16 A. He did.
17 Q. Was he resisting in any way?
18 A. No.
19 Q. Was he fighting?
20 A. No.
21 Q. And as Jyran got out of the vehicle, what
22    happened next?
23 A. Trooper Dumais released him from custody.
24 Q. Trooper Dumais removed the handcuffs from
25    Jyran, correct?

Page 148

1  A. Correct.
2  Q. And you saw this happen?
3  A. Yes.
4  Q. As you saw Trooper Dumais remove the
5     handcuffs from Jyran Mitchell, what --
6     did you ask Trooper Dumais what was going
7     on, why he was releasing him?
8  A. I think I was -- at some point I did.
9  Q. At what point did you ask Trooper Dumais?
10 A. I don't know, but I believe -- I
11    believe -- I know initially when he was
12    removing the handcuffs I did not
13    understand why. I did not know why.
14    After the handcuffs came off I believe
15    Trooper Dumais voluntarily stated that
16    that was not Shawn.
17 Q. So Trooper Dumais told you that the
18    individual that he was taking out of the
19    handcuffs was not Shawn?
20 A. Correct. I believe he was the one who
21    told me that, yes, Sir.
22 Q. Did Trooper Dumais tell you why he knew
23    that to be the case?
24 A. If I recall correctly, I believe he said
25    that --

Page 149

1  Q. He being?
2  A. Trooper Dumais.
3  Q. Okay.
4  A. That Trooper Dumais performed a Secretary
5     of State image search for drivers
6     license --
7  Q. Okay.
8  A. -- and compared the photographs of Jyran
9     and Shawn.
10 Q. Okay. And that was not done before you
11    and Trooper Dumais approached the house,
12    correct?
13 A. I did not do that.
14 Q. Did you ask Trooper Dumais if he had ever
15    done that before approaching the house?
16 A. No, I don't believe I did.
17 Q. Did Trooper Dumais ever tell you at any
18    later point in time why he didn't do that
19    before?
20 A. Not that I can recall.
21 Q. Okay. I am going to show you now what's
22    been previously marked as Exhibit No. 2.
23    Exhibit No. 2 is previously produced in
24    the lawsuit. It appears to be your
25    Village of Matteson Police Department

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 150..153

Page 150
1    Incident Report identified by some
2    numbers, 18MS02484. It appears to be a
3    three-page document Bates labeled
4    Matteson 9, Matteson 10, and Matteson 11.
5        Now, take a moment to look at that
6    document. Is this the incident that you
7    prepared concerning the incident?
8  A. Yes, Sir.
9  Q. Okay. You would agree that it is a three
10    page document, correct?
11 A. Yes, Sir.
12 Q. And on page -- actually it's numbered at
13    the top. Well, the first page doesn't
14    have it, but the second page says Page 2
15    of 3 and the third page is Page 3 of 3?
16 A. Yes, Sir.
17 Q. Did you author this incident report?
18 A. Yes, Sir.
19 Q. Did anyone assist you in authoring this
20    incident report?
21 A. No, sir.
22 Q. Did you consult with anyone about
23    information -- what information to
24    include or exclude from this report?
25 A. I consulted with dispatch for, I think,

Page 151
1    ISPERN number and for the -- at the very
2    end where it says reference MFD ambulance
3    run number.
4  Q. And you're referring to the last page of
5    the report, correct?
6  A. Yes, Sir.
7  Q. Let me put it to you this way: Is there
8    any portion of this report that contains
9    information that was not independently
10    supplied by you apart from what you just
11    told me?
12 A. No, Sir.
13 Q. So numbers of reports, things of that
14    nature?
15 A. No, sir.
16 Q. Okay. Is it your testimony that the
17    incident report, this incident report
18    that's marked as Exhibit 2, contains a
19    complete account of everything that
20    transpired between you and Trooper Dumais
21    and Mr. Mitchell on February 2nd, 2018,
22    to the best of your recollection?
23        MR. MCGRATH: Object to the
24    form of the question.
25 BY MR. SCHOOP:

Page 152
1  Q. Let me put it to you this way: Do you
2    think this is a complete and accurate
3    report?
4  A. It's a summarization of things that
5    happened.
6  Q. In fact, the first thing you wrote, the
7    first two words in your narrative you
8    wrote in summary, correct?
9  A. Yes, Sir.
10 Q. It's not a verbatim account, is it?
11 A. I mean, it --
12 Q. Well, if it says in summary, it means by
13    definition not verbatim, correct?
14 A. Correct.
15 Q. I am not asking you if it's a verbatim
16    account. My original question is do you
17    believe it's accurate?
18 A. I believe it's accurate, yes, Sir.
19 Q. Do you think it's misleading in any way?
20 A. In --
21 Q. I am asking you as the author of this
22    report, does this information contain
23    inaccurate information that might cause
24    someone to read it and cause them to be
25    mislead about what transpired that night?

Page 153
1  A. No, sir.
2  Q. Now, is this the final version of this
3    incident report?
4  A. Yes, Sir.
5  Q. Were there any prior draft versions of
6    this incident report?
7  A. That I don't recall.
8  Q. So I am going to direct your attention to
9    the bottom right-hand corners. If you
10    look at each page you will notice each
11    page has a line that says Officer's
12    Initials?
13 A. Uh-huh.
14 Q. Is that a yes?
15 A. Yes, Sir. Yes, Sir.
16 Q. There's a line beneath -- right next to
17    Officer's Initials there's a line and the
18    date 3/14/18?
19 A. Yes, Sir.
20 Q. Is that a date March 14, 2018?
21 A. Yes, Sir.
22 Q. Do you believe that this incident report
23    was created on or about March 14, 2018?
24 A. No, sir.
25 Q. Why?

Urlaub Bowen & Associates, Inc.   312-781-9586          Exhibit G

DOMINIC BATES, 09/04/2019                    Page 154..157

Page 154

1  A. From my understanding of the software for
2     our report writing system, that date is
3     generated from when the report was
4     printed.
5  Q. So you believe that March 14th date
6     reflects the date that this version was
7     printed?
8  A. I believe so.
9  Q. So here's my next question for you, do
10    you see at the last page of Page 3 of 3,
11    at the very end of the narrative section?
12 A. Yes, Sir.
13 Q. There are multiple lines.  There's one
14    line that says Reporting Officer: D.
15    Bates?
16 A. Yes.
17 Q. The D. Bates is printed, correct?
18 A. Yes, Sir.
19 Q. It's not handwritten, correct?
20 A. Yes, Sir.
21 Q. And then there's a line that -- there's a
22    blank line next to the word signature?
23 A. Yes, Sir.
24 Q. Did you ever sign this document?
25 A. Not this particular one that you have.

Page 155

1  Q. When you mean this particular one that I
2     have, what do you mean?
3  A. Every report that we draft we have to
4     sign.
5  Q. Okay.  Do you believe that there's an
6     actual signed version of this report?
7  A. Yes, Sir.
8  Q. Do you know where it is?
9  A. I don't work there.  I have no clue.
10 Q. You don't work there anymore?
11 A. Yes, sir.
12 Q. If I wanted to get a signed version of
13    this document, do you know how I could
14    get one?
15 A. You probably would have to either FOIA or
16    subpoena them for the specific --
17 Q. Okay.  Now, is it fair to say that if
18    this version -- for the report to be
19    final, you had to sign it, correct?
20 A. Not necessarily.
21 Q. I earlier asked you if this was the final
22    version report and you believed it was,
23    correct?
24 A. Yes, Sir.
25 Q. But you would agree with me that you

Page 156

1     didn't -- your physical signature is not
2     on this report and there's also no
3     signature next to the approval line,
4     correct?
5  A. That's correct.
6  Q. And there's no dates on this document?
7  A. That's correct.
8  Q. If it's not signed by you and it's not
9     signed -- I'm assuming it's a superior
10    officer that would review and approve
11    this report, correct?
12 A. Yes, Sir.
13 Q. How do we know that this, in fact, is the
14    final version of the report?
15 A. A supervisor has to go into the computer
16    and physically read the report and
17    actually has to sign off on the report
18    electronically, approve it and print it.
19 Q. So could there be an electronic version
20    that has an electronic signature on the
21    incident report?
22 A. I don't believe they upload the signed
23    copies electronically.  What I am trying
24    to say is when I write a report, when I
25    am finished with the report, I send the

Page 157

1     report electronically to my supervisor
2     with no signature.  He or she would sign
3     off or approve the report, put it in
4     approval status, meaning that they
5     reviewed it and approved the report and
6     then they would print the report.
7  Q. Okay.
8  A. And then the report -- they would sign it
9     and then I would sign it and then it
10    would get put in a book with every other
11    report.
12 Q. Essentially when you said you would print
13    it, you would print a hard copy of the
14    electronic version and it would be signed
15    by you and countersigned by your
16    supervisor?
17 A. Correct.
18 Q. Or the approving officer?
19 A. Correct.
20 Q. The approving officer would have been a
21    supervisor, correct?
22 A. Correct.
23 Q. To your best recollection, who was the
24    superior officer that reviewed and
25    approved this particular incident report

Exhibit G

DOMINIC BATES, 09/04/2019                          Page 158..161

Page 158

1      for the February 2nd, 2018, incident?
2   A. I believe it was Officer Brnicky.
3   Q. And that would have been the officer that
4      later arrived on the scene?
5   A. Yes, Sir.
6   Q. Why do you believe it was Officer Brnicky
7      in particular?
8   A. Traditionally if you have a report,
9      whatever report you're doing for that
10     shift, would get sent to whoever was the
11     supervisor that day for that shift,
12     traditionally.
13  Q. Now, I want to direct your attention to
14     the third full paragraph on Page 2 of
15     your report. Actually let's start with
16     Page 1. Let's do it in order.
17        If you can go to Page 1, in this
18     report you mention that the person's
19     involved -- before we start all that,
20     when -- what day did you actually prepare
21     this report?
22  A. I don't know. I would assume it would
23     have been that night, the night of
24     February 2nd, 2018.
25  Q. You're saying you're assuming it was the

Page 159

1      same night or you know it was the same
2      night?
3   A. I don't know. Our reports and when they
4      get done depends on our -- what's going
5      on in town. If we're busy, we don't
6      have --
7   Q. If it would have been a busy night or a
8      busy week you might not have prepared
9      this report until a week later, two weeks
10     later?
11  A. Not two weeks later. Maybe a couple of
12     days afterwards depending if it was
13     really busy or not.
14  Q. It's possible, according to your
15     testimony, that you did not
16     contemporaneously prepare this report the
17     day of the incident?
18  A. It is possible.
19  Q. It could have been two, three, four days
20     later depending how busy it was in the
21     Village of Matteson, correct?
22  A. That is correct.
23  Q. And you also would have reviewed the
24     Illinois State Police Field Report before
25     preparing this document, correct?

Page 160

1   A. No.
2   Q. Well, when you mention in the very first
3      paragraph of your narrative where you
4      wrote in summary on above date and time
5      R/O, R/O stands for responding officer,
6      correct?
7   A. Responding, reporting.
8   Q. Responding and/or reporting?
9   A. Either way. They are used --
10  Q. In this particular report R/O would mean
11     you, correct?
12  A. Yes.
13  Q. R/O was dispatched to the above address
14     regarding assisting Illinois State Police
15     in locating a subject that had fled from
16     them on a traffic stop; is that correct?
17  A. Yes, Sir.
18  Q. Now, you didn't mention anything in this
19     report about this being a possible DUI
20     investigation, correct?
21  A. I don't --
22  Q. Look at the report. Look at the report.
23  A. It appears that I did not.
24  Q. That would be an important detail,
25     correct?

Page 161

1         MR. MCGRATH: Objection.
2      Form of the question.
3   BY MR. SCHOOP:
4   Q. You're an officer. You can answer the
5      question. If you're responding assisting
6      somebody else who told you that they
7      suspect someone was fleeing because they
8      were DUI, wouldn't you want that detail
9      in the report?
10        MR. MCGRATH: Objection.
11     Misstates the evidence.
12  BY MR. SCHOOP:
13  Q. Well, that's one opinion. Please answer
14     the question.
15  A. It's not necessary.
16  Q. Well, what dictates what's necessary and
17     what -- what is or isn't necessary to
18     include in the report? Do you have
19     discretion to decide what facts go in a
20     report?
21  A. I don't understand. In what sense?
22  Q. Well, you were there?
23  A. Right.
24  Q. Trooper Dumais was there? Jyran was
25     there. I wasn't there. Mr. McGrath

Exhibit G

DOMINIC BATES, 09/04/2019                           Page 162..165

Page 162

1    wasn't there.  The court reporter wasn't
2    there.  We can all watch an event.  You
3    drafted the report.  You can -- if your
4    supervising Officer Brnicky wasn't there,
5    you're the first report.  We have to rely
6    on what you tell us.
7  A.  Right.
8  Q.  You can write the narrative essentially,
9      you would agree with that?
10 A.  Correct.
11 Q.  When you're writing a narrative, if you
12     decide to insert certain facts or omit
13     other facts that could shape the
14     narrative, correct?  You would agree with
15     that general proposition, correct?
16 A.  Yes.
17 Q.  So my question is this:  Wouldn't you
18     agree that if you're assisting a state
19     trooper who told you at the scene that
20     this guy fled and I think he was a
21     possible DUI, isn't that an important
22     detail that you would want to put in the
23     incident report?
24 A.  Not necessarily.
25 Q.  Why not?

Page 163

1  A.  People flee all the time.
2  Q.  People flee all the time for all kinds of
3      reasons, right?
4  A.  That's correct.
5  Q.  This particular reason, though, you were
6      told by the other officer that that
7      officer suspected that the person was
8      fleeing because of a possible DUI,
9      correct?
10 A.  Correct.
11         MR. MCGRATH:  Objection to
12     the form of the question, suspect.
13 BY MR. SCHOOP:
14 Q.  You also know that when you're assisting
15     an officer and you did not see what
16     actually transpired, you have to rely on
17     what that officer is telling you,
18     correct?
19 A.  Correct.
20 Q.  But if that officer gives you information
21     that causes you to suspect that maybe
22     that officer is not accurate, you would
23     agree as a police officer that you have
24     to step back and confirm the information,
25     correct?

Page 164

1  A.  How do you mean?
2  Q.  Well, if the officer told you, hey, the
3      guy I am looking for is five foot ten, if
4      he initially told you the guy he was
5      looking for was five foot ten, is white,
6      like pale white, and then when you get to
7      the scene he sees this black kid and says
8      oh, that's the guy, would you have any
9      cause for pause because the officer seems
10     to be contradicting what he told you
11     earlier?
12 A.  Sure.
13 Q.  So if the officer -- you would want to
14     put that kind of detail in there,
15     correct?
16 A.  What detail?
17 Q.  The inconsistency?
18 A.  The situation you're referring to with
19     the hypothetical white guy and he grabs a
20     black guy?
21 Q.  Right.
22 A.  Yes, that would probably -- that might go
23     into a report.
24 Q.  Would the fact that there was an
25     inconsistency about the description of

Page 165

1      the vehicle, would that go into the
2      report, too?
3  A.  Yes.
4  Q.  So if Dumais told you, hey, I was looking
5      for a Jaguar, but now you're hearing it's
6      a Chevy, was that cause for pause for you
7      and you might want to highlight that
8      inconsistency?
9  A.  I believe I did.
10 Q.  So you put that fact in there?
11 A.  Yes.
12 Q.  And where did you put it?
13 A.  When I stated reference ISPERN number
14     regarding black 2013 Jaguar that had fled
15     from a traffic stop bearing Illinois
16     registration AL 68377 and then the next
17     paragraph --
18 Q.  So the second paragraph is what you're
19     referring to the Jaguar, correct?
20 A.  Correct.
21 Q.  But that information was supplied to you
22     by the ISPERN, correct?
23 A.  The ISPERN and the dispatch that I
24     received.
25 Q.  But in Paragraph 3, the next paragraph,

Exhibit G

DOMINIC BATES, 09/04/2019                                   Page 166..169

Page 166

1     that information was provided to you by
2     Trooper Dumais, correct?
3  A. Yes, and then I verified it when I was
4     walking up with him.
5  Q. Okay. But when you were walking up to
6     the house with Trooper Dumais, Trooper
7     Dumais told you at that point he thought
8     it was the black Chevy that was the car
9     that fled, even though you had previously
10    been informed it was a Jaguar, correct?
11 A. Correct.
12 Q. And you didn't mention anything about
13    alcohol or a possible DUI, correct?
14 A. In the report?
15 Q. Correct.
16 A. Correct.
17 Q. You didn't mention that Jyran didn't
18    smell of alcohol, correct?
19 A. Correct.
20 Q. In fact, if Jyran didn't smell of
21    alcohol, that would be more relevant and
22    significant if this report had mentioned
23    that this was a possible DUI
24    investigation, correct?
25 A. Potentially.

Page 167

1  Q. Thank you. You didn't mention that there
2     was no search warrant, correct?
3  A. Correct.
4  Q. You didn't mention in your report that
5     Jyran voluntarily stepped out and
6     initially walked out, correct?
7  A. I did. As the unknown -- in Paragraph 5,
8     the first sentence, as the unknown male
9     black exited the residence Trooper Dumais
10    attempted to detain the unknown subject.
11 Q. But you didn't affirmatively write that
12    Mr. Mitchell was attempting to flee
13    before Trooper Dumais attempted to detain
14    him, correct?
15 A. Again, I did not perceive that to be an
16    attempted flight, so no, I did not
17    include it.
18 Q. And essentially despite the fact that
19    Mr. Mitchell was not trying to flee,
20    Trooper Dumais just immediately grabbed
21    him when he allegedly heard
22    Mr. Mitchell's grandmother refer to him
23    as Shawn, correct?
24 A. After he had exited the residence,
25    correct.

Page 168

1  Q. Now, you mention in the very bottom
2     paragraph, and I numbered them. I guess
3     the second to last paragraph which
4     appeared to be Paragraph 8 that starts
5     with Trooper Dumais was able to obtain an
6     SOS image of Shawn Mitchell and showed it
7     to responding or reporting officer,
8     that's referring to you, correct?
9  A. Yes.
10 Q. When specifically did Trooper Dumais show
11    you the Secretary of State image of Shawn
12    Mitchell?
13 A. I believe it was after he had released
14    Jyran from custody.
15 Q. Describe this SOS image to me.
16 A. I believe I put it in that same
17    paragraph. I said which did look very
18    similar to the unknown male black subject
19    that Trooper Dumais had detained. R/O
20    observed that the SOS image showed Shawn
21    Mitchell to have very short hair and the
22    subject detained had hair that was
23    approximately one to two inches in
24    length, appearing to be upright and
25    twisted.

Page 169

1  Q. So let me ask you a question. The SOS
2     image, did it have -- did the person have
3     dreads or twisted hair?
4  A. Not in the SOS image, no.
5  Q. Did Jyran Mitchell have longer hair than
6     what the person in the SOS picture was
7     depicted as having?
8  A. He did, but not much longer.
9  Q. Did they look alike?
10 A. They did.
11 Q. Now, after Jyran was released, what, if
12    anything, did Jyran's grandmother say?
13    She was -- she was pretty animated at
14    that point, wasn't she?
15 A. I don't remember. I remember -- I
16    remember -- I'm sorry, I don't remember
17    specifically what she had stated to us.
18 Q. Let's just do this: I am going to ask
19    you a couple of questions and you tell me
20    if you agree or disagree, just don't
21    remember?
22 A. Okay.
23 Q. Do you remember Mrs. Mitchell, Jyran's
24    grandmother, yelling or saying words to
25    the effect you're all so cruel, why are

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 170..173

Page 170

1    you being so cruel to my grandson?
2  A.  She may have.
3  Q.  You don't remember one way or the other?
4  A.  No.
5  Q.  You don't remember Mrs. Mitchell telling
6      Jyran to go back inside the house after
7      he had been released?
8  A.  I believe she did say that.
9  Q.  Do you recall Mrs. Mitchell, Jyran's
10     grandmother, when I say -- for this line
11     of questioning when I say -- let's just
12     be clear.  Carolyn Mitchell I will
13     formally represent to you is Jyran's
14     mother, excuse me, grandmother.  Carolyn
15     is his grandmother.
16 A.  Okay.
17 Q.  Did Carolyn Mitchell ever -- did you ever
18     hear her words -- say words to the
19     effect -- her expressing concern that you
20     or Trooper Dumais might shoot Jyran?
21 A.  I don't recall.
22 Q.  Is that something that you're likely to
23     forget?
24 A.  Given what happened when the rest of the
25     family showed up, some of the statements

Page 171

1      that were made had blended together and I
2      don't recall specifically who would have
3      stated them.
4          MR. POSKOZIM:  I only got
5      about half of that answer.
6          THE WITNESS:  I said given
7      some of the statements that were made
8      once the rest of the family and friends
9      showed up, I cannot definitively state
10     who said what in regards to the statement
11     of his grandmother asking if we were
12     going to shoot Jyran.
13 BY MR. SCHOOP:
14 Q.  Now, do you believe that she might have
15     said this before Jyran's parents, his
16     mother and father, arrived at the house
17     or is it after?
18 A.  I don't recall.
19 Q.  Okay.  Now, you do realize that Jyran's
20     parents did arrive at the scene, correct?
21 A.  Yes.
22 Q.  Now, you also said earlier that Officer
23     Brnicky arrived at the scene and Trooper
24     Reyes arrived at the scene, correct?
25 A.  Yes.

Page 172

1  Q.  Let's work on some chronology here so we
2      can help paint the picture for us that
3      weren't there that night.  Did Trooper
4      Reyes arrive after Mr. Mitchell was
5      released by Trooper Dumais or before?
6  A.  Let me refer to my report.
7  Q.  Before you do that, do you have an
8      independent recollection independent of
9      that report of when Trooper Reyes
10     arrived?
11 A.  I believe he showed up right after Jyran
12     was released.
13 Q.  Right after or right as he was being
14     released?
15 A.  Around that time.  Around the very finite
16     timeframe of either him getting removed
17     from the vehicle or him being released
18     from custody.
19 Q.  Did you hear Trooper Reyes or Trooper
20     Dumais talking about why Jyran was being
21     released?
22 A.  I believe they were discussing -- having
23     a conversation.  As to what the
24     conversation was about, I don't know.
25 Q.  And then do you recall any -- while it

Page 173

1      was just the three of you officers, you
2      and the two troopers, did anyone tell or
3      engage Jyran's grandmother in a
4      conversation where after he had been
5      released telling her words to the effect
6      that Jyran had fled the scene of an
7      accident and that he, in fact, had been
8      driving the car even after he had been
9      released from -- been released by Trooper
10     Dumais?
11 A.  I don't know.
12 Q.  Is it possible that you would have said
13     something like that?
14 A.  No.
15 Q.  Because you knew that was not false --
16     you knew that that was just not correct?
17 A.  I didn't know what he had done, so I
18     wouldn't have made allegations as to
19     something I didn't observe or know.
20 Q.  So essentially you're not going to make
21     an assumption unless you had actually
22     seen the event?
23 A.  Not necessarily.  I mean, I don't have --
24 Q.  Let me put it to you this way:  I am not
25     trying to play gotcha games and I'm not

Exhibit G

Page 174

1   trying to put words in your mouth, but I
2   want to be really clear about what was or
3   did or didn't happen. When Trooper
4   Dumais and you were talking, Trooper
5   Dumais said that he was -- the guy
6   definitely fled the traffic stop,
7   correct?
8  A. He said that somebody had fled.
9  Q. Somebody had fled. Did Trooper Dumais
10   ever tell you that he actually saw the
11   person driving the Jaguar?
12  A. I believe he told me that when he went to
13   go effect the traffic stop the car would
14   not pull over right away, so he pulled up
15   next to it and made eye contact -- either
16   made eye contact or observed who the
17   driver of the vehicle was.
18  Q. And did he tell you what the driver of
19   the vehicle he observed with his own two
20   eyes looked like?
21         MR. MCGRATH: Object to the
22   foundation. At what point are we talking
23   about?
24         MR. SCHOOP: Fair enough.
25   Let me clarify.

Page 175

1  BY MR. SCHOOP:
2  Q. At any point on February 2nd, 2018, did
3   Trooper Dumais tell you that he
4   positively saw a black male driving the
5   Jaguar on 294?
6  A. I believe he did, yes.
7  Q. And when do you believe Trooper Dumais
8   said that to you?
9  A. I have no idea.
10  Q. You have no idea if it was before Jyran
11   was released or after he was released?
12  A. I mean, I think it was before and then it
13   was --
14  Q. Let me put it to you this way: Do you
15   think that Trooper Dumais said that to
16   you as you and he were approaching the
17   house to knock on the door?
18  A. I don't know.
19  Q. The description of the person you're
20   looking for, that would be an important
21   detail, correct?
22  A. Understood.
23  Q. You agree with that, correct?
24  A. Yes, Sir.
25  Q. You also agree that the description of

Page 176

1   the car as you were approaching the house
2   Dumais was telling you I think it's that
3   Chevy, but earlier the ISPERN told you it
4   was a Jaguar, correct?
5  A. Correct.
6  Q. So if that was a little conflicting, you
7   want to make the sure the description of
8   the person you're looking for is
9   accurate, correct?
10  A. Correct.
11  Q. Is it possible that while you're
12   approaching the house you'd asked Trooper
13   Dumais for clarification of the
14   description and during that time Trooper
15   Dumais told you that he saw the person
16   driving the vehicle, the Jaguar or the
17   vehicle that fled, and that person was,
18   in fact, a black male?
19  A. Again, I don't know when that was
20   discussed.
21  Q. But it was discussed sometime that night?
22  A. I believe so.
23  Q. Okay.
24  A. I would imagine it was.
25  Q. So you believe and imagine it was done

Page 177

1   that night, but you don't know for sure?
2  A. Correct.
3  Q. Is it possible that that particular
4   detail might have been a detail that you
5   and he discussed during those multiple
6   telephone conversations you had --
7  A. No.
8  Q. Let me finish the question.
9       -- after you found out that you were
10   being sued?
11  A. No.
12  Q. You certain of that?
13  A. Yes.
14  Q. Now, you don't recall ever saying words
15   to the effect that -- do you remember any
16   officer on the scene that night after
17   Jyran was released saying he fled,
18   accusing Jyran of fleeing the scene of an
19   accident?
20  A. No, I don't recall that.
21  Q. You don't believe you said that?
22  A. No.
23  Q. Okay. Did you ever hear anybody suggest
24   that the vehicle stop -- the traffic stop
25   was arising from an accident?

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 178..181

Page 178

1  A.  Not that I recall.
2  Q.  The ISPERN had told you fleeing the scene
3      of a traffic stop and possible DUI, but
4      didn't mention anything about an
5      accident, correct?
6  A.  Correct.
7  Q.  And you do realize that fleeing the scene
8      of an accident, that is considered either
9      a Class A misdemeanor or possibly a low
10     level felony in Illinois, correct?
11 A.  Depending what happened as a result of
12     the accident, yes, Sir.
13 Q.  Okay.  So depending on the circumstances,
14     correct?
15 A.  Correct.
16 Q.  So that would be a salient point to put
17     in a report, assuming that there's going
18     to be a criminal prosecution, correct?
19 A.  If I was -- if it was my investigation,
20     correct, yes.
21 Q.  Fair enough.  Let's do this:  Given the
22     nature of the lawsuit and the claims that
23     are being raised, I am going to have to
24     ask you some questions concerning your
25     finances.

Page 179

1      Now, before we go any further with
2      this, I want to be really clear about a
3      couple of things I'm asking for and, more
4      importantly, things that I am not asking
5      for.  Okay?
6  A.  Okay.
7  Q.  In no way, shape, or form am I asking you
8      to give me the names -- your social
9      security number.  I am not asking you to
10     give me the name of your spouse, names of
11     children, things of that nature.  I don't
12     need to get that information.  To the
13     extent that we need to go down that road,
14     I can deal directly with Mr. McGrath.
15     Okay?  But I do need to get some general
16     information about your financial status,
17     because there are -- there is the issue
18     of punitive damages based on some of the
19     allegations in the complaint.
20     If Mr. Mitchell were to prevail, if
21     you were found liable and if the jury
22     were to award, several ifs there, and you
23     can discuss that later with your client,
24     we would about entitled to know certain
25     information about your finances.  Let me

Page 180

1      ask you some basic questions.
2      You are currently employed, correct?
3  A.  Yes.
4  Q.  Approximately, and I am looking for a
5      gross amount, not looking for net, but
6      gross, approximately how much do you earn
7      annually in terms of income?
8  A.  Sixty-two a year.
9  Q.  $62,000.00?
10 A.  Around there.
11 Q.  Are you salaried or does this also
12     include overtime?
13 A.  Salaried.
14 Q.  Do you have any other source of income?
15 A.  No.
16 Q.  No outside income?
17 A.  No.
18 Q.  I realize that we stipulated earlier, I
19     am not going to ask you about what you do
20     for ATF, but let me ask you this:  Does
21     your employment as an ATF officer
22     prohibit you from having outside
23     employment?
24 A.  Again, I cannot discuss any of that
25     information.

Page 181

1      MR. SCHOOP:  You are going to
2      stand by that?
3      MR. MCGRATH:  Yes.
4  BY MR. SCHOOP:
5  Q.  So you're refusing to answer that
6      specific answer -- question?
7  A.  Yes, respectfully.
8  Q.  I understand.  I am not suggesting that
9      you are being respectful.  I understand
10     the unique circumstances in this
11     particular issue and I will respect it.
12     Let me ask you this:  You don't have
13     any outside sources of income apart from
14     your working for the ATF; is that
15     correct?
16 A.  Correct.
17 Q.  All right.  I can live with that.
18     You are married?
19 A.  Correct.
20 Q.  Does your spouse, again, I don't want
21     names, addresses or things, does your
22     spouse have an income?
23 A.  No.
24 Q.  Do you have -- do you currently have any
25     dependents?

Urlaub Bowen & Associates, Inc.    312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 182..185

Page 182

1   A.  No.
2   Q.  Do you expect to have some dependents in
3       the future?
4   A.  Yes.
5   Q.  I take it your wife is expecting,
6       correct?
7   A.  Correct.
8   Q.  And do you own a car?
9   A.  Yes.
10  Q.  I don't need the vehicle -- I don't need
11      the make, model, anything of that nature,
12      but do you know the current -- do you own
13      the car free and clear?
14  A.  Yes.
15  Q.  Do you know approximately what the Blue
16      Book value of that car would be?
17  A.  Probably $500.00.
18  Q.  Do you own a boat?
19  A.  No.
20  Q.  Do you own a house?
21  A.  No.
22  Q.  You're renting, I take it?
23  A.  No.
24  Q.  Are you living somewhere else right now?
25  A.  Yes.

Page 183

1   Q.  With family members?
2   A.  With my wife.
3   Q.  But do you rent your apartment?
4   A.  No.
5   Q.  But you don't -- you don't pay rent and
6       you don't pay a mortgage?
7   A.  We do pay.  We do not own.
8   Q.  Fair enough.  How much is your monthly
9       rent or mortgage?
10  A.  $1,600.00.
11  Q.  Do you currently have any debts such as
12      tuition for school?
13  A.  No.
14  Q.  How about your wife?
15  A.  No.
16  Q.  Any credit card debt?
17  A.  No.  Very minor.
18  Q.  How much would you estimate your monthly
19      living expenses to be currently, between
20      you and your wife before your dependent?
21  A.  $2,500.00, $2,600.00, $2,800.00.
22  Q.  Is all that paid from your salary?
23  A.  Yes.
24  Q.  Do you have any stocks, bonds, things of
25      that nature?

Page 184

1   A.  Just traditional retirement stuff.
2   Q.  401k?
3   A.  (Witness nods head.)
4   Q.  Yes?
5   A.  Yes.
6   Q.  Do you anticipate winning the lottery any
7       time soon?
8   A.  No.
9   Q.  Rich uncle, things of that nature, you
10      might have some windfall inheritance?
11  A.  No.
12  Q.  How long -- did you have any
13      conversations with Officer Brnicky -- I
14      am done now with the financial questions.
15      I am wrapping up and winding up now.
16          When you were still on the scene
17      after Mr. Mitchell was released from
18      Trooper Dumais' squad and before his mom
19      and dad showed up, did you ever attempt
20      to leave the scene?
21  A.  Before parents showed up, I believe we
22      were all three leaving and then we were
23      flagged back down.
24  Q.  Okay.
25  A.  I didn't actually leave.  I think the two

Page 185

1       troopers were starting to leave and then
2       they flagged me down and then I in turn
3       flagged them down.
4   Q.  Who?
5   A.  Jyran and, I'm sorry, what was her name
6       Carolyn, Ms. Mitchell.
7   Q.  His grandmother?
8   A.  Yes, Sir.  They both flagged us back down
9       and then I think I was trying to grab the
10      trooper's attention to come back as well.
11  Q.  Do you know why Carolyn and Jyran flagged
12      you down?
13  A.  If I recall correctly, it was to speak
14      with us about names, badge numbers, and
15      to wait for -- I believe the other family
16      members were coming.
17  Q.  Did Mr. -- Jyran's parents, Cherryl or
18      Shawn, Sr., eventually arrive at the
19      house?
20  A.  Yes.
21  Q.  And when they arrived at the house, what,
22      if anything, did you hear them say or say
23      to you or say to anybody?
24  A.  From my recollection of it, I really did
25      not discuss much with them.  I believe it

Exhibit G

Page 186

1    was Trooper Dumais that was discussing
2    what had happened or what was going on.
3    I do recall conversations that
4    Mr. Mitchell, Shawn Sr., was having
5    with -- I shouldn't say conversations.
6    People were just talking at us about the
7    police profiling them.
8  Q.  Now, you mentioned profiling earlier, and
9      I just want to make sure the record is
10     clear, when you say profiling, is it your
11     testimony that Jyran's father Shawn
12     Mitchell, Sr., was implying, suggesting,
13     or otherwise accusing you or the other
14     officers of engaging in racial profiling?
15 A.  Correct.
16 Q.  What specifically did Shawn, Sr. say
17     about racial profiling that you
18     considered to be racial profiling?
19 A.  The police were always after him and his
20     family for nothing.  I believe when
21     Trooper Dumais asked something about
22     Shawn, Shawn, Sr. then stated I guess we
23     all look like or I bet we all look alike
24     or something along those lines.
25 Q.  And you actually put that in your

Page 187

1      incident report in quotation marks on the
2      second page or third page, correct?
3  A.  Yes, Sir, second to last paragraph.
4  Q.  But you didn't likewise put quotations
5      marks that Jyran didn't smell of alcohol
6      or have bloodshot eyes, correct?
7  A.  Correct.
8  Q.  Now, who was Shawn, Sr. specifically
9      directing these comments to, if anyone?
10 A.  It seemed like everybody, all police
11     officers on scene.
12 Q.  Was there one particular person that he
13     was talking to, though, about the
14     situation?  For example, was he talking
15     to you specifically, having a
16     conversation before he was making these
17     accusations or was he talking to Trooper
18     Dumais?
19 A.  I believe at one point he might have been
20     speaking with Officer Brnicky.
21        MR. POSKOZIM: I'm having
22     some problems with your voices dropping
23     off again.  If you could raise your
24     voices.
25        MR. SCHOOP:  Sorry, Richard.

Page 188

1    We will speak up.
2        MR. POSKOZIM:  Thank you.
3        THE WITNESS:  I was saying
4    that I believed Shawn, Sr. might have had
5    a conversation with Officer Brnicky from
6    our police department, the Matteson
7    Police Department, but I don't recall
8    specifically having a conversation -- an
9    actual conversation with him.  He was
10   very irate.  He was yelling and
11   screaming.
12 BY MR. SCHOOP:
13 Q.  Now, Officer Brnicky -- did Officer
14     Brnicky ever talk to Jyran before leaving
15     the scene?
16 A.  Yes.
17 Q.  What did officer -- did you actually see
18     Officer Brnicky talk to Jyran and
19     actually hear what the two gentlemen were
20     saying to each other?
21 A.  Hear, no.  Observe, yes.
22 Q.  So you saw Officer Brnicky talking to
23     Jyran, but you could not actually hear
24     the words that were being exchanged
25     between the two?

Page 189

1  A.  Yes, correct.
2  Q.  So anything that you would have known
3      about was or wasn't said between Officer
4      Brnicky and Jyran Mitchell is based on
5      what Officer Brnicky told you later,
6      correct?
7  A.  Correct.
8  Q.  What did Officer Brnicky tell you later
9      about what he allegedly said to Jyran
10     Mitchell before leaving the Goldenrod --
11 A.  I believe he asked Jyran if he was hurt
12     and Jyran stated he was not injured.
13 Q.  Okay.  Now, were you -- did you ever see
14     the Mitchell family again that evening on
15     February 2nd, 2018, after you left 612
16     Goldenrod Circle?
17 A.  Yes.
18 Q.  Where did you see them?
19 A.  I was in the police station after the
20     incident occurred and they arrived in the
21     police station lobby.
22 Q.  Were you in the lobby when they arrived?
23 A.  I don't believe so.  I think it was in
24     our records area, which has a direct line
25     of sight to the lobby.

Exhibit G

DOMINIC BATES, 09/04/2019                               Page 190..193

Page 190

1  Q. You could see them walking in?
2  A. See them as they are at the window, yes.
3  Q. What, if anything, did you do when you
4     saw the Mitchell family coming into the
5     police department, police station?
6  A. I might have asked Officer Brnicky to
7     come up front. I don't recall
8     specifically.
9  Q. Was there anybody else in the records
10    office or at the front desk or were you
11    by yourself?
12 A. There would have been a records clerk
13    there.
14 Q. So when the Mitchells first came into the
15    police station at Matteson, were you the
16    only one at the front?
17 A. There would have been another records
18    clerk that's up front.
19 Q. Who was that records clerk, if you
20    remember?
21 A. No idea.
22 Q. Do you know for a fact that there was a
23    records clerk or are you just assuming
24    there might have been?
25 A. There is always somebody on -- or

Page 191

1     somebody at the front desk 24 hours a
2     day. Sometimes it might not be a records
3     person. It might be an officer who is
4     filling in while a records person is
5     going to the bathroom or something.
6         MR. POSKOZIM: I can't hear
7     any of that answer.
8         THE WITNESS: I was saying
9     there's always somebody who is available
10    at the front records desk 24 hours a day.
11    Whether or not it's a records clerk, it
12    could be an officer who's filling in
13    while a records clerk is taking a small
14    break.
15        MR. POSKOZIM: Thank you.
16 BY MR. SCHOOP:
17 Q. Now, you said the Mitchells showed up at
18    the police department. What happened
19    when they walked it?
20 A. I don't know. I don't recall.
21 Q. You never talked to them?
22 A. I don't believe I did. I don't believe
23    so.
24 Q. You did mention that they showed up --
25    you mentioned them being -- in your

Page 192

1     incident report you mention the Mitchell
2     family showing up, correct?
3  A. Correct.
4  Q. How would you know to write this last
5     paragraph of your report describing that
6     incident if you didn't actually see it?
7     Were you relying on what somebody else
8     told you?
9  A. Any time that we would have called the
10    paramedics that comes over our radio band
11    to the dispatchers who then dispatch the
12    paramedics.
13 Q. So this last paragraph that talks about
14    the paramedic dispatch and alleged
15    refusal of medical treatment by Jyran
16    Mitchell, that information was related to
17    you by the ambulance driver?
18 A. That I don't recall. It might have been
19    Officer Brnicky who relayed that, too,
20    them or the ambulance.
21 Q. So you don't have actual personal
22    knowledge about what was said by Jyran
23    Mitchell or his parents to the ambulance
24    driver? This is something somebody else
25    told you; is that correct?

Page 193

1  A. Correct. If you're asking if I observed
2     their conversation with the ambulance
3     driver, I did not.
4  Q. So you don't know how accurate or
5     complete this last paragraph in Page 3 of
6     3 of your incident report is, correct?
7  A. I disagree.
8  Q. Well, you didn't personally see it,
9     correct?
10 A. Correct.
11 Q. You're relying on what other people told
12    you happened, correct?
13 A. Correct.
14 Q. I am not asking you do you believe it or
15    not. I am asking you you don't know for
16    a fact that it's 100 percent verbatim,
17    it's accurate, correct?
18 A. I can't say that.
19 Q. Because you didn't see it, correct?
20 A. That's not what I am saying.
21 Q. What are you saying?
22 A. I'm saying that I can't state that it's
23    not 100 percent accurate. Just because I
24    didn't observe something doesn't mean
25    it's not 100 percent accurate.

Urlaub Bowen & Associates, Inc.   312-781-9586

Exhibit G

DOMINIC BATES, 09/04/2019                    Page 194..197

Page 194

1  Q. So you're assuming that it's accurate
2     because you're relying on what other --
3     on the accuracy of what other people told
4     you, correct?
5  A. Correct.
6  Q. But you agree that that is an assumption,
7     correct?
8  A. Correct.
9  Q. Now, I am going to show you what was
10    previously marked -- did I already give
11    you Exhibit 3? Do you have it?
12 A. No.
13 Q. No, this is the original right here. The
14    exhibit label is little higher up on this
15    one. I'm showing you what's previously
16    marked as Exhibit No. 3. This appears to
17    be an Illinois State Police Field Report,
18    Field Report No. F15-18-00374.
19        Now, your incident report, which was
20    previously marked as Exhibit No. 2 in the
21    very first paragraph of your narrative
22    you cross-reference this State Police
23    Report, correct?
24 A. I will double check. Yes.
25 Q. And, in fact, you reference it by the

Page 195

1     actual report number, correct?
2  A. Correct.
3  Q. Now, how would you be able to be able to
4     reference in your narrative this State
5     ISP Report Number without first looking
6     at the report?
7  A. I believe I asked Trooper Dumais what his
8     incident report number would be. Every
9     call that gets generated has a report
10    number, incident number, that's attached
11    to it.
12 Q. Okay. So the incident report -- each
13    incident gets a number, correct?
14 A. I can't speak for Illinois State Police,
15    but for the Matteson Police Department,
16    yes, every call that is open or generated
17    gets a number.
18 Q. My question is this: And I understand
19    that you don't work for the Illinois
20    State Police, you might -- you don't
21    necessarily know their internal rules and
22    we will get that from somebody else. So
23    my question is this: It's your testimony
24    that when you wrote your narrative, this
25    very first paragraph and you wrote the

Page 196

1     report number, even though you reference
2     a report number, you never actually saw
3     the contents of this report?
4  A. That is correct.
5  Q. You didn't have a chance to read anything
6     that Trooper Dumais wrote in this report?
7  A. That's correct.
8  Q. You weren't able to compare his narrative
9     with your narrative to get your stories
10    straight, so to speak?
11 A. That's correct.
12 Q. And do you believe anything that's
13    contained in the narrative of Trooper
14    Dumais' report is inconsistent with the
15    narrative -- any portion of your
16    narrative in your report?
17       MR. MCGRATH: Object to the
18    form of the question.
19       THE WITNESS: I'm sorry, one
20    more time.
21 BY MR. SCHOOP:
22 Q. What I am asking you is this: Do you
23    believe that Trooper Dumais' report
24    conflicts with your report in any
25    substantive manner?

Page 197

1  A. No.
2  Q. Now --
3  A. Conflicts, no.
4  Q. Okay. Does it seem to be omitting
5     anything that your -- does your report
6     seem to go in to more detail than Trooper
7     Dumais' report?
8  A. Yes.
9  Q. Okay. Is it fair to say that one salient
10    issue that's not mentioned in State
11    Trooper Dumais' report, what is
12    elaborated in more detail in your report,
13    is when Trooper Dumais went hands-on with
14    Mr. Mitchell at his house?
15 A. Yes.
16 Q. Fair to say that Trooper Dumais' report
17    does not mention any use of force or
18    going hands-on of the physical detention
19    of Jyran Mitchell, but your report does,
20    correct?
21 A. His report does not mention the physical
22    detention and mine does, correct.
23 Q. And his report does not mention
24    Mr. Mitchell -- now, you would agree that
25    Trooper Dumais' report does mention that

Exhibit G

Page 198

1    the person that he was trying to pull
2    over was suspected of a DUI, but your
3    report does not mention that report,
4    correct, or that detail?
5  A.  I believe that's correct.
6  Q.  Now, apart from those facts, do you
7    believe that your report and Trooper
8    Dumais' report are substantially similar?
9  A.  Apart from the physical detention and the
10    lack of suspected DUI, I believe that
11    they are similar to each other.
12  Q.  I want to show you what was previously
13    marked as -- we will do it at the same
14    time and wrap up with these.  I am going
15    to show you what's been marked as Exhibit
16    No. 8 and Exhibit No. 9.  We will do 8
17    and 9 together.
18      Now, Exhibit No. 8 appears bearing
19    Bates label Matteson 69 and 70.  It
20    appears to be a Matteson Police
21    Department Call Detail Report; is that
22    correct?
23  A.  Yes.
24  Q.  Now, at the very -- now, who creates this
25    document?  Do you know?

Page 199

1  A.  I have no clue.
2  Q.  You didn't create this document?
3  A.  I don't honestly think I have seen this
4    before, anything similar to this.
5  Q.  Okay.  But you would agree that there's a
6    section that says comments that appears
7    to identify -- provide some type of
8    narrative of what happened at the
9    Goldenrod Circle location, correct?
10  A.  Correct.
11  Q.  But it's your testimony you did not
12    create this document?
13  A.  Create the call detail report, this
14    physical document?
15  Q.  Yes.
16  A.  No.  I don't even know how to do it.
17  Q.  Do you know who would?
18  A.  No.
19  Q.  Okay.  Now, let me ask you this:  You
20    will notice there's -- in the middle
21    section where it says radio log,
22    dispatcher, and there's multiple columns?
23  A.  Yes.
24  Q.  The first column says dispatcher.  The
25    second column says time and date.  The

Page 200

1    third column says unit, and then there's
2    a code, zone, agency, and then a
3    description, correct?
4  A.  Correct.
5  Q.  Now, your name is listed here twice at
6    the time stamp of 20:33:39 and 20:33:59,
7    correct?
8  A.  Correct.
9  Q.  Do you know what any of this information,
10    this radio log signifies?
11  A.  I believe code is -- the VHIN, I believe
12    is to run a license plate.
13  Q.  Do you believe that you ran a license
14    plate sometime at or about -- well, 8:33
15    p.m. on February 2nd?
16  A.  According to this it appears I would have
17    ran two plates.  I believe the M -- I
18    believe the MDC is that I would have ran
19    it on my computer.
20  Q.  When you say MD --
21  A.  In description where it says MDC: pl.
22  Q.  Yes.  Okay.  Now, the PL=Q991196, what's
23    that?  Do you know?  Is that the plate
24    number?
25  A.  No.  That would be a plate number, yes,

Page 201

1    that would be a plate number.
2  Q.  Okay.  But do you believe that those
3    aren't the plate numbers that were listed
4    in your report, correct?
5  A.  Correct.
6  Q.  Do you know where these plate numbers
7    came from?
8  A.  Traditionally when you are driving to
9    calls if you see a car or see something
10    that catches your eye, you can run a
11    plate.
12  Q.  Is it fair to say that it's possible that
13    you were running plates before or after
14    you were at the Goldenrod Circle?
15  A.  Judging by the time stamps, yes.
16  Q.  When do you believe your best estimate is
17    when you physically arrived at the
18    Goldenrod Circle location?
19  A.  It says, according to the time stamp,
20    20:38 hours is when I arrived.
21  Q.  Where do you see that?
22  A.  Where it says dispatcher G. Ranieri,
23    time/date 20:38, code ARRV would be
24    arrival.
25  Q.  I'm sorry, which column are you --

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 202..205

---

Page 202

1  A.  So it would be -- the fourth one down
2      under radio log.
3  Q.  Yes.
4  A.  Unit.  It says time/date, 20:38:44,
5      02/02/18 2216, Code ARRV, zone M2,
6      call=5961.
7  Q.  And that's you?
8  A.  That would be me.
9  Q.  How do you know that?
10 A.  Just based off of unit number.
11 Q.  Unit number is what?  It signifies what?
12     Is that squad unit?
13 A.  Like your call sign on the radio.
14 Q.  So even though your Star number was 216
15     your unit number that evening was 2216?
16 A.  The 2216 is just a place marker in the
17     computer.  Over the radio I was just 216.
18 Q.  It's your belief that that 20:38 time
19     stamp, that signifies you being
20     dispatched to Goldenrod Circle?
21 A.  Correct.
22 Q.  Why do you believe that?
23 A.  It states that that's the time that I
24     arrived and if that's when the
25     dispatchers put it in, then I arrived on

---

Page 203

1      scene.
2  Q.  And you have no reason to doubt that, the
3      accuracy of this time stamp?
4  A.  I don't believe so, no.
5  Q.  If you take a look at Exhibit No. 9, it's
6      a similar call detail report.  You will
7      notice that the first -- Exhibit No. 8,
8      the call number was for C1965044 and the
9      address was for 612 Goldenrod Circle,
10     correct?
11 A.  Correct.
12 Q.  But there's a different call number
13     that's C1965109, correct?
14 A.  Where are you at?
15 Q.  If you look at Exhibit No. 9 at the very
16     top.
17 A.  Correct.
18 Q.  There's a call number at the top?
19 A.  C1965044?
20 Q.  No.
21 A.  That's what I have for Exhibit 9.
22 Q.  Let me see your Exhibit 9.
23          MR. SCHOOP:  Let's take
24     second here.  Just proof no one is
25     perfect.  Let the record reflect that I

---

Page 204

1      am removing Deposition Exhibit No. 9 from
2      which was previously Bates labeled
3      Matteson 69 and 70 and I am going to
4      place it now --
5          MR. MCGRATH:  You had that
6      as 8, so 69 and 70 we just went through
7      that.  That was eight.
8          MR. SCHOOP:  Right, so what
9      happened is that -- right.  What happened
10     was when we put the original exhibit tab
11     on what was supposed to be 9 we put --
12         MR. MCGRATH:  The last
13     exhibit you went through, which is the
14     Call Detail Report, was marked 8.  Are
15     you going to keep that as 8?
16         MR. SCHOOP:  Yes, we're going
17     to keep that Call Detail Report for call
18     number C1865044, we're going to keep that
19     as Exhibit 8.
20         MR. MCGRATH:  Okay.
21         MR. SCHOOP:  There's another
22     Call Detail Report for call number
23     C1965109 that happened later that night,
24     that was meant to be labeled as Exhibit 9
25     and it got -- I will show you in a

---

Page 205

1      second.
2          MR. MCGRATH:  I have it as
3      nine.
4          MR. SCHOOP:  Okay.
5          MR. MCGRATH:  You handed it
6      to me correctly?
7          MR. SCHOOP:  The one I handed
8      to the witness had the wrong label.
9  BY MR. SCHOOP:
10 Q.  I am going to show you what's been marked
11     as Exhibit 9, which is previously
12     identified as Matteson 71, 72 and 73.  It
13     purports to be a Call Detail Report for
14     call number C1965109.
15 A.  Okay.
16 Q.  Take a moment to review that.  This
17     appears to be a Call Detail Report for a
18     call placed at the Matteson Police
19     Department, correct?
20 A.  Yes.
21 Q.  Now, on the radio log for the dispatcher,
22     is there anything in that section that
23     would suggest that you were present for
24     this call?
25 A.  No.

---

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 206..209

Page 206

1  Q. Okay. Who would have been present for
2     this call?
3  A. It appears ambulance two and engine six.
4  Q. So there's no reference to any Matteson
5     Police Department police officers being
6     present for this call, correct?
7  A. That is correct, for this fire call.
8  Q. And this is a fire call for this Call
9     Detail Report?
10 A. Correct.
11 Q. Even though it says Matteson Police
12    Department, this is considered a fire
13    call?
14 A. You can obtain these records from the
15    police department. We share a network
16    and computer system together.
17 Q. Fair enough. I think -- and we know that
18    this is a fire call because we look in
19    the column and it says MSFD, which stands
20    for the Matteson Fire Department?
21 A. Correct.
22 Q. What does the S stand for?
23 A. There's like 100 agencies that all use
24    this software, so MS is just Matteson.
25 Q. So it doesn't get confused with some

Page 207

1     other jurisdiction?
2  A. Correct.
3  Q. So Exhibit No. 8 was a fire call --
4     excuse me, Exhibit No. 8 was a police
5     call and Exhibit No. 9 was a fire call,
6     correct?
7  A. Correct.
8  Q. And the fire call was to the Matteson
9     Police Department, correct?
10 A. That's where they responded, correct.
11 Q. I am now going to show you what was
12    previously marked as Exhibit No. 10.
13    Exhibit No. 10 appears to be a statement
14    from the Village of Matteson, Official
15    Response to Recently Filed Lawsuit. It's
16    Bates labeled Matteson 75.
17       Officer Bates, I have one real big
18    question for you and then I will ask you
19    a couple of short followups and then I
20    think I'm going to be done.
21       Did you ever see this press release
22    before it was sent out?
23 A. I believe this is my first time ever
24    seeing it.
25 Q. So you don't -- first, take your time.

Page 208

1     Make sure. Read it. Once you're done
2     reading just let us know.
3  A. Will do. Okay.
4  Q. Before I ask you any questions, you have
5     had a chance to read Exhibit No. 10?
6  A. Yes.
7  Q. You agree that it has a caption or title
8     that says Village of Matteson Official
9     Response to Recently Filed Lawsuit,
10    correct?
11 A. Yes.
12 Q. It appears to be some form of press
13    release, correct?
14 A. It would appear that way?
15 Q. Now, is it your testimony that prior to
16    sitting in this deposition and reading
17    this document you had never seen this
18    press release before?
19 A. It might have been read, but I don't
20    recall actually physically doing this,
21    sitting down and reading it.
22 Q. When you say it might have been read,
23    what do you mean by that?
24 A. It might have been read to like --
25    normally I believe it's the chief who

Page 209

1     would come up with this response, so it
2     might have been the Village that had read
3     it or the chief that had read it.
4  Q. When you say the chief or the village
5     read it, are you saying that they read it
6     to you?
7  A. Not to me specifically, but in open
8     discussion about the lawsuit they made a
9     statement.
10 Q. Where would this open discussion about
11    the lawsuit have been -- you mean a
12    public open discussion?
13 A. If somebody -- I can't definitively
14    state. There's bits and pieces of it
15    that are ringing a bell, so to speak, but
16    definitively as to where I would have
17    heard them or read them, I cannot recall.
18 Q. That fifth paragraph, each paragraph has
19    a little star or asterisks next to it,
20    correct?
21 A. Yes.
22 Q. If you go to that fifth asterisks, it
23    reads the state trooper lawfully
24    questioned Mitchell household members who
25    failed to provide identification or

Exhibit G

Page 210

1    provide information as to the driver of
2    the vehicle that fled off on I294.  Did I
3    read that first sentence correctly?
4  A.  Correct.
5  Q.  Do you, based on your testimony today,
6    believe that's an accurate statement?
7         MR. MCGRATH:  Objection.
8    Form of the question.  Relevance.  You
9    can answer.
10        THE WITNESS:  Yes.
11 BY MR. SCHOOP:
12 Q.  Well, how did Mr. Mitchell, Jyran
13   Mitchell, fail to identify himself?
14 A.  He did not provide his identification
15   when requested.
16 Q.  When was he requested to do so?
17 A.  After -- I believe it was after he --
18   after Trooper Dumais released him from
19   handcuffs.
20 Q.  Because you previously told me he never
21   was asked to provide such identification
22   before he was asked to come out of the
23   house, correct?
24 A.  I'm sorry?
25 Q.  You did earlier testify that Mr. Mitchell

Page 211

1    was never asked to provide that
2    identification before he was asked to
3    step out of the house, correct?
4  A.  I believe I stated I was not sure.  I
5    believe he did not, but I can't
6    definitively say.
7  Q.  In fact, you don't remember one way or
8    the other?
9  A.  Again, I believe he did not ask him, but
10   definitively I cannot say yes or no.
11 Q.  Well, you can definitively say that you
12   did not ask Jyran Mitchell?
13 A.  That's correct.
14 Q.  As it reads, it suggests that
15   Mr. Mitchell is refusing to identify
16   himself, correct?
17 A.  Originally, yes, he was.  He did not
18   identify himself.
19 Q.  I think you understand there's a
20   distinction between refusing -- for
21   example, I walk up to you and say what's
22   your name and if you responded I am not
23   answering that question, that's an
24   affirmative refusal, correct?
25 A.  Correct.

Page 212

1  Q.  That's not what happened on February 2nd,
2    2018, at the Mitchell household, correct?
3    Trooper Dumais did not ask Mr. Mitchell
4    to -- did not affirmatively ask
5    Mr. Mitchell to identify him and
6    Mr. Mitchell did not respond by refusing
7    to answer the question, correct?
8  A.  When?
9  Q.  At the door.
10 A.  At the door, I believe that's correct.
11 Q.  If you continue, that last sentence of
12   the fifth paragraph in the press release,
13   it says within minutes the trooper
14   determined the driver of the vehicle was
15   Shawn Mitchell, correct?
16 A.  Yes.
17 Q.  And then the next -- the last sentence
18   reads Shawn Mitchell who was not at the
19   scene and family members provided no
20   information as to his whereabouts,
21   correct?
22 A.  That is what it says.
23 Q.  What information did you have on
24   February 2nd, 2018, that suggested that
25   his family members even knew where Shawn,

Page 213

1    Jr. was?  Did you have any reason to
2    believe that they knew where he was?
3  A.  I don't know.  Honestly, I don't
4    understand what you're asking.
5  Q.  Well, this sentence here, this press
6    release suggests that the Mitchell family
7    was refusing to provide information about
8    where Shawn was, correct?
9  A.  Correct.
10 Q.  Do you have a reason to believe that
11   Jyran and his grandmother were hiding
12   Shawn or refusing to answer questions
13   about Shawn?
14 A.  Do I have reason -- I still don't
15   understand you're asking.
16 Q.  As you sit here today, based on
17   everything that you remember that night,
18   do you think that Jyran and his
19   grandmother were trying to mislead you
20   and Trooper Dumais and were trying to
21   hide his older brother?
22 A.  They could have.
23 Q.  I am not asking you could they have.  I
24   am asking do you think that they were
25   actually doing that?

Exhibit G

DOMINIC BATES, 09/04/2019                                Page 214..217

Page 214

1  A. Are you asking for what I personally
2     believe --
3  Q. Yes.
4  A. -- or are you asking if there are any
5     facts to --
6  Q. We will break it up. What you actually
7     believe and then what the factual basis
8     for your belief is? Let's start -- let's
9     do it step-by-step.
10       That night did you believe that Jyran
11    Mitchell and his grandmother were trying
12    to mislead you and Trooper Dumais and
13    suggest that his brother was not there
14    and they didn't know where his brother
15    was?
16       MR. MCGRATH: Objection.
17    Form of the question. Foundation. It's
18    compound.
19       THE WITNESS: I believe that
20    it's possible.
21 BY MR. SCHOOP:
22 Q. Okay. But my question is not -- I am not
23    asking if it's possible. I am asking do
24    you believe that they were actually doing
25    it?

Page 215

1  A. I can't say definitively one way or
2     another. It's possible, yes.
3  Q. Why do you believe that that's possible?
4  A. In my training and experience family
5     members often mislead police about
6     whereabouts of other family members who
7     are wanted by police.
8  Q. Is it also based -- has it also been your
9     experience as a police officer that
10    sometimes police officers make mistakes
11    and assumptions about people?
12       MR. MCGRATH: Objection.
13    Form of the question. Compound.
14       THE WITNESS: Police
15    officers, along with everybody else make
16    mistakes, yes, they do.
17 BY MR. SCHOOP:
18 Q. Because you are a human being, correct?
19 A. That is correct.
20 Q. Sometimes people make snap judgments that
21    aren't always correct?
22       MR. MCGRATH: Objection.
23    Form of the question.
24       THE WITNESS: People -- all
25    people do.

Page 216

1        MR. SCHOOP: Thank you.
2     Let's take two minutes and just make sure
3     I don't have anything else and then it
4     might save us some time.
5        (A recess was had in the proceedings)
6  BY MR. SCHOOP:
7  Q. Officer Bates, I only have one last
8     question for you. I can't promise there
9     might not be a couple follow-up based on
10    your answer, but I don't think there will
11    be.
12       Did the Matteson Police Department,
13    just listen very carefully to the
14    question and think about it before you
15    answer, did the Matteson Police
16    Department ever subject you to any form
17    of professional discipline as a result of
18    your involvement in the incident
19    concerning Jyran Mitchell at his home at
20    Goldenrod Circle in Matteson, Illinois?
21    I'm just asking. I am not suggesting
22    that you did or didn't do anything. I am
23    just asking you did they discipline you
24    for anything that happened that night?
25 A. No.

Page 217

1  Q. Okay. To your knowledge, did the
2     Matteson Police Department ever conduct
3     any investigation concerning your conduct
4     to determine whether you should have been
5     disciplined as a result of your
6     involvement in the February 2nd, 2018,
7     incident concerning Jyran Mitchell at his
8     home at Goldenrod Circle?
9  A. When you say investigation, a formal
10    investigation notifying me?
11 Q. Okay. Fair enough. Let me put it to you
12    this way: Yes, formal investigation,
13    notifying you, allowing you to have a
14    union rep present, things of that nature?
15 A. No.
16 Q. Let me rephrase the question. To your
17    knowledge, was there any informal
18    investigation, i.e., someone asked you
19    what happened that night, things of that
20    nature, not as a means to discipline you,
21    but just to find out what happened and
22    possibly could have led to discipline
23    later?
24 A. Yes.
25 Q. When did that happen?

Exhibit G

DOMINIC BATES, 09/04/2019                    Page 218..221

---

Page 218

1  A.  Probably would have happened -- I think
2     it happened that night by Officer Brnicky
3     and maybe the following day by another
4     superior.
5  Q.  And this informal investigation, was this
6     initiated by Officer Brnicky?
7  A.  I don't know.  Again, I think it's more
8     to what you were saying is just to have
9     an understanding as to what happened.
10 Q.  Officer Brnicky approached you and was
11    trying to find out what happened?
12 A.  Basically.
13 Q.  Before Brnicky arrived on the scene?
14 A.  No, this was, I think, after.  I believe
15    he asked me after we had went back to the
16    PD.
17 Q.  Let me make sure that I have got the
18    picture clear or the foundation.
19       After everything that transpired at
20    612 Goldenrod Circle had ended, you and
21    Officer Brnicky went back to the police
22    station and he asked you some questions
23    about what happened?
24 A.  I believe out on the scene Officer
25    Brnicky asked me a very, very brief

Page 219

1     what's going on.  I gave him a very, very
2     brief answer.  Once we were back at the
3     police department, then we had time to
4     actually discuss it and we discussed it.
5  Q.  The on scene very brief answer that you
6     gave to Officer Brnicky's what happened
7     question, what was it?
8  A.  I can't say definitively.  It just would
9     have been a very brief factual account of
10    what happened.
11 Q.  And what was the gist of what you told
12    Officer Brnicky on scene?
13 A.  Again, I can't say definitively verbatim
14    what I said.  I imagine I would --
15 Q.  That's why I asked you for the gist.  I
16    am not asking for a verbatim account.  As
17    best you recall, what do you believe you
18    told Officer Brnicky at the scene?
19 A.  I was there to assist Trooper Dumais,
20    that he went and spoke with them.  They
21    believe this was the subject that ran
22    from them on the traffic, attempted to
23    take him in to custody and the subject
24    was resisting.  After being taken into
25    custody, it was discovered that he was

Page 220

1     not the person that ran.
2  Q.  You said you also had another
3     conversation with Officer Brnicky later,
4     not at the scene, but at the police
5     station that would have gone in to more
6     detail.  What do you believe you said to
7     Officer Brnicky during that conversation?
8  A.  Just more of the same, but --
9        MR. POSKOZIM:  I'm sorry, I
10    haven't heard anything for the past few
11    seconds.  Could you try speaking up?
12       MR. SCHOOP:  Sorry, Richard.
13    I asked Officer Bates what did he and
14    Officer Brnicky discuss in more detail
15    when they were at the police station.
16       MR. POSKOZIM:  Great.  Thank
17    you.
18       THE WITNESS:  More of the
19    same of what was discussed on scene with
20    just more detail, I guess.
21 BY MR. SCHOOP:
22 Q.  And what specific additional details did
23    you give Officer Brnicky at the police
24    station that you didn't give at the
25    scene?

Page 221

1  A.  I can't say specifically, but I imagine
2     it would have been something that would
3     have been more formal and --
4  Q.  Let me put it to you this way:  Is it
5     fair to say you don't have any
6     independent recollection of what you
7     specifically said to Officer Brnicky and
8     what he might have asked in some form of
9     a follow-up?
10 A.  Specifically, yes.
11 Q.  So you can't give any particular details
12    about that conversation?
13 A.  Correct.
14 Q.  At least none that you feel comfortable
15    representing as a factual assertion under
16    oath, correct?
17 A.  That's correct.
18 Q.  Is that also a fair statement about your
19    earlier testimony about what Officer
20    Brnicky -- you said to him or what he
21    might have said to you at the scene?
22 A.  That, I believe, I would have -- what I
23    had already previously stated, a brief
24    account of what happened simply because
25    that is traditionally what has happened

---

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 222..225

Page 222

1     any time a supervisor arrives on scene
2     and asks what's going on.
3  Q. So essentially you believe that that is
4     what happened because you're assuming
5     that that's what happened because that's
6     typically what happens?
7  A. That's correct. It's not based off
8     recollection.
9  Q. So you can't say under oath that that
10    testimony is based on your personal
11    recollection?
12 A. That is correct.
13 Q. You're assuming?
14 A. That's correct.
15        MR. SCHOOP: Gentlemen, with
16    that, I have no further questions at this
17    time. I will turn it over to -- Richard,
18    do you want to go first or do you want to
19    turn it over to -- it might be faster to
20    let you go first, Mike.
21        MR. POSKOZIM: I don't think
22    I have any specific follow-ups, no.
23        MR. MCGRATH: I just have a
24    few.
25        MR. SCHOOP: Okay.

Page 223

1              EXAMINATION
2  BY MR. MCGRATH:
3  Q. Officer Bates, if you can go back to the
4     scene when you and the state troopers
5     were leaving the scene and then according
6     to your testimony you stated that Jyran
7     Mitchell and his grandmother flagged you
8     down?
9  A. Yes.
10 Q. And your report is a summary. Can you
11    just explain to us how that occurred?
12    You indicated that your car was parked
13    about two or three houses away from the
14    Mitchell household. The troopers, at
15    least Dumais, was closer to the
16    household. I don't know where Reyes'
17    squad car was. Can you just explain to
18    us how you were flagged down by those
19    people?
20        MR. SCHOOP: Objection.
21    Asked and answered. Go ahead.
22        THE WITNESS: So I believe
23    that I was parked a couple of houses, two
24    or three houses, away and I believe
25    Trooper Dumais parked in front of me.

Page 224

1     Trooper Dumais and Trooper Reyes got to
2     their vehicles before I did and they
3     drove through the cul-de-sac. I think
4     Trooper Dumais drove through the
5     cul-de-sac and turned around. As I was
6     walking back to my vehicle, that was when
7     they flagged me down and as I was -- I
8     got flagged down to come back and talk to
9     them.
10 BY MR. MCGRATH:
11 Q. When you say they, who do you mean?
12 A. Jyran and his grandmother, Ms. Mitchell.
13 Q. Where were they when they were flagging
14    you down?
15 A. They were outside of the house. I think
16    they were trying to walk towards me, I
17    believe, yelling just hey, hey, come
18    back.
19 Q. Physically, if you could just describe
20    the front of the house? Is there a
21    walkway that leads up to the front door?
22 A. Yes.
23 Q. Is there a public sidewalk that crosses
24    the front lawn?
25 A. Yes. From my recollection, yes.

Page 225

1  Q. To the best of your recollection, where
2     were they walking towards or where were
3     they located when they were flagging you
4     down?
5  A. Either on like the easement leading to
6     the public sidewalk and into their
7     driveway or on the street right in front
8     of their driveway, somewhere -- I believe
9     somewhere around that area or maybe
10    walking up the sidewalk to where I was
11    at.
12 Q. And was Jyran and his grandmother
13    side-by-side or close proximity to each
14    other?
15 A. Close proximity.
16 Q. When you saying flagging down, what do
17    you mean by you were being flagged down?
18 A. Again, I think they were like walking
19    towards me and yelling. I don't believe
20    they were yelling in an aggressive way,
21    just yelling to get my attention, hey,
22    officer, hey, hey, come back, we want to
23    talk to you really quick.
24 Q. Were they waving to you and making any
25    hand gestures?

                                                    Exhibit G

DOMINIC BATES, 09/04/2019                              Page 226..229

Page 226

1  A.  I believe they were.
2  Q.  At that point did you walk over towards
3      them?
4  A.  Yes.
5  Q.  And around that time was the state
6      troopers -- did they circle around the
7      cul-de-sac and have their squad cars back
8      in the area of the Mitchell household?
9  A.  They did only because I then -- I think I
10     used my flashlight to shine down at them
11     and told them to come back.
12 Q.  Okay.  Did they park their squad cars
13     again?
14 A.  Yes.
15 Q.  And did they get out and then come to the
16     area where you were at?
17 A.  Yes.
18 Q.  And is that where Jyran and his
19     grandmother were at?
20 A.  Yes.
21 Q.  Again, where was this at in location in
22     front of the house?  Was it in the
23     driveway, front steps, sidewalk?
24 A.  It was out -- again, I believe it was out
25     by like -- again, from the street there's

Page 227

1      the front easement and then there's the
2      public sidewalk and then the driveway
3      going up to the house.  I think they were
4      on the front easement public sidewalk
5      part of the house.
6  Q.  Did you notice Jyran having any
7      difficulty in walking --
8  A.  None.
9  Q.  -- towards you or flagging you down?
10 A.  No.
11 Q.  Did he complain of being in any pain
12     while you stood with him out in front of
13     the household?
14 A.  No.
15 Q.  As a matter of fact, did he ever complain
16     of any pain during the whole time you
17     were out in front of the house with him
18     from the time that he exited his house
19     until the time that you eventually left
20     the location for good?
21 A.  No.
22 Q.  When you spoke with Mr. Mitchell and his
23     grandmother and the troopers were out
24     there with you, they wanted to get your
25     identification, correct?

Page 228

1  A.  Correct.
2  Q.  Did you provide that identification or
3      did you attempt to hide your badges or
4      your identification?
5  A.  We provided it.
6  Q.  Okay.  And then what happened?
7  A.  So shortly after we came back, they then
8      started obtaining our information and
9      then all the family members and what we
10     assumed were friends of family all began
11     to arrive.
12 Q.  When you say they began to arrive, how
13     did they arrive?  Did they come out of
14     the household, from other houses?  Did
15     they pull up in cars?
16 A.  I believe they pulled up in cars.
17 Q.  And then was there a conversation or
18     elevated speaking that was going on at
19     the scene?
20 A.  Yes.
21         MR. SCHOOP:  I will just
22     object to the leading form of that last
23     question, but go ahead.
24         THE WITNESS:  Yes.
25 BY MR. SCHOOP:

Page 229

1  Q.  Was that coming from different family
2      members and friends towards you and the
3      troopers?
4  A.  Yes.
5  Q.  At any point during the time that you
6      were out while the mother or the father
7      or the grandmother, friends and
8      relatives, were out in the area, did
9      Jyran ever complain of having any pain?
10 A.  No.
11 Q.  Did -- was it then requested for Jyran to
12     go get his identification?
13 A.  Yes.
14 Q.  And did he go into the house to obtain or
15     look for the identification?
16 A.  He stated he would, yes.
17 Q.  All right.  Did he actually go towards
18     the house?
19 A.  He actually went into the house, yes.
20 Q.  Did you notice him having any difficulty
21     in physically walking or going back
22     towards the house or entering the house?
23 A.  No.
24 Q.  Could you see him moving around inside
25     the house?

Exhibit G

DOMINIC BATES, 09/04/2019                                    Page 230..233

Page 230

1  A.  I believe from where I was at I could see
2     him like pass through the storm door and
3     then he went into the house and out of
4     view.  I couldn't see where he went in to
5     the house.
6  Q.  How long was he in the house for?
7  A.  I don't know.  Maybe a few minutes.
8  Q.  And then did he exit the house?
9  A.  He did.
10  Q.  Did he have any difficulty in exiting the
11     house and walking back towards where you
12     were located?
13  A.  No.
14  Q.  Did he complain of being in any type of
15     pain?
16  A.  No.
17  Q.  Was he able to provide his school ID or
18     any state identification?
19  A.  No.
20  Q.  Was it shortly after that that you and
21     the troopers left the scene?
22  A.  After speaking with -- attempting to
23     speak with the family, friends and
24     relatives, yes, we left.
25        MR. POSKOZIM:  I'm sorry, I

Page 231

1     may have disconnected there for a second.
2     I didn't hear an answer.
3        THE WITNESS:  I said after we
4     had attempted to speak with the family
5     and the family friends then we left the
6     scene.
7        MR. POSKOZIM:  Thank you.
8        MR. MCGRATH:  That's all I
9     have.
10        EXAMINATION
11  BY MR. SCHOOP:
12  Q.  Just very brief follow-up.  I am not
13     asking new questions.  I'm going to limit
14     myself to Mr. McGrath's questions here.
15     Mr. McGrath had asked you about Jyran
16     going into the house to get some ID,
17     correct?
18  A.  Correct.
19  Q.  Let me just clarify something.  Is it
20     your testimony that someone suggested
21     that Jyran go inside the house to get his
22     ID?
23  A.  Correct.
24  Q.  And this happened after he had already
25     been released by Trooper Dumais from his

Page 232

1     vehicle?
2  A.  Correct.
3  Q.  Who suggested that Jyran go back into the
4     house and get his ID?
5  A.  I believe it was Trooper Dumais.
6  Q.  And why?
7  A.  Because I believe at that point we still
8     did not have Jyran identified.
9  Q.  Wait.  How --
10  A.  Again, I --
11  Q.  Let me just make sure I understand you.
12     You're saying it's your belief that after
13     Jyran had been released by Trooper
14     Dumais -- is it Dumais?
15  A.  I believe it's Dumais.  I don't know.
16  Q.  An it's your understanding that after
17     Jyran had been released from Trooper
18     Dumais' vehicle that there was still some
19     doubt about whether he was Jyran Mitchell
20     or Shawn Mitchell?
21  A.  No.  There was -- from my understanding
22     Trooper Dumais was able to rule out that
23     Jyran was not Shawn.
24  Q.  Okay.
25  A.  But Trooper Dumais was not able to

Page 233

1     identify that Jyran Mitchell was Jyran
2     Mitchell.
3  Q.  Okay.  But you would agree that it was
4     your understanding that when you
5     originally were dispatched that Trooper
6     Dumais was looking for -- the only name
7     that you had was Shawn Mitchell, correct?
8  A.  Correct.
9  Q.  By the time that Jyran had been released
10     from the vehicle, he had been ruled out
11     as being Shawn, correct?
12  A.  Correct.
13  Q.  But Trooper Dumais wanted, for some
14     reason, to confirm that Jyran was, in
15     fact, Jyran?
16  A.  I believe so.  I can't speak to what
17     Trooper Dumais was trying to do.
18  Q.  Okay.  Did Trooper Dumais ever tell you
19     why he was asking Jyran to go get his ID?
20  A.  I believe -- I don't think he told -- I
21     don't believe he told me specifically.
22  Q.  He?
23  A.  Trooper Dumais told me specifically why
24     he would ask that.
25  Q.  Okay.

DOMINIC BATES, 09/04/2019                          Page 234..237

Page 234

1  A.  My understanding of it is just to
2      officially rule out that this officially
3      is not Shawn, that he did not cut his
4      hair, grow his hair.
5  Q.  Now, you said that Jyran went inside the
6      house.  Once Jyran went inside the house
7      Jyran was outside your line of view, line
8      of site, correct?
9  A.  Correct.
10 Q.  But Jyran, after a couple of minutes,
11     came back outside of the house?
12 A.  Correct.
13 Q.  Now, it's your testimony that Jyran did
14     not have any form of photo ID?
15 A.  He did not provide us any.
16 Q.  Did you ask Jyran why he was not
17     providing -- why photo ID was not being
18     provided?
19 A.  At that point I don't believe that
20     conversation was asked or that
21     conversation was had due to the hostility
22     of all the family.
23 Q.  Now, you mentioned hostility of the
24     family.  How were they hostile?  Let me
25     put it this way:  You never mentioned --

Page 235

1      you never used the word hostile in your
2      incident report, did you?
3  A.  I don't believe I used the word hostile,
4      no.
5  Q.  No one physically threatened you,
6      correct?
7  A.  Not that I recall.  No, not physically
8      threatening.
9  Q.  If someone had physically threatened you
10     that night, that would have been put in
11     your incident report, correct?
12 A.  Most likely, yes.
13 Q.  If you were in fear for your safety or
14     the officer's safety based on anything
15     that the Mitchell family or their friends
16     had said that night, that would have been
17     in the incident report, correct?
18 A.  Yes.
19 Q.  And if it was that serious, someone
20     possibly would have been arrested,
21     correct?
22 A.  It just depends.
23 Q.  Yes, it does depends.  My question is the
24     circumstances that night didn't present
25     themselves where anybody was arrested as

Page 236

1      a result of their interaction with the
2      police department --
3  A.  Correct.
4  Q.  -- based on hostility, correct?
5  A.  Correct.
6  Q.  And hostility was not recorded in your
7      official incident report, correct?
8  A.  The actual verbiage hostility, no, but
9      the phrases and words and their attitudes
10     and demeanors towards the police were
11     recorded.
12 Q.  Where in your incident?  What paragraph?
13 A.  Let me go back here.  It's stated in the
14     second to last paragraph while still on
15     scene and the troopers were speaking with
16     Shawn's mother, Shawn's father arrived on
17     scene and began yelling at all police
18     officers on scene.  Shawn's father was
19     repeatedly stating that he's a taxpayer
20     and this, quote, this is my village, end
21     quote, and that police are profiling him
22     and his family.  Shawn's father further
23     state, quote, I guess we all look alike,
24     huh, end quote, to Trooper Dumais when he
25     asked where Shawn Mitchell was.  All

Page 237

1      family members then proceeded to talk
2      amongst each other about being profiled
3      by the police and they are always
4      stopped, quote, for nothing.
5  Q.  And you consider that to be hostile?
6  A.  The fact that they were all yelling at
7      us, yes.
8  Q.  Now, you didn't mention -- where did you
9      write that they were yelling?
10 A.  Shawn's father arrived on scene and began
11     yelling at all police officers on scene.
12 Q.  Now, you mention Shawn's father was
13     yelling?
14 A.  Correct.
15 Q.  But you also just said they were yelling?
16 A.  Correct.
17 Q.  They plural, not Shawn's father singular?
18 A.  Correct.
19 Q.  So you didn't write that the group was
20     yelling, you wrote that Shawn's father
21     was yelling, correct?
22 A.  That's correct.
23 Q.  Now, you would agree there's a difference
24     between one person yelling versus
25     multiple people yelling, correct?

Exhibit G

DOMINIC BATES, 09/04/2019                     Page 238..240

Page 238

1  A.  Sure.  Yes.
2  Q.  **That's a big difference in circumstances,**
3     **correct?**
4  A.  Depending.
5  Q.  **Well, if you have five or six people**
6     **hostily yelling at you, an officer can**
7     **perceive that to be threatening, correct?**
8         MR. MCGRATH:  Object to the
9     form of the question.  It goes beyond the
10    questioning.
11        MR. SCHOOP:  Well, no, no.
12    No, your question clearly painted a
13    particular picture of a hostile group and
14    I am going to ask some questions about
15    it.
16        THE WITNESS:  When there
17    are -- when you get yelled at by multiple
18    people multiple times when you're
19    experiencing a career as a police
20    officer, five people yelling doesn't
21    necessarily warrant being put into a
22    report sometimes.
23        MR. SCHOOP:  With that
24    clarification, I have no further
25    questions.

Page 239

1         MR. MCGRATH:  No follow-up.
2         MR. SCHOOP:  We'll waive.
3         MR. POSKOZIM:  We will waive.
4         THE REPORTER:  Richard, did
5     you want a copy of the transcript?
6         MR. SCHOOP:  Rich?
7         THE REPORTER:  Did you want a
8     copy of the transcript?
9         MR. POSKOZIM:  Yes, please.
10        THE REPORTER:  Would you like
11    a full size or a condensed?
12        MR. POSKOZIM:  Condensed is
13    okay.
14        MR. MCGRATH:  The same for
15    me.
16       (Whereupon, the deposition
17    concluded at 4:40 p.m.)
18
19
20
21
22
23
24
25

Page 240

1  STATE OF MINNESOTA    )
                         )  ss.
2  COUNTY OF DAKOTA      )
3
4       BE IT KNOWN, that I took the
   deposition at the time and place set forth
   herein;
5
6       That I was then and there a Notary
   Public in and for the County of Dakota,
7  State of Minnesota, and by virtue thereof,
   I was duly authorized to administer an
8  oath;
9       That the witness before testifying
   was by me first duly sworn to testify to
10 the whole truth relative to said cause;
11      That the testimony of said witness
   was recorded in shorthand and transcribed
12 into typewriting, that the deposition is a
   true record of the testimony given by the
13 witness, to the best of my ability;
14      That I am not related to any of the
   parties hereto nor interested in the
15 outcome of the action;
16      That the reading and signing of the
   deposition by the witness and the Notice of
17 Filing were waived;
18      That the original transcript was
   delivered to the attorney conducting the
19 deposition for filing;
20
   IN EVIDENCE HEREOF, WITNESS MY HAND AND
21 SEAL.
22
                  _____
23                   Leslie Pingley
24
25

Urlaub Bowen & Associates, Inc.   312-781-9586                    Exhibit G

DOMINIC BATES, 09/04/2019

**Exhibits**

**1 Bates 090419-1** 4:3 8:9,11

**2 Bates 090419-2** 149:22,23 151:18 194:20

**3 Bates 090419-3** 194:11,16

**4 Bates 090419-4** 62:10

**5 Bates 090419-5** 62:24

**6 Bates 090419-6** 63:8,9

**7 Bates 090419-7** 64:24 65:5 67:17 68:4,6,25 71:22

**8 Bates 090419-8** 198:15,16,18 203:7 204:19 207:3,4

**9 Bates 090419-9** 198:16 203:5, 15,21,22 204:1,24 205:11 207:5

**10 Bates 090419-10** 207:12,13 208:5

**#**

**#216** 9:19 12:12 63:13

**#239** 12:21

**$**

**$1,600.00** 183:10

**$2,500.00** 183:21

**$2,600.00** 183:21

**$2,800.00** 183:21

**$500.00** 182:17

**$62,000.00** 180:9

**0**

**0023** 70:15

**02/02/18** 202:5

**1**

**1** 4:3 8:9,11 10:7 158:16,17

**10** 4:3 150:4 207:12,13 208:5

**100** 79:4 130:24 193:16,23,25 206:23

**11** 150:4

**111** 70:25 71:2

**111th** 71:2

**11501** 4:22

**14** 153:20,23

**14th** 154:5

**17** 114:8

**18** 10:16 42:23

**18MS02484** 150:2

**19** 63:3,13

**1:00** 11:12

**2**

**2** 10:9 16:8 26:24 38:22 149:22,23 150:14 151:18 158:14 194:20

**20** 81:5 136:15 142:5

**2013** 70:10 75:14 165:14

**2015** 10:15 52:17 62:17

**2016** 52:17

**2017** 63:3 90:21

**2018** 4:22 11:24 12:3 14:24 15:20 16:5,8 18:9 19:20 22:3 26:2,5,24 32:10 34:10 35:1,24 36:1,12 37:8, 15 38:10,13,20,22 39:6,11,13 40:3, 7,13,22 55:6 58:5 61:17,25 62:5 63:13 68:18 70:14 113:23 115:21 151:21 153:20,23 158:1,24 175:2 189:15 212:2,24 217:6

**2019** 26:12 70:25 77:1

**20:27:50** 68:17 69:15

**20:28:16** 70:13

**20:33:39** 200:6

**20:33:59** 200:6

**20:38** 201:20,23 202:18

**20:38:44** 202:4

**21** 57:1

**216** 40:24 202:14,17

**220** 10:3

**2216** 202:5,15,16

**24** 191:1,10

**28** 10:15 62:17

**29** 10:16

**294** 15:1 71:9 175:5

**2:00** 59:21,22 60:10,13

**2nd** 11:24 12:3 14:23 15:20 16:5 18:9 19:20 22:2 32:9 34:10,25 35:23 36:1,12 37:7,15 38:9,13,20 39:5,11,13 40:3,7,13,22 55:6 58:4 59:18 61:17,25 62:5 68:18 70:14 113:23 115:21 118:6 151:21 158:1, 24 175:2 189:15 200:15 212:1,24 217:6

**3**

**3** 11:3 150:15 154:10 165:3 193:5, 6 194:11,16

**3/14/18** 153:18

**3G1I** 68:12

**4**

**4** 8:17 11:20 12:8 62:10 77:1

**401k** 184:2

**4900** 10:13

**4:00** 59:23 60:15

**4:40** 239:17

**4th** 11:12

**5**

**5** 11:17 13:3,11 62:24 167:7

**50s** 97:24

**6**

**6** 63:9

**60s** 97:25

**612** 12:13 15:16 22:1 23:5 30:20 34:13 35:6 40:1 58:23 70:4 74:10 75:8 78:13,23 79:8 80:5 90:17 91:12 93:9 94:1 115:2,22 189:15 203:9 218:20

**67** 65:6 67:20

**68** 65:6 67:21

DOMINIC BATES, 09/04/2019

**68377** 69:24 88:24 165:16

**69** 198:19 204:3,6

---

**7**

**7** 64:24 65:5 67:17 68:4,6,25 71:22

**70** 198:19 204:3,6

**71** 205:12

**72** 205:12

**73** 205:12

**75** 207:16

---

**8**

**8** 168:4 198:16,18 203:7 204:6,14, 15,19 207:3,4

**80** 121:23

**8:33** 200:14

---

**9**

**9** 150:4 198:16,17 203:5,15,21,22 204:1,11,24 205:11 207:5

**90** 121:23

---

**A**

**a.m.** 59:22,23 60:10,14,15

**ability** 7:20 60:23 61:12

**above-entitled** 4:8

**absolutely** 46:15 146:17

**academy** 41:15,18,19,21,24 42:2, 12,15 43:2 45:14 57:6,7 126:24

**accept** 49:17

**accepted** 112:22

**accepting** 121:6

**access** 73:7,13

**accident** 173:7 177:19,25 178:5,8, 12

**account** 151:19 152:10,16 219:9, 16 221:24

**accuracy** 194:3 203:3

**accurate** 8:25 9:3,8 34:8 64:4,6 152:2,17,18 163:22 176:9 193:4, 17,23,25 194:1 210:6

**accusations** 187:17

**accusing** 177:18 186:13

**action** 4:9 31:17 49:13 51:14 62:12 63:1

**actively** 133:13

**actual** 27:18 31:10 33:4,16 44:7 72:20 84:23 94:11 96:7 136:12 142:2 155:6 188:9 192:21 195:1 236:8

**Adam** 88:23

**additional** 220:22

**address** 22:2,12 38:15 70:4 81:21 160:13 203:9

**addressed** 8:1 63:10

**addresses** 181:21

**Administration** 118:1

**advise** 131:13

**advised** 47:12

**affirmative** 211:24

**affirmatively** 133:7 167:11 212:4

**African-american** 97:21

**AFT** 47:13

**agencies** 17:16,17 18:6 67:5,14 72:15 74:4 206:23

**agency** 17:4 18:11,20 46:6 47:2 200:2

**agent** 8:1 11:7

**aggressive** 225:20

**agree** 5:22 19:18 40:5,21 47:1 48:3 49:18 50:1,5 53:25 54:13,15 85:14 110:17 119:19 123:24 150:9 155:25 162:9,14,18 163:23 169:20 175:23,25 194:6 197:24 199:5 208:7 233:3 237:23

**ahead** 40:16 136:1 223:21 228:23

**AL68377** 71:13

**alcohol** 10:20 46:18 117:10 118:7, 9,22 166:13,18,21 187:5

**alderman** 31:11

**alike** 14:3 169:9 186:23 236:23

**allegations** 173:18 179:19

**alleged** 192:14

**allegedly** 167:21 189:9

**allowed** 18:22 34:15

**allowing** 217:13

**altercation** 142:2,4,8

**ambulance** 151:2 192:17,20,23 193:2 206:3

**amount** 180:5

**and/or** 23:7 160:8

**animated** 169:13

**annually** 180:7

**answering** 12:7 127:16 211:23

**answers** 6:3,6 8:12,13,23 9:2 10:6 32:14 66:20 124:13,14

**anticipate** 184:6

**anymore** 155:10

**apartment** 183:3

**apologize** 12:19 23:3 46:24

**apparently** 63:12 112:20

**appeared** 80:11 104:12,13,20,25 105:25 107:22 108:6,13 126:23 168:4

**appearing** 168:24

**appears** 62:11,14,25 63:9 65:7 67:22 68:7,9,15 70:13 149:24 150:2 160:23 194:16 198:18,20 199:6 200:16 205:17 206:3 207:13 208:12

**applicable** 47:5

**approach** 85:20 91:12

**approached** 85:17 86:4 87:13 101:23 149:11 218:10

**approaching** 85:24 87:10 90:11 91:14 93:3,24 95:22 96:14 102:15 149:15 175:16 176:1,12

**approval** 156:3 157:4

**approve** 156:10,18 157:3

**approved** 157:5,25

**approving** 157:18,20

**approximate** 60:7 83:9 103:17

**approximately** 10:2,4 81:3 82:13, 23 83:16 102:20,23 103:5,6,7 142:5 145:21 168:23 180:4,6

DOMINIC BATES, 09/04/2019

182:15

**AR-15** 51:19 114:8

**area** 17:9 38:4 82:17 123:9 139:12 189:24 225:9 226:8,16 229:8

**arguing** 110:11

**argument** 52:22

**arising** 177:25

**arm** 127:2 128:1,3,10,13,15,22 129:9,23 130:10 131:25 132:10,22 134:7

**arms** 135:24 138:5,13,15,17,20,24 139:2 142:10,11

**arrest** 36:20 37:6 48:16 50:9,19,25 92:20 113:11,19 130:14 131:7,9, 14,17 132:21

**arrested** 36:23 39:17 235:20,25

**arresting** 36:6 37:3 48:7 50:14

**arrival** 201:24

**arrive** 79:25 80:1 83:22 171:20 172:4 185:18 228:11,12,13

**arrived** 52:24 79:7,19 80:3 83:18, 24,25 84:10 158:4 171:16,23,24 172:10 185:21 189:20,22 201:17, 20 202:24,25 218:13 236:16 237:10

**arrives** 222:1

**ARRV** 201:23 202:5

**asks** 48:22 222:2

**assaulting** 53:9 54:2

**assertion** 221:15

**assigned** 43:5,11,21 44:3 58:12 63:3 78:14 79:6

**assignments** 79:4

**assist** 15:15 16:10,12,15,18 17:17 18:16 19:24 38:14 53:17 73:25 76:2 92:24 120:17 129:19 132:2 133:20 134:15 150:19 219:19

**assistance** 40:6 75:3

**assisted** 18:5 125:15

**assisting** 16:6 18:11,15,19 19:5 73:23 91:25 93:6 116:23 160:14 161:5 162:18 163:14

**assume** 7:10 71:3 158:22

**assumed** 107:7 228:10

**assuming** 73:8 127:22 144:12 156:9 158:25 178:17 190:23 194:1 222:4,13

**assumption** 173:21 194:6

**assumptions** 215:11

**asterisks** 209:19,22

**ATF** 46:12,21 47:1,4,14,22 52:4 180:20,21 181:14

**attached** 100:17 195:10

**attempt** 14:25 95:16 136:25 137:17 184:19 228:3

**attempted** 84:20 86:24 123:6 139:7 167:10,13,16 219:22 231:4

**attempting** 133:12 135:2,10,23 136:2,11 138:3 167:12 230:22

**attempts** 134:20,21

**attend** 41:14,17,20

**attended** 41:23

**attention** 8:15 67:17 70:15 153:8 158:13 185:10 225:21

**attitudes** 236:9

**attorneys** 47:13

**audible** 6:7

**audio** 21:24 22:11 73:17,19,22

**author** 150:17 152:21

**authored** 63:11 64:1

**authoring** 150:19

**avoid** 137:13

**award** 179:22

**aware** 25:3,5,8,17 31:20 85:2

## B

**B-A-T-E-S** 4:15

**back** 8:18 11:2 34:18 37:20 45:10 55:5 58:4 78:7 84:8 115:7 120:18 123:12 124:5 126:9 127:1,5,10 128:6 129:18 130:4,7 138:18,21,24 142:11,13,17,25 143:7,16,20,21,23 144:3 145:8 163:24 170:6 184:23 185:8,10 218:15,21 219:2 223:3 224:6,8,18 225:22 226:7,11 228:7 229:21 230:11 232:3 234:11 236:13

**backup** 116:9

**badge** 9:16 55:18 56:12,14,15 185:14

**badges** 228:3

**band** 192:10

**bar** 57:23,25

**based** 49:19,22 53:6,12 122:14,15 179:18 189:4 202:10 210:5 213:16 215:8 216:9 222:7,10 235:14 236:4

**basement** 93:18

**bases** 118:18

**basic** 6:5 45:17 46:1 48:9 180:1

**basically** 43:24 218:12

**basis** 40:9 118:18 214:7

**Bates** 4:6,15,19,25 5:2 8:1,2,5,7, 11,13,18,21 12:12 14:24 40:14 49:1 62:13 63:12 64:22 65:5,9,10 67:20 89:19 115:17 135:11,15 150:3 154:15,17 198:19 204:2 207:16,17 216:7 220:13 223:3

**bathroom** 115:12 191:5

**battered** 53:25

**battering** 53:9

**battery** 54:1,8

**bearing** 165:15 198:18

**beat** 78:20,24 79:2

**beating** 54:1,16 55:2

**began** 132:10 134:19 228:10,12 236:17 237:10

**begin** 5:6 6:21 7:3

**beginning** 5:21 68:16

**belief** 134:14 202:18 214:8 232:12

**believed** 12:22,23 84:4,6 87:2 112:7 113:12 114:21 155:22 188:4

**bell** 94:7,9 97:13 209:15

**belt** 55:21,22 56:6

**beneath** 8:20 141:4 153:16

**bent** 142:10

**bet** 186:23

**big** 207:17 238:2

**birth** 9:21

**bit** 22:16 116:12

**bite** 137:23

**bits** 209:14

**black** 14:2 56:1 57:21 70:9,10 71:12 75:14,24 76:3,4 77:5,16,22 78:4 79:12 80:9,11 84:6 87:23 88:2 89:5 90:18 98:1,14 101:1,25 102:22 110:23 111:1 164:7,20 165:14 166:8 167:9 168:18 175:4 176:18

**Blair** 32:11,16,17

**blank** 154:22

**bleed** 54:17

**blended** 171:1

**blinds** 96:8,10

**block** 37:22 38:6

**blood** 53:3

**bloodshot** 117:14 187:6

**blue** 55:25 182:15

**boat** 182:18

**body** 56:2 85:7 127:22

**bold** 8:19

**bonds** 183:24

**book** 157:10 182:16

**boots** 56:1

**bottom** 8:17 63:14 153:9 168:1

**branches** 46:25

**break** 34:22 40:14 115:11,14,17 133:14,17 145:3 191:14 214:6

**breath** 81:10 118:8

**briefly** 45:9 48:19

**Brnicky** 12:21 32:11,12,16,18 33:10 141:22 158:2,6 162:4 171:23 184:13 187:20 188:5,13,14,18,22 189:4,5,8 190:6 192:19 218:2,6,10, 13,21,25 219:12,18 220:3,7,14,23 221:7,20

**Brnicky's** 219:6

**broad** 14:19

**broadcast** 72:8

**broken** 58:13 61:15,17

**brother** 36:9 213:21 214:13,14

**buildings** 83:2

**bullet** 56:6

**Bureau** 10:20 46:18

**busy** 159:5,7,8,13,20

---

**C**

**C1865044** 204:18

**C1965044** 203:8,19

**C1965109** 203:13 204:23 205:14

**calendar** 26:2,11

**call** 8:4 15:14 16:9,18 40:9 52:21 55:7,21 59:2 75:2,7 77:3 78:1,13 98:12 104:10 121:15,17 122:12 139:10 195:9,16 198:21 199:13 202:13 203:6,8,12,18 204:14,17,22 205:13,14,17,18,24 206:2,6,7,8,13, 18 207:3,5,8

**call=5961** 202:6

**called** 31:9 43:5 45:7,15 51:4 56:2 66:16 117:22 124:2 140:22 192:9

**calls** 38:15 40:1 54:6 75:2 107:11 122:7 124:11 201:9

**cam** 20:6,25 22:10 58:6,25 62:1 84:22 85:3,12 112:3

**camera** 23:8 56:3 85:7,13

**cams** 58:16

**capacity** 11:6 39:23 46:8 52:4

**caption** 208:7

**captioned** 4:20

**captured** 20:8

**car** 34:19 73:8 81:9 87:14,22 88:2, 11 89:13,25 90:5 100:16 103:8 111:21 112:16 119:17 142:14,15, 17,18,25 143:2,5,8,10,16,17 144:1, 4,7,11,23 145:5 146:15,20 166:8 173:8 174:13 176:1 182:8,13,16 201:9 223:12,17

**card** 109:4 183:16

**career** 238:19

**careful** 119:22

**carefully** 14:21 96:12 142:21 216:13

**Carolyn** 37:17 38:1 121:17 170:12, 14,17 185:6,11

**carrier** 55:18

**cars** 58:10,11,15 66:14 226:7,12 228:15,16

**case** 4:21 148:23

**case-by-case** 49:9

**catch** 47:20

**catches** 201:10

**causing** 54:17

**cell** 21:25

**center** 66:5 74:14

**centers** 66:5 67:2,3

**certification** 57:4

**certified** 57:2

**chance** 196:5 208:5

**change** 9:10,21,22 78:16

**changed** 8:3

**characterization** 116:4 127:19

**charges** 54:9

**chase** 47:12

**chasing** 51:16

**check** 9:14 79:3 194:24

**Cherryl** 39:9,10 185:17

**Chevrolet** 79:12

**Chevy** 79:13 80:6,8 84:6 87:25 88:5,10 89:1,4,13 90:8,18 91:2,4 93:23 165:6 166:8 176:3

**Chicago** 68:14

**Chicagoland** 17:9

**chief** 29:23 30:1,3,12,14,25 32:23 33:9 63:10,11 208:25 209:3,4

**children** 51:17 179:11

**chronology** 133:15 172:1

**circle** 12:13 14:14 15:16,23 22:2, 12,22 30:20 31:3 34:13 35:6,17 38:16 40:2 55:8 58:23 70:5 71:18 74:11 75:8 78:23 79:8 80:5 82:7 87:19 90:18 91:12,22 93:9,13 94:2, 12 115:2,22 189:16 199:9 201:14, 18 202:20 203:9 216:20 217:8 218:20 226:6

**Circuit** 4:23

**circumstance** 53:12,13,21

113:17,18

**circumstances** 9:10 49:20,22 51:8,11,21 52:1,7 53:7 82:2 113:11,22 114:16 178:13 181:10 235:24 238:2

**cities** 17:13

**City** 17:5

**claims** 178:22

**clarification** 7:5 176:13 238:24

**clarify** 4:18 174:25 231:19

**Class** 178:9

**classroom** 44:16 45:16

**cleaner** 40:17

**clear** 15:6 18:17 20:18 34:6 74:24 80:16 89:20 97:20 102:20 111:24 122:21 123:4 135:16 140:11 143:13 170:12 174:2 179:2 182:13 186:10 218:18

**clearing** 110:1

**clerk** 190:12,18,19,23 191:11,13

**client** 179:23

**clip** 56:21

**close** 84:13 117:15 144:7 225:13, 15

**closed** 54:2 100:20

**closer** 84:15,16 116:14,19 223:15

**clue** 155:9 199:1

**co-defendant** 27:22

**coat** 120:14 123:19 124:3,23,24 125:4,8

**code** 200:2,11 201:23 202:5

**cold** 7:19 80:21

**color** 80:8

**column** 199:24,25 200:1 201:25 206:19

**columns** 199:22

**comfortable** 221:14

**command** 130:1

**commands** 130:8

**comment** 106:3

**comments** 187:9 199:6

**commit** 101:20

**committed** 49:12 50:7,15,18,19

**commonly** 46:21 55:21

**Commons** 10:13

**communication** 65:21

**Communications** 66:17

**compare** 196:8

**compared** 149:8

**comparing** 28:11

**compartmentalize** 40:18

**compiled** 45:21

**complain** 227:11,15 229:9 230:14

**complaint** 11:14 25:12,15 179:19

**complete** 9:5,8 15:25 42:6,11 43:23 65:1 82:2 147:1 151:19 152:2 193:5

**completed** 42:14

**comply** 47:5 48:4

**compound** 124:10 214:18 215:13

**computer** 59:7 65:16,18,23 72:4, 13,14,21,22 73:7,9 90:7 156:15 200:19 202:17 206:16

**concepts** 46:1

**concern** 97:7,9 170:19

**concerned** 27:21 28:3

**concerns** 96:16

**conclude** 142:8

**concluded** 239:17

**conclusion** 48:23,25 54:6

**condensed** 239:11,12

**conditional** 42:5,9

**conduct** 31:16,19 37:6 217:2,3

**conducted** 117:18

**conducting** 16:11 91:20

**confident** 36:24,25 37:4 79:24

**confirm** 36:18 163:24 233:14

**confirmed** 41:5

**confirming** 62:15

**conflicting** 176:6

**conflicts** 196:24 197:3

**confuse** 40:19

**confused** 46:24 206:25

**confusion** 137:14

**considered** 5:23 54:3 137:5 140:13 178:8 186:18 206:12

**consist** 55:14

**consistently** 130:18

**constitute** 54:8,9

**constitutes** 49:8

**constitutional** 47:5

**consult** 150:22

**consulted** 150:25

**consumption** 118:9,23

**contact** 24:21 35:10 97:4 174:15, 16

**contacted** 25:7

**contained** 78:3 196:13

**contemporaneously** 159:16

**contents** 22:8 196:3

**context** 38:12 41:13

**continue** 92:17 212:11

**continues** 67:21

**contradicting** 164:10

**control** 138:13,15

**conversation** 24:14 25:23 27:22 30:24 33:12,15 85:22 86:4 96:15 97:6 99:13,16,20 103:21 106:8,9, 12,14 144:22 146:22 172:23,24 173:4 187:16 188:5,8,9 193:2 220:3,7 221:12 228:17 234:20,21

**conversations** 20:20 23:12 24:17,18 26:6,10,15 27:1 28:7,16 33:8 177:6 184:13 186:3,5

**Cook** 4:23 41:19,20 42:7 45:11

**copies** 156:23

**copy** 157:13 239:5,8

**corner** 63:15

**corners** 153:9

**correct** 9:19,22 10:7,16,21,24 11:8,14 15:8,9,12,18,24 16:1,6,7 17:9,13,18,24 18:2,12,13 19:22

21:9 26:8,9 27:15,19 30:16,17,21,
22 32:23 36:8 40:7,8,11,22 41:15
42:12,18 43:1 44:14,17,22 45:14,
19,24 46:2,6,15,19,22 47:2 48:7,
12,17 49:24 50:3,7,10,15,20 51:5,8
53:14,22,23 54:4,18,20,22,25 55:3
58:23 62:2,3,17,20 63:5 64:14,20
69:5,9,13,24 70:2,5,16,20 71:10,14
73:3 74:25 75:4,14 79:21 80:6,17
81:14 82:21,25 83:2 85:4,20,24
86:12,18 87:17,19,23,24 88:2,5
89:2,3,6,7,9,14,15,16,17,18 90:4,
19,20 91:9,12,23 92:1,5,13,21,25
93:4,9,13 97:21 98:23 99:10,17
100:18,20,23,24 102:1 103:11
104:5,9,18 105:3,18 108:3,7
110:21,24 111:2,17 112:4,8,12,17,
19,21,23,24 113:21 114:1,2,3,5,9,
13,18,19,24 115:5 116:2,24 117:3,
7 118:2,4,9,19,23 119:5,12,14,17
120:7,22,23,24,25 121:8,9,12,13
125:11,16 126:3,7,9,13 128:4,8,13,
24 131:2,9 132:2 134:13 135:4
137:15,18,21 138:1 140:2,7 141:16
142:5 143:8 144:16,17,19 145:5,8,
10 147:4,5,25 148:1,20 149:12
150:10 151:5 152:8,13,14 154:17,
19 155:19,23 156:4,5,7,11 157:17,
19,21,22 159:21,22,25 160:6,11,
16,20,25 162:10,14,15 163:4,9,10,
18,19,25 164:15 165:19,20,22
166:2,10,11,13,15,16,18,19,24
167:2,3,6,14,23,25 168:8 171:20,
24 173:16 174:7 175:21,23 176:4,
5,9,10 177:2 178:5,6,10,14,15,18,
20 180:2 181:15,16,19 182:6,7
186:15 187:2,6,7 189:1,6,7 192:2,
3,25 193:1,6,9,10,12,13,17,19
194:4,5,7,8,23 195:1,2,13 196:4,7,
11 197:20,22 198:4,5,22 199:9,10
200:3,4,7,8 201:4,5 202:21 203:10,
11,13,17 205:19 206:6,7,10,21
207:2,6,7,9,10 208:10,13 209:20
210:4,23 211:3,13,16,24,25 212:2,
7,10,15,21 213:8,9 215:18,19,21
221:13,16,17 222:7,12,14 227:25
228:1 231:17,18,23 232:2 233:7,8,
11,12 234:8,9,12 235:6,11,17,21
236:3,4,5,7 237:14,16,18,21,22,25
238:3,7

**correctly**  12:19 34:4 66:9 134:13
143:18 148:24 185:13 205:6 210:3

**counsel**  20:21 47:12

**counterforce**  139:3

**countersigned**  157:15

**County**  4:23 41:19,20 42:7 45:11

**couple**  5:7 81:20 82:12 159:11
169:19 179:3 207:19 216:9 223:23
234:10

**court**  4:23 5:11,14,17 6:1,17 48:4,
5 162:1

**covered**  53:3

**coworker**  29:20

**create**  27:24 199:2,12,13

**created**  59:1 153:23

**creates**  198:24

**credit**  183:16

**crime**  49:12 50:7,15,17,20 54:25

**crimes**  45:23

**criminal**  178:18

**criminals**  45:22

**cross-reference**  194:22

**crossed**  28:5

**crosses**  224:23

**cruel**  169:25 170:1

**cues**  118:8,11

**cul-de-sac**  82:16,18,20 224:3,5
226:7

**current**  182:12

**curtains**  96:4

**curtilage**  93:12,16,20

**custody**  133:12 142:12 147:23
168:14 172:18 219:23,25

**cut**  47:11 76:15 96:24 234:3

**cutting**  116:12

**D**

**D-O-M-I-N-I-C**  4:15

**dad**  184:19

**damages**  179:18

**dark**  55:25

**dash**  20:6,25 22:10 23:8 58:6,16,
25 62:1 84:22 85:3,12 112:3

**data**  59:7

**databases**  59:9

**date**  9:21 42:24 70:14 153:18,20
154:2,5,6 160:4 199:25

**dated**  63:13

**dates**  41:5 68:8 156:6

**dating**  58:3

**day**  16:4 42:23 45:6 59:16,17 60:4,
6 78:17 79:5 158:11,20 159:17
191:2,10 218:3

**days**  159:12,19

**DEA**  46:8,9,10

**deal**  44:17 179:14

**Debeikis**  63:11

**debt**  183:16

**debts**  183:11

**decide**  161:19 162:12

**Defendant**  4:19 8:13

**definition**  49:17 51:13 152:13

**definitions**  35:22

**definitive**  18:24

**definitively**  16:21 49:7 130:16,23
131:20 146:5,9 171:9 209:13,16
211:6,10,11 215:1 219:8,13

**degrees**  81:5

**delegated**  74:20

**delineated**  18:18

**demand**  112:11

**demeanors**  236:10

**department**  9:18 17:23 25:10,19
28:21,22,24 29:2,9,12 31:16 39:25
41:3,8,23 42:17 43:1 44:20 45:1
48:2 52:9 58:9 62:14,16 64:18
67:10,12 74:16 149:25 188:6,7
190:5 191:18 195:15 198:21
205:19 206:5,12,15,20 207:9
216:12,16 217:2 219:3 236:2

**departments**  41:11 61:9

**dependent**  183:20

**dependents**  181:25 182:2

**depending**  43:21 60:6 159:12,20
178:11,13 238:4

**depends**  59:20 60:4 159:4 235:22,
23

**depicted**  169:7

**deposition** 4:3,17 5:8,13,22,24 19:12 20:19 21:16,19,22 26:20,21 204:1 208:16 239:16

**Deputy** 63:11

**describe** 48:19 55:11 57:18 97:23 123:16 126:20,21 135:21 168:15 224:19

**describing** 192:5

**description** 77:11,20,25 78:11 88:9 110:20 134:19 164:25 175:19, 25 176:7,14 200:3,21

**desk** 190:10 191:1,10

**detail** 55:12 101:8,14 131:1 160:24 161:8 162:22 164:14,16 175:21 177:4 197:6,12 198:4,21 199:13 203:6 204:14,17,22 205:13,17 206:9 220:6,14,20

**details** 47:14 220:22 221:11

**detain** 113:25 115:2 120:16 122:16 123:6 125:10 126:15 127:24 129:8, 16 134:20,22 136:11 139:8 167:10, 13

**detained** 125:19 135:3,11 168:19, 22

**detaining** 125:16

**detainment** 129:20 136:12

**detains** 125:14

**detect** 117:10

**detention** 125:23,24 126:16 136:20 197:18,22 198:9

**determinations** 117:16

**determine** 31:18 37:8 91:20 217:4

**determined** 212:14

**device** 59:7

**Devlin** 5:2

**dictates** 161:16

**difference** 5:15 88:4 91:8 237:23 238:2

**differently** 9:12

**difficulty** 227:7 229:20 230:10

**digits** 69:22

**direct** 8:14 67:16 153:8 158:13 189:24

**directed** 106:4

**directing** 187:9

**directly** 47:22 179:14

**disagree** 169:20 193:7

**discipline** 216:17,23 217:20,22

**disciplined** 217:5

**disclose** 47:8

**disconnected** 231:1

**discovered** 219:25

**discovery** 4:17

**discrepancy** 88:8 89:9

**discretion** 161:19

**discuss** 23:25 26:23 28:19 29:2 30:3 32:25 33:4 84:1 89:8 100:25 179:23 180:24 185:25 219:4 220:14

**discussed** 23:15,18,24 24:3 30:5, 8,10,11,14 101:9,13,24 102:9 103:16 122:18 176:20,21 177:5 219:4 220:19

**discussing** 24:5 146:24 147:1 172:22 186:1

**discussion** 91:15 102:3 209:8,10, 12

**dispatch** 15:14 40:9 55:7 65:21 66:5,15,25 67:2,3,6,14 69:1 73:17, 19,22 74:13 75:7,12 76:13 77:3 78:1,9,13 110:21 111:1 150:25 165:23 192:11,14

**dispatched** 16:9 17:1 38:14 39:25 40:6 61:24 71:17 76:21 160:13 202:20 233:5

**dispatcher** 68:22,23 71:24 72:12 73:11 75:22 76:22 199:22,24 201:22 205:21

**dispatchers** 68:10 74:25 192:11 202:25

**dispatches** 74:17

**dispatching** 72:15 74:20 75:3

**display** 69:15 72:4

**displayed** 55:19 57:22

**disrespectful** 8:4

**distance** 83:9

**distinction** 74:24 211:20

**District** 68:14

**Division** 4:24

**divulge** 20:20

**document** 65:7,8,9 68:25 123:22 150:3,6,10 154:24 155:13 156:6 159:25 198:25 199:2,12,14 208:17

**documents** 21:18 63:20,23 90:23

**domestic** 52:21

**Dominic** 4:6,15,19 8:18,20 12:11 14:24 32:1 63:12

**door** 53:2,3,4,16 94:1,6,9,14,15,17, 20 95:1,13 97:3,12,14,17,19 98:8, 15 100:20 102:13,18,19,24 103:18 106:15 107:8,22 109:9 175:17 212:9,10 224:21 230:2

**doorbell** 95:2,5,8

**doorway** 94:12 102:22 104:3,12, 20 108:6,14,18 110:18 115:22 117:6 118:13 120:10 139:8

**double** 9:14 123:12 124:5 194:24

**doubt** 203:2 232:19

**draft** 20:2 153:5 155:3

**drafted** 162:3

**dreads** 169:3

**dressed** 105:3

**driver** 84:4 174:17,18 192:17,24 193:3 210:1 212:14

**driver's** 109:2 119:3

**drivers** 149:5

**driveway** 79:10 87:12 89:2 90:17 102:16 225:7,8 226:23 227:2

**driving** 77:12,16 173:8 174:11 175:4 176:16 201:8

**dropping** 187:22

**drove** 224:3,4

**Drug** 46:6

**due** 234:21

**DUI** 70:20 86:8 87:3 92:5 117:18 118:19 160:19 161:8 162:21 163:8 166:13,23 178:3 198:2,10

**duly** 4:9

**Dumais** 12:18 15:3,15,22 22:13,20 23:6,24 24:1,6,11,14,21,24 25:23, 25 26:7,11,16 28:8,18 32:22 33:10, 20,22 62:2 73:24 74:1 79:22 83:18,

DOMINIC BATES, 09/04/2019

21,24 84:9,18 85:6,23 86:3,10,17,
20,21,23 87:1,5,9,18 88:7 89:9,12
90:2 91:11,25 92:3 93:7,22 94:6,
16,18,19,23 95:1,12,21 96:13,14
97:2,14 98:18,21,25 99:9,12,19
100:2,9,11,25 101:23 102:10,21
103:7,14,15,20,22 106:7,10,11,13,
16 107:2,4,7,14,21 108:1,5,13,16,
22,25 109:11,25 111:15 112:2,6,13
113:7,24 115:24 116:23 118:16
119:11,15 120:1,15,21 122:4,11
123:5 125:7,10,14,15,21 126:16,21
127:4,6,11,14,16 128:2,5,7,12,16,
21 129:1,4,7,15,19,22,25 130:8
131:17,24 132:6,9,20,21 133:9,21,
22,23 134:4,6,15 135:3,12 137:18
140:12,21 141:10,20 142:12,13,24
143:4 144:18,21 145:7,17,22
146:18 147:3,6,9,23,24 148:4,6,9,
15,17,22 149:2,4,11,14,17 151:20
161:24 165:4 166:2,6,7 167:9,13,
20 168:5,10,19 170:20 172:5,20
173:10 174:4,5,9 175:3,7,15 176:2,
13,15 186:1,21 187:18 195:7 196:6
197:13 210:18 212:3 213:20
214:12 219:19 223:15,25 224:1,4
231:25 232:5,14,15,22,25 233:6,
13,17,18,23 236:24

**Dumais'** 34:18 85:3 116:5 121:7
127:22 128:9 142:17,25 143:1,8,
10,25 144:4,11,16 184:18 196:14,
23 197:7,11,16,25 198:8 232:18

**duration** 136:11

**duties** 44:6

**duty** 40:21 55:8 92:23

---

## E

**earlier** 41:9 61:23 76:20 84:20
87:16 88:1,11 101:12 113:16
155:21 164:11 171:22 176:3
180:18 186:8 210:25 221:19

**earliest** 24:4

**earn** 180:6

**easement** 225:5 227:1,4

**Eduardo** 34:12

**effect** 134:17 139:21 169:25
170:19 173:5 174:13 177:15

**effected** 88:15

**effecting** 129:19

**effectuate** 92:20

**effectuated** 15:2

**effectuating** 126:16

**elaborated** 197:12

**elbow** 127:2 128:16,17,20,23
129:4,24 134:8

**electronic** 156:19,20 157:14

**electronically** 156:18,23 157:1

**elevated** 228:18

**elude/poss** 70:19

**emergency** 53:13 60:18 140:13,
22

**employed** 10:11,15,19 29:10,13,
14 41:2 46:17 48:1 62:16 180:2

**employment** 8:2 10:19 17:21,22
41:6 42:5 180:21,23

**encounter** 36:11 136:8

**encountered** 36:15

**encounters** 35:16,23 38:21

**end** 60:3,7 142:7,8 151:2 154:11
236:20,24

**ended** 33:19,21 142:9 218:20

**enforcement** 10:24 11:7 16:16
17:3,16,17 18:6,15 27:23 45:18
46:5,6 47:2 49:13 59:8 79:15,20
80:1 83:21 126:1,25 127:17 131:7
141:13,19

**engage** 48:12 173:3

**engaging** 186:14

**engine** 206:3

**English** 64:17

**enter** 50:24 51:1,5 52:10 53:14
93:8,12 113:9 115:5

**entering** 53:18 229:22

**entire** 136:8

**entitled** 179:24

**entity** 31:10

**entry** 70:12

**equipped** 57:19 58:6,15,17 59:6
60:23 61:12 85:4 90:7

**essentially** 78:20 157:12 162:8
167:18 173:20 222:3

**estimate** 183:18 201:16

**et al** 4:21

**evening** 26:24 30:6 34:9 189:14
202:15

**event** 162:2 173:22

**events** 12:3 27:6,7,12 33:4 34:11

**eventually** 82:18 102:8 185:18
227:19

**evidence** 161:11

**exact** 83:7

**EXAMINATION** 4:11 223:1
231:10

**exceptions** 51:4

**exchanged** 188:24

**exclude** 150:24

**excuse** 15:4 122:22 127:3 143:22
170:14 207:4

**exhaust** 101:19

**exhibit** 4:3 8:9,11 62:10,24 63:8,9
64:24 65:5 67:17 68:4,6,25 71:22
88:23 149:22,23 151:18 194:11,14,
16,20 198:15,16,18 203:5,7,15,21,
22 204:1,10,13,19,24 205:11
207:3,4,5,12,13 208:5

**exhibiting** 135:17

**exhibits** 65:2

**exigency** 51:2

**exigent** 51:8,10,21 52:1,7 113:11,
18,22 114:16

**exit** 230:8

**exited** 111:23 120:12,15 122:14
167:9,24 227:18

**exiting** 230:10

**expect** 182:2

**expected** 48:9

**expecting** 15:5 182:5

**expenses** 183:19

**experience** 52:3 88:16 215:4,9

**experienced** 52:2,6

**experiencing** 238:19

**explain** 223:11,17

**Explosives** 46:20

expressed 96:16

expressing 97:6 170:19

extended 146:6

extent 179:13

extra 55:23 56:21

eye 174:15,16 201:10

eyes 117:13,14 118:7 174:20 187:6

**F**

F15-18-00374 194:18

face 137:21

face-to-face 24:17 127:10

facilities 67:2

facing 127:4,11 128:6 138:7

fact 19:19 25:4 36:24 37:25 64:7, 10 91:19,22 104:14 107:25 114:11 123:25 124:7 125:10 152:6 156:13 164:24 165:10 166:20 167:18 173:7 176:18 190:22 193:16 194:25 211:7 227:15 233:15 237:6

facts 49:10 50:2 161:19 162:12,13 198:6 214:5

factual 214:7 219:9 221:15

fail 210:13

failed 209:25

fair 15:13,19 16:22,25 17:4,20 18:4 27:20 42:4,8 43:10 44:2 47:16 49:15,21 61:10 68:16 72:16 74:19 79:18 82:1 91:19 94:5 95:15 97:13 98:3,18 107:7 108:22 109:24 116:4,22 125:6 155:17 174:24 178:21 183:8 197:9,16 201:12 206:17 217:11 221:5,18

fairly 5:13 79:24

false 173:15

familiar 45:18 117:22

family 13:15,17,23 35:17 37:13 170:25 171:8 183:1 185:15 186:20 189:14 190:4 192:2 212:19,25 213:6 215:4,6 228:9,10 229:1 230:23 231:4,5 234:22,24 235:15 236:22 237:1

faster 222:19

father 13:1,25 14:9 38:24 39:4,14 171:16 186:11 229:6 236:16,18,22 237:10,12,17,20

fear 235:13

February 11:24 12:3 14:23 15:20 16:5,8 18:9 19:20 22:2 26:24 32:9 34:10,25 35:23 36:1,12 37:7,15 38:9,13,20,22 39:5,11,13 40:2,7, 13,22 55:6 58:4 59:18 61:17,25 62:5 68:18 70:14 80:17 81:14 96:6 113:23 115:21 118:6 151:21 158:1, 24 175:2 189:15 200:15 212:1,24 217:6

federal 46:18,24

feel 98:6 221:14

feeling 97:9

felony 54:4,8 178:10

female 97:18,21

field 29:21 43:6,8,9,13,19 44:2,13, 21,24 63:4 117:19,24 159:24 194:17,18

fight 52:22

fighting 53:1 147:19

figure 113:1

filed 24:9 26:4,8 31:2 32:19 207:15 208:9

filled 45:6

filling 191:4,12

final 153:2 155:19,21 156:14

finally 142:8

finances 178:25 179:25

financial 179:16 184:14

find 217:21 218:11

fine 76:16 81:12

finish 6:20,23 177:8

finished 132:16 156:25

finite 172:15

fire 37:21 38:6 51:17 64:19 206:7, 8,12,18,20 207:3,5,8

Firearms 10:20 46:19

fist 137:15

fists 54:2

fit 110:19

fix 61:20

flagged 184:23 185:2,3,8,11 223:7,18 224:7,8 225:17

flagging 224:13 225:3,16 227:9

flashed 72:22

flashlight 226:10

fled 74:4 75:9 84:3,7 87:22 89:13 91:21 92:4,16 103:9 112:7 113:13 114:12,22 160:15 162:20 165:14 166:9 173:6 174:6,8,9 176:17 177:17 210:2

flee 123:9 124:5,8 163:1,2 167:12, 19

fleeing 70:18 124:22 161:7 163:8 177:18 178:2,7

flight 167:16

focus 125:20

focused 142:1

focusing 139:24

FOIA 155:15

follow-up 216:9 221:9 231:12 239:1

follow-ups 222:22

followups 207:19

foot 9:25 97:25 164:3,5

footage 21:25 59:1

force 197:17

forced 53:5

foremost 5:25 8:7

forget 96:21 170:23

forgot 39:2 84:8

form 16:11 35:10 41:14 48:22 62:15 93:16 107:11 109:1,17 110:7,19 119:2 122:1 124:10 131:4,11 136:22 137:15 140:9 141:6 151:24 161:2 163:12 179:7 196:18 208:12 210:8 214:17 215:13,23 216:16 221:8 228:22 234:14 238:9

formal 32:6 45:16 217:9,12 221:3

formally 25:15 170:13

found 177:9 179:21

foundation 110:7 174:22 214:17 218:18

DOMINIC BATES, 09/04/2019

**fourth** 202:1

**frame** 38:19

**free** 182:13

**frequently** 16:13

**Friday** 60:12,14

**Fridays** 59:22

**friends** 13:14,17,23 171:8 228:10 229:2,7 230:23 231:5 235:15

**front** 94:20 97:3 102:13 103:22 139:12 143:16,20,22 144:6,18 145:7 190:7,10,16,18 191:1,10 223:25 224:20,21,24 225:7 226:22, 23 227:1,4,12,17

**full** 158:14 239:11

**full-time** 42:16

**fully** 54:14

**future** 182:3

## G

**gain** 138:12,15

**games** 173:25

**garage** 93:12 100:16,17,20,22 101:2,25 102:11

**gave** 42:5 219:1,6

**gaze** 117:23

**general** 162:15 179:15

**generally** 14:12 16:16 17:2 43:19 49:10 52:20 57:17,20 78:15

**generated** 154:3 195:9,16

**generic** 125:18

**gentleman** 11:22 12:25 14:8

**gentlemen** 188:19 222:15

**gestures** 225:25

**gist** 219:11,15

**give** 7:13,17 8:10 51:15 60:6 130:9 179:8,10 194:10 220:23,24 221:11

**giving** 27:13 130:1

**glass** 94:15 96:7

**glassy** 117:13 118:7

**Glock** 57:1

**Goldenrod** 12:13 14:14 15:16,23 22:1,12,21 23:5 30:20 31:3 34:13 35:6,17 38:16 40:2 55:8 58:23 70:4 71:17 74:11 75:8 78:23 79:8 80:5 82:7 87:19 90:17 91:12,22 93:9,13 94:2,12 115:2,22 189:10,16 199:9 201:14,18 202:20 203:9 216:20 217:8 218:20

**good** 41:9 114:20 227:20

**gotcha** 41:12 54:14 89:21 173:25

**government** 31:11

**governmental** 31:10

**grab** 113:10 114:23 120:14 123:19 124:3 126:17 128:10,13,16,21 129:1,4,10,22 131:25 132:9 185:9

**grabbed** 126:21 127:14 128:2 132:4,6 134:7 167:20

**grabbing** 127:5 130:9 132:22 133:9 134:4

**grabs** 164:19

**grandma** 123:18 124:2

**grandmother** 12:23 37:17 104:21, 22 106:1,4 109:11 116:1 120:13 121:15,17 139:5 167:22 169:12,24 170:10,14,15 171:11 173:3 185:7 213:11,19 214:11 223:7 224:12 225:12 226:19 227:23 229:7

**grandson** 139:21 170:1

**grasp** 126:25

**grass** 139:11

**gray** 98:1

**great** 80:13 220:16

**gross** 180:5,6

**ground** 80:19 140:6,8,15,23

**group** 237:19 238:13

**grow** 234:4

**guess** 4:18 27:9,10 29:4 52:18 58:3 95:10 101:15 168:2 186:22 220:20 236:23

**guessing** 95:7

**gun** 55:21,22

**guy** 162:20 164:3,4,8,19,20 174:5

**guys** 110:2

## H

**hair** 98:2 168:21,22 169:3,5 234:4

**half** 42:22 130:19 171:5

**hand** 126:12,25 127:1,23 128:13, 18,19,21,25 129:3,9,22,23,24 131:25 225:25

**handcuffed** 143:19

**handcuffs** 34:5,15,20 55:23 115:3,4 136:9 145:10 147:24 148:5,12,14,19 210:19

**handed** 205:5,7

**hands** 128:9,11 129:17 130:4,7 132:1 138:20

**hands-on** 133:23 134:6 197:13,18

**handwritten** 8:19 154:19

**happen** 7:7 26:11 38:7 148:2 174:3 217:25

**happened** 20:8 26:23 30:6,11,16, 18,20 31:2,13 32:1,2,4,8 33:5 102:5,6,8 113:2 120:11 139:25 147:22 152:5 170:24 178:11 186:2 191:18 193:12 199:8 204:9,23 212:1 216:24 217:19,21 218:1,2,9, 11,23 219:6,10 221:24,25 222:4,5 228:6 231:24

**happening** 12:3 52:16

**hard** 157:13

**head** 6:9 29:16 184:3

**headed** 6:23

**hear** 52:25 73:17 87:21 107:14 122:4 135:6 146:14,21 170:18 172:19 177:23 185:22 188:19,21, 23 191:6 231:2

**heard** 112:10 120:13 121:14,16, 17,21 122:3,12 129:21 146:17 167:21 209:17 220:10

**hearing** 43:18 53:24 66:20 124:13 165:5

**height** 9:24

**hesitant** 145:14

**hey** 27:13 31:25 107:15,19 164:2 165:4 224:17 225:21,22

**HGN** 117:23

**hide** 213:21 228:3

**hiding** 213:11

**higher** 194:14

**highlight** 165:7

**Highway** 117:25

**hire** 42:23,24

**hired** 41:6,13,22 42:1 62:16,19

**hold** 83:7

**home** 50:25 51:1,5 100:3 216:19 217:8

**honest** 102:2

**honestly** 29:15 56:10 113:12 199:3 213:3

**hope** 92:15

**horizontal** 117:23

**hostile** 234:24 235:1,3 237:5 238:13

**hostility** 234:21,23 236:4,6,8

**hostily** 238:6

**hours** 68:17 191:1,10 201:20

**house** 37:21 38:6 51:20,22 53:2,25 82:6 84:15,17 85:17,20,24 86:5 87:10 90:12 91:15 93:3,13,18 94:3 95:19,22,23 96:1,9,18 100:18 101:7,10,23 102:15 104:5,7,8 111:5,6,8,11,12,13,16,23 112:1,15 113:8,10,19,25 114:17 119:4,13, 20,24 120:3,6,11,15,20 121:11 122:15,23 123:13 125:14 139:13, 14 149:11,15 166:6 170:16 171:16 175:17 176:1,12 182:20 185:19,21 197:14 210:23 211:3 224:15,20 226:22 227:3,5,17,18 229:14,18, 19,22,25 230:3,5,6,8,11 231:16,21 232:4 234:6,11

**household** 209:24 212:2 223:14, 16 226:8 227:13 228:14

**houses** 81:20 82:12,13,24,25 83:11 223:13,23,24 228:14

**huh-uh** 6:10

**human** 215:18

**hurt** 189:11

**hypothetical** 110:8 164:19

---

**I**

---

**I-S-P-E-R-N** 60:16

**i.e.** 217:18

**I294** 20:9 62:1 70:22 74:5 210:2

**ID** 109:3,12 119:3 230:17 231:16, 22 232:4 233:19 234:14,17

**idea** 13:13 38:8 104:17 175:9,10 190:21

**identification** 4:4 70:8 109:2,4 110:1 119:2 209:25 210:14,21 211:2 227:25 228:2,4 229:12,15 230:18

**identified** 13:2,10 32:13 55:15 87:22 150:1 205:12 232:8

**identifies** 70:7

**identify** 9:16 11:18,19 98:25 107:5,22 108:23 111:1 199:7 210:13 211:15,18 212:5 233:1

**identifying** 99:3 110:1

**identities** 14:7

**ifs** 179:22

**ignore** 50:2

**IL** 71:12

**Illinois** 10:14 12:17 15:2,21 19:1,3, 16 20:7 25:11 45:21 48:4 60:17 61:7,13 65:22 66:3,25 69:4 72:12 159:24 160:14 165:15 178:10 194:17 195:14,19 216:20

**image** 149:5 168:6,11,15,20 169:2, 4

**imagine** 176:24,25 219:14 221:1

**immediately** 84:24 134:3,9 167:20

**impair** 7:20

**implying** 186:12

**important** 123:25 131:1 160:24 162:21 175:20

**importantly** 179:4

**impossible** 6:18

**in-service** 44:13

**inaccurate** 152:23

**inappropriate** 31:19

**inches** 168:23

**incident** 11:21 13:5 16:24 19:19, 21 20:13 21:2 28:12 31:17 32:5 33:13 36:19 37:8 39:19 52:19

141:15,25 150:1,6,7,17,20 151:17 153:3,6,22 156:21 157:25 158:1 159:17 162:23 187:1 189:20 192:1, 6 193:6 194:19 195:8,10,12,13 216:18 217:7 235:2,11,17 236:7,12

**inclined** 40:16

**include** 69:7,8 150:24 161:18 167:17 180:12

**included** 42:25

**income** 180:7,14,16 181:13,22

**Incomplete** 110:8 124:11

**inconsistency** 164:17,25 165:8

**inconsistent** 196:14

**increase** 63:2

**independent** 12:2,6 66:16 75:21 78:6 90:24 95:11 108:11 172:8 221:6

**independently** 151:9

**index** 70:8

**indications** 118:22

**indicia** 118:9,12

**individual** 76:5 113:13 115:19 148:18

**individuals** 12:12 13:2 14:3,7,11

**informal** 217:17 218:5

**information** 47:9 48:10 65:23 71:21 72:1 150:23 151:9 152:22,23 163:20,24 165:21 166:1 179:12,16, 25 180:25 192:16 200:9 210:1 212:20,23 213:7 228:8

**informed** 25:9 75:7,12 166:10

**inheritance** 184:10

**initially** 104:23 132:8 148:11 164:4 167:6

**Initials** 153:12,17

**initiate** 86:24 97:4 99:13,20 106:13 118:17

**initiated** 24:20 106:9 218:6

**injured** 189:12

**insert** 162:12

**inside** 53:1,25 61:6 91:4 95:19,23 96:1,9 97:5 100:22 104:7 123:12 143:1,4 144:10,15 146:15,19 170:6 229:24 231:21 234:5,6

**intended** 5:19 7:12

**interacted** 12:14,15

**interacting** 13:19,21 115:25 117:2

**interaction** 12:17 15:21 37:9,16 39:5,10,15,18 236:1

**internal** 195:21

**interpretation** 124:21

**interrogatories** 8:12,14,16,24 9:3

**interrogatory** 10:6,9 11:3,17,20 12:1,7 13:3,11 32:13

**interrupt** 22:25 115:9

**Interstate** 15:1

**interviewed** 31:21,24

**intoxicated** 84:4

**investigation** 16:11 18:12 31:17 91:17,20 92:18,24 93:7 117:18 118:19 160:20 166:24 178:19 217:3,9,10,12,18 218:5

**investigations** 18:7

**investigatory** 18:7

**invitation** 112:22 113:1

**invited** 119:4 120:21

**involuntarily** 64:13

**involved** 158:19

**involvement** 216:18 217:6

**involving** 11:22 19:21

**irate** 188:10

**ISP** 75:8 195:5

**ISPERN** 60:16,20,24 61:14 65:21 66:2,8,10,11 67:12,19,23,25 68:15 70:15 71:16,25 72:2,7,8,11,16 73:5,23,25 74:2,3,6,12 78:8 87:16, 21 88:9,22 89:5 151:1 165:13,22, 23 176:3 178:2

**issue** 40:11 179:17 181:11 197:10

**issues** 58:9

J

**jacket** 105:8,9,17

**Jaguar** 70:10 71:12 75:14,24 76:3, 4,9 77:5,8,12,17 87:23 88:5 89:6 91:9 101:2,25 102:11 114:12

165:5,14,19 166:10 174:11 175:5 176:4,16

**jerk** 132:12

**job** 6:1 43:24,25 110:11

**Jones** 30:2,3,13 31:1 32:23 33:9 63:11

**Jr** 36:10,12,15 213:1

**judge** 5:16

**judging** 68:7 201:15

**judgments** 215:20

**jump** 40:16

**June** 63:3

**jurisdiction** 61:7 73:2 207:1

**jury** 5:15 179:21

**Jyran** 4:20 5:5 11:23 12:22,24,25 34:14 35:2,5,9 36:2,7 37:11,16 38:21,24 39:4,8 102:9,12,17,18,24 103:18 104:10,14 106:15 107:3 110:2 111:20,22,25 112:1,6,7,11, 21 115:18,20 116:2 120:16,20 122:13,14,22 127:3,24 128:6 129:16 132:1,4,5,20,23 133:21,23 134:1,9,16 135:1,9 137:3,13,14 138:11 139:24 140:1,4 144:8,10 145:18,20 147:12,13,14,15,21,25 148:5 149:8 161:24 166:17,20 167:5 168:14 169:5,11 170:6,20 171:12 172:11,20 173:6 175:10 177:17,18 185:5,11 187:5 188:14, 18,23 189:4,9,11,12 192:15,22 197:19 210:12 211:12 213:11,18 214:10 216:19 217:7 223:6 224:12 225:12 226:18 227:6 229:9,11 231:15,21 232:3,8,13,17,19,23 233:1,9,14,15,19 234:5,6,7,10,13, 16

**Jyran's** 36:9 39:14 116:1 127:10 128:1,2,6,10,13,15,19,20,22 129:23,24 134:7 169:12,23 170:9, 13 171:15,19 173:3 185:17 186:11

K

**keeping** 66:21

**Kevlar** 56:9

**kick** 137:20 141:3

**kicked** 53:15

**kid** 164:7

**kill** 114:9

**kind** 26:21 30:8 56:25 57:8 96:20 164:14

**kinds** 163:2

**knee** 137:20 141:5

**knew** 49:23 113:9 148:22 173:15, 16 212:25 213:2

**knock** 94:6 175:17

**knocked** 53:2 95:1,2 97:12

**knocking** 94:17 95:8,12

**knowledge** 11:10 19:8 31:15,22 36:14 58:14,19,20,25 61:3,11,16 68:1 84:18 85:6 90:21 114:4,6,10, 11 122:4 192:22 217:1,17

L

**label** 194:14 198:19 205:8

**labeled** 65:6 67:20 150:3 204:2,24 207:16

**lack** 198:10

**laid** 140:8

**lasted** 142:4

**law** 4:23 10:23 11:7 16:15 17:3,16, 17 18:6,15 27:23 45:17 46:5 47:1 59:8 79:15,20,25 83:21 126:1,24 127:17 131:7 141:13,18

**lawfully** 113:9 209:23

**lawn** 224:24

**laws** 45:17

**lawsuit** 4:20 5:5 24:1,7,8,9,11,15, 24 25:8,24 26:4,7 28:19 29:2,25 30:4,7,8,10 31:1 32:18 33:1,16 40:10,11 63:20 149:24 178:22 207:15 208:9 209:8,11

**lawyer** 5:3 49:7,15 51:12 54:14,15

**lawyers** 5:16 23:13,17 28:17

**lay** 126:12

**lead** 13:22 49:11 91:16 98:19,21 115:25 116:8,24 117:1

**leading** 225:5 228:22

**leads** 59:9 67:1 224:21

**learned** 107:3

DOMINIC BATES, 09/04/2019

**leave** 34:15 139:21 184:20,25 185:1

**leaving** 184:22 188:14 189:10 223:5

**led** 217:22

**left** 10:18 55:17 128:12 189:15 227:19 230:21,24 231:5

**leg** 141:4

**legal** 20:21 46:1 48:23,25 51:13 54:6

**length** 168:24

**Leslie** 5:25 6:9,16

**Leslie's** 6:1

**letter** 63:10,25 64:3

**level** 6:22 130:21 178:10

**liable** 179:21

**license** 71:13 76:8 88:18,21,25 93:23 109:3 119:3 149:6 200:12,13

**light** 57:23,25

**lights** 58:1 95:25 96:1,3

**likewise** 187:4

**limit** 231:13

**limited** 19:5

**Lincoln** 88:24

**lines** 52:23 103:12 106:23 133:5 154:13 186:24

**listed** 71:21 200:5 201:3

**listen** 14:20 21:24 22:19 96:12 119:22 142:21 216:13

**literally** 6:2

**litigation** 23:18,25 24:5

**live** 181:17

**lived** 92:11

**lives** 100:15

**living** 25:11 182:24 183:19

**lobby** 189:21,22,25

**locate** 74:10 75:9 92:15

**located** 225:3 230:12

**locating** 160:15

**location** 14:15 15:16 16:2 199:9 201:18 226:21 227:20

**log** 199:21 200:10 202:2 205:21

**long** 42:20 83:16 102:21,23 136:4, 5 145:21 184:12 230:6

**longer** 44:16 146:8 169:5,8

**looked** 132:8 174:20

**losing** 130:18

**lot** 14:22 58:9,10,12

**lots** 11:18 126:2

**lottery** 184:6

**loud** 133:7 145:19

**low** 178:9

**lure** 113:7

## M

**M/1251** 68:12

**M/sc02** 69:19

**M2** 202:5

**made** 22:12 171:1,7 173:18 174:15,16 209:8

**magazines** 55:23

**maintenance** 61:20

**majority** 29:5,6,7

**make** 8:24 22:25 34:8,23 35:20 65:1 76:17 86:13,16 89:22 95:18 117:15 119:11 123:4 132:14 133:15 173:20 176:7 182:11 186:9 208:1 215:10,15,20 216:2 218:17 232:11

**making** 14:1,4 134:22,24 187:16 225:24

**male** 77:22 78:3 110:23 111:2 167:8 168:18 175:4 176:18

**Malibu** 79:13 80:6,8 84:6 87:25 88:1,5,10 89:1,4,13 90:9,18,24,25 91:2,5,9 93:23

**man** 104:12,19,25 105:25 106:10 107:3,5,8,15,21 108:6,13,17,23 109:1,12,25 110:23 111:4 114:21 117:6,10 118:13,21 120:19 122:24, 25 123:6,7,11 125:3,7,13,16 126:17,22 133:6

**manner** 196:25

**March** 153:20,23 154:5

**marked** 4:4 8:9 57:14,16,19 62:8, 10,24 63:8 64:23 149:22 151:18 194:10,16,20 198:13,15 204:14 205:10 207:12

**marker** 202:16

**marks** 187:1,5

**married** 181:18

**Mars** 58:1

**materials** 20:2

**matter** 19:10 114:20 227:15

**Matteson** 4:21 9:18 10:13,14 12:20 15:17 17:5,6,8,23 19:2 21:2 28:24 29:1,8,11 30:12,25 31:6,7,16 39:24 41:3,7,22 42:4,17 44:20 45:1 48:2 52:5,9 55:13,16 57:5,15,18,21 58:5,15 61:2,11 62:11,25 63:16,17, 23 64:12,18,19 65:6,14 66:12,13 67:9,11,20,21 69:5,9 73:6 74:15, 18,21 75:22 76:22 78:21 82:21 90:6 99:4 114:8 149:25 150:4 159:21 188:6 190:15 195:15 198:19,20 204:3 205:12,18 206:4, 11,20,24 207:8,14,16 208:8 216:12,15,20 217:2

**mayor** 31:8

**Mcgrath** 43:16 46:12 47:11 48:21 49:4 54:5 81:6 93:15 107:10,16 109:16 110:6,12 119:6 121:25 122:6 124:9,15 131:3,10 132:15 151:23 161:1,10,25 163:11 174:21 179:14 181:3 196:17 204:5,12,20 205:2,5 210:7 214:16 215:12,22 222:23 223:2 224:10 231:8,15 238:8 239:1,14

**Mcgrath's** 231:14

**MD** 200:20

**MDC** 200:18,21

**meaning** 136:25 157:4

**means** 70:19 71:4 152:12 217:20

**meant** 41:8 93:20 204:24

**meat** 19:10

**medical** 192:15

**medication** 7:20

**meet** 36:11

**meeting** 16:2

**member** 37:12

DOMINIC BATES, 09/04/2019

**members** 183:1 185:16 209:24 212:19,25 215:5,6 228:9 229:2 237:1

**memory** 101:19

**mention** 158:18 160:2,18 166:12, 17 167:1,4 168:1 178:4 191:24 192:1 197:17,21,23,25 198:3 237:8,12

**mentioned** 10:10 56:5,12,21 166:22 186:8 191:25 197:10 234:23,25

**mentions** 70:9

**message** 66:2,4,6,8,11 67:1,20, 23,25 68:15 69:3 71:16 72:2,11,13, 14 73:5,11,23 74:2,3,7,12 76:14 78:8

**messages** 60:24 61:13 67:13 71:25 72:7,8,16

**metal** 56:14,15

**MFD** 151:2

**Michael** 30:2,13 31:1 32:23

**microphone** 85:11

**middle** 78:18 199:20

**Mike** 222:20

**mind** 28:5 66:21

**mine** 197:22

**minor** 183:17

**minute** 102:25 103:1,3,4,7,17 136:14 145:25 146:3

**minutes** 27:18 145:25 146:1,4,8 212:13 216:2 230:7 234:10

**misdemeanor** 54:10 178:9

**mislead** 152:25 213:19 214:12 215:5

**misleading** 152:19

**missed** 106:20

**Misstates** 161:11

**misstating** 134:14

**mistakes** 215:10,16

**Mitchell** 4:20 5:5 11:23 19:22 34:5, 14,17 35:2,5,9,16 36:2,7,10,12,15 37:3,10,11,12,13,17 38:1,21,25 39:3,9,10 70:1 76:6 77:15 102:9, 17,19,24 103:18 104:11,15 107:4,9 110:2,3 111:15,25 112:1,11,21

113:8,25 115:19,20 119:16,19,24 120:2,5,9,20 127:24 129:9 130:9 132:1 133:21,23 134:1,16 135:2,9, 16,22 136:19 137:3,13,14 140:5, 15,23 141:1 142:9,16,20,24 143:7, 19,24 144:3,22 145:7,10,19,22 146:19 148:5 151:21 167:12,19 168:6,12,21 169:5,23 170:5,9,12, 17 172:4 179:20 184:17 185:6 186:4,12 189:4,10,14 190:4 192:1, 16,23 197:14,19,24 209:24 210:12, 13,25 211:12,15 212:2,3,5,6,15,18 213:6 214:11 216:19 217:7 223:7, 14 224:12 226:8 227:22 232:19,20 233:1,2,7 235:15 236:25

**Mitchell's** 12:22,24 13:1,25 14:8,9 37:16 38:24 39:4,8 141:4 167:22

**Mitchells** 190:14 191:17

**model** 182:11

**modify** 9:13

**mom** 184:18

**moment** 109:8 120:9 141:14 150:5 205:16

**moments** 27:19

**Monday** 60:9

**monthly** 183:8,18

**months** 42:23

**mortgage** 183:6,9

**mother** 12:24 39:8,14 170:14 171:16 229:6 236:16

**mouth** 174:1

**move** 23:2 47:25

**moved** 116:13 139:11

**moving** 58:11 116:18 229:24

**MSFD** 206:19

**muffled** 146:21

**mult** 70:2

**multi-unit** 83:2

**multiple** 23:22 154:13 177:5 199:22 237:25 238:17,18

**municipalities** 17:12

**Murray** 29:18,19 32:22 33:1,9

**mystery** 147:1

**N**

**naked** 105:4,7

**named** 11:22 51:7 76:5

**names** 13:13 14:6 68:8 98:12 179:8,10 181:21 185:14

**narrative** 152:7 154:11 160:3 162:8,11,14 194:21 195:4,24 196:8,9,13,15,16 199:8

**National** 117:25

**nature** 12:16 13:18 18:16 27:4,15 28:13 36:21 44:11 45:23 47:7 77:3 93:19 109:5 117:3,14 136:3 141:11 151:14 178:22 179:11 182:11 183:25 184:9 217:14,20

**navy** 55:25

**NCIC** 59:9

**necessarily** 27:11 47:22 124:1 155:20 162:24 173:23 195:21 238:21

**net** 180:5

**network** 60:18 206:15

**newer** 58:2

**NHTSA** 118:4

**night** 29:10 30:11,16,18 31:13 32:1,7 33:5 57:9 58:21 59:11,13 78:25 80:11,15 81:3 85:2 92:23 116:6 152:25 158:23 159:1,2,7 172:3 176:21 177:1,16 204:23 213:17 214:10 216:24 217:19 218:2 235:10,16,24

**nods** 6:9 184:3

**noise** 54:20

**north** 81:20

**Nos** 4:3

**notes** 33:7

**notice** 9:15 11:13 63:14 118:11 153:10 199:20 203:7 227:6 229:20

**notifying** 74:3 217:10,13

**November** 10:16 63:13

**number** 9:17 40:24 41:1 56:16 70:9,15 71:13 76:9 83:8 88:21,25 151:1,3 165:13 179:9 195:1,5,8,10, 13,17 196:1,2 200:24,25 201:1 202:10,11,14,15 203:8,12,18

Exhibit G

204:18,22 205:14

**numbered** 8:16 150:12 168:2

**numbers** 63:15,18 150:2 151:13 185:14 201:3,6

**nystagmus** 117:23

**O**

**oath** 221:16 222:9

**object** 48:21 110:9 124:9 151:23 174:21 196:17 228:22 238:8

**objection** 49:4 54:5 93:15 107:10, 16 109:16 110:6 119:6 121:25 122:6 131:3,10 161:1,10 163:11 210:7 214:16 215:12,22 223:20

**objections** 124:16,18

**observations** 30:19

**observe** 22:19 79:9 95:25 117:5 118:24 144:21 173:19 188:21 193:24

**observed** 117:9 137:4 168:20 174:16,19 193:1

**observing** 118:12

**obtain** 168:5 206:14 229:14

**obtaining** 228:8

**obvious** 5:14

**OC** 55:20

**occasion** 18:5

**occurred** 11:23 189:20 223:11

**October** 26:4

**odor** 117:10 118:7

**offense** 91:7

**offer** 119:15 121:7

**office** 135:3 190:10

**officer** 4:18,25 5:1 7:2 8:1,5,7,11 10:12 11:6 12:11,21 15:15 16:6,16 18:15 19:5 27:23 29:18,19,21 32:11,12,16,17,22 33:1,9,20 40:14 42:16,18,20 43:4,6,8,13,15,19 44:3,4,5,7,21,24 45:7 46:4,5 48:10, 15 49:1,2,23 50:12 52:5 62:2,13,20 63:4,12,13 64:22 65:10 73:24,25 74:5 79:20 80:1 81:23 83:20,22 89:19 99:5 115:17 116:8 117:17 126:1,15 130:18 131:7 135:11,15 141:22 154:14 156:10 157:18,20,

24 158:2,3,6 160:5 161:4 162:4 163:6,7,15,17,20,22,23 164:2,9,13 168:7 171:22 177:16 180:21 184:13 187:20 188:5,13,17,18,22 189:3,5,8 190:6 191:3,12 192:19 207:17 215:9 216:7 218:2,6,10,21, 24 219:6,12,18 220:3,7,13,14,23 221:7,19 223:3 225:22 238:6,20

**officer's** 153:11,17 235:14

**officers** 29:5,6,8 38:15 43:9 45:3, 18 50:2 52:8 138:8 141:14,19 173:1 186:14 187:11 206:5 215:10, 15 236:18 237:11

**official** 39:22 207:14 208:8 236:7

**officially** 24:7 45:4 234:2

**older** 36:9 97:18,20,24 98:3,7,14 102:23 213:21

**omit** 162:12

**omitting** 197:4

**open** 96:4,7,11 195:16 209:7,10,12

**opened** 51:17

**operational** 58:18 59:11

**opinion** 161:13

**opportunity** 117:5

**order** 158:16

**ordinance** 19:2,3

**original** 115:7,8 118:17 152:16 194:13 204:10

**originally** 211:17 233:5

**outer** 55:18

**overtime** 180:12

**owned** 77:8 92:10

**owner** 70:2

**P**

**P-O-S-S** 70:19

**P-R-O-C-E-E-D-I-N-G-S** 4:1

**p.m.** 59:21,23 60:10,13,15 200:15 239:17

**paid** 183:22

**pain** 227:11,16 229:9 230:15

**paint** 172:2

**painted** 238:12

**pale** 164:6

**pants** 55:24

**paragraph** 158:14 160:3 165:17, 18,25 167:7 168:2,3,4,17 187:3 192:5,13 193:5 194:21 195:25 209:18 212:12 236:12,14

**paramedic** 192:14

**paramedics** 192:10,12

**parameters** 18:18

**parents** 171:15,20 184:21 185:17 192:23

**park** 81:17,19 84:10 226:12

**parked** 80:5 82:12 84:12,14,15,16 85:14 87:25 89:1 90:17 101:2,25 102:11 223:12,23,25

**parking** 54:18

**part** 75:5 127:21 227:5

**participate** 15:10

**partition** 143:15

**partitions** 143:11,14

**partner** 57:12

**parts** 145:3

**pass** 230:2

**past** 120:10 123:8 220:10

**patches** 55:17

**patrol** 44:10 55:24 56:1

**patrolling** 57:11

**pause** 164:9 165:6

**pay** 183:5,6,7

**paying** 54:24

**PD** 218:16

**pending** 4:22 23:18 115:10

**people** 13:3,6,7,9,16 14:2 23:22 28:16,21 29:10,13,14 43:17 48:7 88:17 117:2 126:2 163:1,2 186:6 193:11 194:3 215:11,20,24,25 223:19 237:25 238:5,18,20

**pepper** 55:20 56:5

**perceive** 125:2 167:15 238:7

**perceived** 30:15

**percent** 79:4 130:24 193:16,23,25

**perception** 27:24

**perfect** 116:20 203:25

**perform** 18:11 43:25 44:5 140:21, 25

**performed** 18:14 149:4

**period** 42:21 58:8 103:17 136:13 145:23 146:6

**permanent** 43:11

**person** 49:11 50:9,14,18 51:18,19 75:9 77:8,11 79:25 85:8 86:8 87:2 91:21 92:10,16 97:16 114:11 163:7 169:2,6 174:11 175:19 176:8,15,17 187:12 191:3,4 198:1 220:1 237:24

**person's** 50:24 52:10 118:8 158:18

**personal** 30:19 52:2 97:7,10 119:2 192:21 222:10

**personally** 14:24 31:21,23 52:6 193:8 214:1

**personnel** 62:12,15 63:1

**phase** 43:22

**phone** 21:25 23:2 27:1,8 116:19

**photo** 119:3 234:14,17

**photographs** 149:8

**phrase** 12:15 126:15

**phrases** 236:9

**physical** 35:10 77:10,20,24 96:16 110:20 125:23,24 129:7 136:23 137:7,9 138:12 141:15 142:2 156:1 197:18,21 198:9 199:14

**physically** 6:18 13:4 15:7 22:18 52:25 53:1,8 54:1,16 97:2 113:25 120:2 125:13 126:12,17 127:23 129:8,16 134:21 135:10 140:1 156:16 201:17 208:20 224:19 229:21 235:5,7,9

**picture** 169:6 172:2 218:18 238:13

**pieces** 209:14

**Pingley** 5:25

**pl** 200:21

**PL=Q991196** 200:22

**place** 66:16 115:3 131:6,8 133:12 202:16 204:4

**placing** 144:8

**plain** 64:17

**plaintiff** 5:4 65:14

**plate** 55:19 56:18 71:13 76:9 88:21,25 200:12,14,23,25 201:1,3, 6,11

**plates** 88:18 90:8 92:9 93:23 200:17 201:13

**play** 47:20 54:13 89:21 173:25

**playground** 51:18

**plural** 19:14 237:17

**point** 7:2 14:23 34:25 37:22 53:6 85:1,2 98:6 102:10 104:13 107:6 124:20 134:10 138:7,19,22,23 141:3 142:20,23 147:3 148:8,9 149:18 166:7 169:14 174:22 175:2 178:16 187:19 226:2 229:5 232:7 234:19

**police** 5:18 9:18 10:12 11:6 12:20 14:1 17:23 19:3,16 25:10,19 28:11, 21,22,24 29:1,9,11,23 30:1,12,24, 25 31:16 32:22 39:24 41:3,7,10,14, 17,19,21,22 42:16,17 44:6,20 45:1, 12 46:4 48:2,10,15 49:1,2,23 50:1 52:5,9 55:9,13,16 57:7,15,22 58:15 60:18 61:3,5,6,12,14 62:14,16,20 64:18 65:22,24 66:4,10,25 67:9,11 69:4 74:15 88:19 99:4 117:17 126:24 149:25 159:24 160:14 163:23 186:7,19 187:10 188:6,7 189:19,21 190:5,15 191:18 194:17, 22 195:14,15,20 198:20 205:18 206:5,11,15 207:4,9 215:5,7,9,10, 14 216:12,15 217:2 218:21 219:3 220:4,15,23 236:2,10,17,21 237:3, 11 238:19

**policing** 78:20

**porch** 95:25 96:2

**portable** 59:7

**portion** 127:21 128:15 151:8 196:15

**posed** 100:9

**positive** 79:4

**positively** 175:4

**Poskozim** 22:24 23:10 64:25 65:3 66:19 96:23 106:19,25 116:11,17, 20 124:12,19 130:17 135:5 140:17 171:4 187:21 188:2 191:6,15 220:9,16 222:21 230:25 231:7

239:3,9,12

**possibility** 101:1,24

**possibly** 9:24 23:14 77:15 92:17, 20 130:6 146:11 178:9 217:22 235:20

**Potentially** 166:25

**pounds** 10:3

**precedence** 48:5

**precise** 123:3

**prefer** 7:25

**preliminary** 5:7

**premises** 53:14,18

**prepare** 19:11,19 21:15,19,21 158:20 159:16

**prepared** 150:7 159:8

**preparing** 19:24 20:13 21:1,12 159:25

**presence** 95:18

**present** 12:13 13:4,6,8,10,12 14:13,25 15:7 32:14 33:24 34:2 58:22 79:16 141:14,19,22,24 205:23 206:1,6 217:14 235:24

**president** 31:8

**press** 94:7 207:21 208:12,18 212:12 213:5

**pretty** 47:19 169:13

**prevail** 179:20

**prevent** 126:12

**prevented** 19:6

**previous** 76:1

**previously** 8:9 10:11 62:10,23 63:8 64:23 65:5 136:24 149:22,23 166:9 194:10,15,20 198:12 204:2 205:11 207:12 210:20 221:23

**primary** 43:12,14

**print** 8:19 156:18 157:6,12,13

**printed** 154:4,7,17

**prior** 11:1 16:2,8 17:20 35:16,20, 22 37:9,15 61:24 119:13 134:22,24 153:5 208:15

**private** 52:10

**probable** 46:2 48:6,16,20 49:3,8, 19 50:6,13

**probationary** 42:8,9,18,20 43:4 44:4 62:19

**problems** 187:22

**proceed** 136:6

**proceeded** 237:1

**proceedings** 115:15 216:5

**process** 26:19,22 35:15 43:22

**produce** 109:1

**produced** 63:20 65:13 149:23

**professional** 216:17

**profiled** 237:2

**profiling** 14:2 186:7,8,10,14,17,18 236:21

**prohibit** 180:22

**promise** 216:8

**proof** 203:24

**proposition** 162:15

**prosecution** 178:18

**provide** 119:1 199:7 209:25 210:1, 14,21 211:1 213:7 228:2 230:17 234:15

**provided** 110:21 166:1 212:19 228:5 234:18

**providing** 234:17

**proximity** 225:13,15

**public** 48:12 209:12 224:23 225:6 227:2,4

**pull** 84:10 119:23 120:2 132:11,12 135:24 136:2 174:14 198:1 228:15

**pulled** 82:8,11 174:14 228:16

**pulling** 136:5 137:2 138:1,2 140:22

**pun** 5:18

**punch** 137:15,17

**punitive** 179:18

**purports** 21:25 205:13

**purpose** 31:22

**purposes** 81:24

**push** 132:11,13 138:4,6,14,24

**pushing** 132:10 135:23 138:2,24 139:2

**put** 47:25 54:12 61:10,19 64:17 72:11 80:23 81:8 90:22 123:2 129:17 130:4,7 142:24 151:7 152:1 157:3,10 162:22 164:14 165:10,12 168:16 173:24 174:1 175:14 178:16 186:25 187:4 202:25 204:10,11 217:11 221:4 234:25 235:10 238:21

**putting** 76:13

---

**Q**

**quad** 58:22

**qualify** 9:12

**question** 6:21,22,25 7:3,6,8,9,11, 14 9:15 11:4 14:20 16:14 20:23 34:22 37:5 48:22 62:22 67:24 76:18 80:14 91:8 93:16 96:13,24 100:8 107:11 109:17,19 110:5,7,14 113:15 115:7,8,10 119:23 122:1 124:10 131:4,11,16 133:16,21 135:6 140:18 142:1,22 143:13 151:24 152:16 154:9 161:2,5,14 162:17 163:12 169:1 177:8 181:6 195:18,23 196:18 207:18 210:8 211:23 212:7 214:17,22 215:13,23 216:8,14 217:16 219:7 228:23 235:23 238:9,12

**questioned** 209:24

**questioning** 170:11 238:10

**questions** 5:7 6:3,4 7:21,22 9:12 31:12 34:7 35:14 38:19 101:17 115:18 142:23 147:7 169:19 178:24 180:1 184:14 208:4 213:12 218:22 222:16 231:13,14 238:14, 25

**quibble** 49:16

**quick** 136:16 225:23

**quotation** 187:1

**quotations** 187:4

**quote** 236:20,21,23,24 237:4

---

**R**

**R/o** 160:5,10,13 168:19

**racial** 186:14,17,18

**radio** 40:1 55:20 60:18 61:15,17,20 66:13,15 72:9,19 145:18 192:10 199:21 200:10 202:2,13,17 205:21

**raise** 187:23

**raised** 178:23

**ran** 87:14 90:1 99:24 100:15 106:17,22,24 108:2 200:13,17,18 219:21 220:1

**rang** 95:2 97:13

**Ranieri** 68:19,21 201:22

**raped** 114:5

**Ray** 29:18,19 32:22

**re-encapsulate** 27:18

**re-living** 27:6,11,12

**read** 19:13,15 86:14 152:24 156:16 196:5 208:1,5,19,22,24 209:2,3,5, 17 210:3

**reading** 208:2,16,21

**reads** 69:21 70:22 71:12 209:23 211:14 212:18

**real** 18:17 19:10 44:7,17 64:17 123:2,4 207:17

**realize** 50:22 171:19 178:7 180:18

**realized** 110:3

**rear** 142:15 144:8 147:12

**reason** 7:16 20:17 21:4 58:7 64:13 88:13 163:5 203:2 213:1,10,14 233:14

**reasonable** 49:11

**reasons** 163:3

**recall** 14:16 24:4,22 28:10 31:4,5 32:20,21 34:4 35:12 36:13 38:17 52:16 59:17 67:18 71:23 75:15 76:7,8,25 77:13,18,19 78:2,10 79:12 84:12,24 87:7,8 88:12 94:8, 10 95:6,14 96:5,10,19 97:8 98:13 99:2,19 100:1,6,10 102:2,13,16 103:19 105:2,11,13,22 107:18 108:24 127:8,12 129:11 130:11,12, 24 131:18,20 139:16,19,20,23 143:18 144:2,14 148:24 149:20 153:7 170:9,21 171:2,18 172:25 177:14,20 178:1 185:13 186:3 188:7 190:7 191:20 192:18 208:20 209:17 219:17 235:7

**recalled** 102:4

**receive** 15:14 57:4 60:24 61:13 71:16 74:6 75:2 87:15

**received** 25:20 52:21 55:7 63:2

72:3,7,9 73:19 74:13 75:6 78:13 165:24

**receiving** 50:23 67:19

**Recently** 207:15 208:9

**recess** 115:15 216:5

**recollection** 12:2,6 34:11 36:4,6, 10,19 39:15 75:18,21 76:12 77:24 78:6 89:24 90:24 95:12 108:11,21 127:21 129:12 134:1,8 138:10 140:20 151:22 157:23 172:8 185:24 221:6 222:8,11 224:25 225:1

**record** 4:14,16 6:9 186:9 203:25

**recorded** 236:6,11

**records** 189:24 190:9,12,17,19,23 191:2,4,10,11,13 206:14

**refer** 5:1 122:13,24 167:22 172:6

**reference** 151:2 165:13 194:25 195:4 196:1 206:4

**referred** 46:21

**referring** 28:23 67:8 82:7 151:4 164:18 165:19 168:8

**reflect** 4:16 89:4 203:25

**reflecting** 39:19 63:1 65:23

**reflects** 63:19 154:6

**refresh** 36:18 75:17 76:11

**refusal** 192:15 211:24

**refuse** 123:13

**refusing** 181:5 211:15,20 212:6 213:7,12

**registered** 76:5

**registration** 165:16

**regulation** 19:4

**related** 77:25 88:22 192:16

**relating** 69:3 86:16

**relatives** 229:8 230:24

**relayed** 192:19

**release** 207:21 208:13,18 212:12 213:6

**released** 34:5,14 102:8 147:23 168:13 169:11 170:7 172:5,12,14, 17,21 173:5,9 175:11 177:17 184:17 210:18 231:25 232:13,17 233:9

**releasing** 148:7

**Relevance** 210:8

**relevant** 166:21

**rely** 162:5 163:16

**relying** 192:7 193:11 194:2

**remember** 16:23 27:13,14 55:12 77:7,10,14,19 81:2,12 85:15 89:25 94:9,11,16 95:4 96:8 97:9,24 99:3 100:5 101:12,14 105:14,15,16,19 106:5 108:16,25 121:1,2,3,5,6 127:7,9,13 128:5,25 129:3,13,15 131:8,13,22 132:21,22 133:6,10 139:3 143:12 169:15,16,21,23 170:3,5 177:15 190:20 211:7 213:17

**remotely** 65:15

**remove** 35:4 148:4

**removed** 34:17,19 147:13,24 172:16

**removing** 148:12 204:1

**rent** 183:3,5,9

**renting** 182:22

**rep** 217:14

**repeat** 96:25

**repeatedly** 236:19

**rephrase** 46:15 67:24 113:15 217:16

**report** 19:16,17,19,25 20:3,13 21:1,2,8,12,17 32:5 36:20 39:19 62:12 63:1 75:19 150:1,17,20,24 151:5,8,17 152:3,22 153:3,6,22 154:2,3 155:3,6,18,22 156:2,11,14, 16,17,21,24,25 157:1,3,5,6,8,11,25 158:8,9,15,18,21 159:9,16,24 160:10,19,22 161:9,18,20 162:3,5, 23 164:23 165:2 166:14,22 167:4 172:6,9 178:17 187:1 192:1,5 193:6 194:17,18,19,23 195:1,5,6,8, 9,12 196:1,2,3,6,14,16,23,24 197:5,7,11,12,16,19,21,23,25 198:3,7,8,21 199:13 201:4 203:6 204:14,17,22 205:13,17 206:9 223:10 235:2,11,17 236:7 238:22

**reported** 92:3

**reporter** 5:17 6:1,17 162:1 239:4, 7,10

**reporting** 154:14 160:7,8 168:7

**reports** 19:13,14,15 21:15 28:12 37:2,7 151:13 159:3

**represent** 26:5 63:18 170:13

**represented** 65:13

**representing** 5:4 221:15

**request** 61:19 119:11

**requested** 210:15,16 229:11

**requesting** 76:2

**require** 113:23

**required** 52:7

**requirement** 51:5

**requires** 47:4 51:14

**residence** 35:5,18 38:3 40:2 52:10 53:5,10 92:11 94:13 115:23 120:12 167:9,24

**residences** 83:5,6

**residential** 82:25

**resign** 17:22 64:11

**resignation** 18:1 63:10,25 64:3,7

**resigned** 44:19,25

**resigning** 17:21

**resist** 134:19 135:2,10

**resistance** 135:17 136:22 137:7,9, 10

**resistant** 56:7

**resisting** 133:1,2,8,10,11,13 134:18,21,25 135:22 136:19 137:5 147:17 219:24

**respect** 10:9 11:3,16,20 181:11

**respectful** 181:9

**respectfully** 47:8 49:6 181:7

**respond** 15:15 212:6

**responded** 207:10 211:22

**respondents** 69:8

**responding** 73:21 160:5,7,8 161:5 168:7

**response** 10:5,6 13:10 68:11,12 69:11,17 74:12 100:2,8 132:7 207:15 208:9 209:1

**responses** 6:6

**responsibilities** 44:6

DOMINIC BATES, 09/04/2019

**responsible** 78:17

**rest** 170:24 171:8

**restaurant** 54:25

**restrain** 129:8

**result** 178:11 216:17 217:5 236:1

**retirement** 184:1

**review** 8:23 20:2,24,25 21:11 156:10 205:16

**reviewed** 21:8,15,18 60:19,21 157:5,24 159:23

**Reyes** 12:20 33:13,16,23,24 34:1, 3,12 35:1,4,8 141:24 171:24 172:4, 9,19 224:1

**Reyes'** 223:16

**Rich** 184:9 239:6

**Richard** 187:25 220:12 222:17 239:4

**right-hand** 63:14 153:9

**ringing** 209:15

**road** 22:10 179:13

**role** 16:4 18:14 92:23 116:5

**roles** 116:5

**rookie** 44:4

**rotate** 43:11,12

**rotations** 78:16

**roundabout** 65:25

**rule** 6:5 19:4 232:22 234:2

**ruled** 233:10

**rules** 5:24 47:6 48:5 195:21

**run** 51:19,22 66:15 88:18 90:8 92:7,9 93:22 113:18,24 122:25 123:7,8,12 151:3 200:12 201:10

**running** 114:7 125:3 201:13

---

**S**

**safe** 29:4

**safety** 81:23 96:17 97:7,10 118:1 235:13,14

**salaried** 180:11,13

**salary** 63:2 183:22

**salient** 178:16 197:9

**Saturday** 60:12,14

**Saturdays** 59:23

**save** 14:21 34:6 63:7 142:22 216:4

**SB** 70:22

**scene** 14:14 22:13,21,23 23:5 29:9 32:14 52:24 79:7,19,20 80:3 81:17 83:22,25 158:4 162:19 164:7 171:20,23,24 173:6 177:16,18 178:2,7 184:16,20 187:11 188:15 203:1 212:19 218:13,24 219:5,12, 18 220:4,19,25 221:21 222:1 223:4,5 228:19 230:21 231:6 236:15,17,18 237:10,11

**scheduled** 59:15,25 60:2

**school** 183:12 230:17

**Schoop** 4:12 5:2 23:11 46:13 47:15,17 48:24 49:14 54:11 64:25 65:4 67:7 81:7 93:17 97:1 107:1, 13,20 109:18 110:9,13 115:13,16 116:15,18,21 119:10 122:2,8 124:17,25 130:25 131:5,15 132:18 135:8 140:19 151:25 161:3,12 163:13 171:13 174:24 175:1 181:1, 4 187:25 188:12 191:16 196:21 203:23 204:8,16,21 205:4,7,9 210:11 214:21 215:17 216:1,6 220:12,21 222:15,25 223:20 228:21,25 231:11 238:11,23 239:2, 6

**screaming** 139:18 188:11

**screen** 72:21,22

**search** 37:6 47:6 48:6 50:23 51:1 52:11 53:21 93:8,11 114:17 115:4 149:5 167:2

**seconds** 136:14,15 142:5 220:11

**Secretary** 69:13 149:4 168:11

**section** 78:18 154:11 199:6,21 205:22

**sections** 71:9

**security** 179:9

**sedan** 70:10

**seek** 7:5

**sees** 164:7

**segway** 80:13

**seizure** 47:6 48:7

**send** 65:1 66:4,6,10,17,25 67:3,4, 13 73:12 156:25

**sending** 71:24

**sends** 72:14

**senile** 121:23

**sense** 66:7 161:21

**sentence** 167:8 210:3 212:11,17 213:5

**separate** 143:15

**separated** 64:13

**September** 10:15 11:12 62:17 77:1

**sergeant** 52:23 53:4,15,17,20

**served** 11:13 25:12,15,20

**service** 56:22,25 74:20 75:4

**set** 65:1

**sewn** 56:14

**shape** 35:10 110:19 140:9 141:5 162:13 179:7

**share** 206:15

**Shawn** 36:9,11,15 37:11 38:25 39:2 70:1 76:6 77:15 99:23,24 100:3,4,12,14,15 103:8,9 106:16, 22,24 107:9 108:1 110:3 120:14 121:15,18 122:13,20,21 123:19 124:2,3,7 127:3 133:4 139:22 148:16,19 149:9 167:23 168:6,11, 20 185:18 186:4,11,16,22 187:8 188:4 212:15,18,25 213:8,12,13 232:20,23 233:7,11 234:3 236:25

**Shawn's** 100:16 103:10 236:16, 18,22 237:10,12,17,20

**sheriff's** 41:19,20 42:7,12,15 43:1, 2 45:10,11

**shift** 59:15,25 60:2 78:16 158:10, 11

**shine** 226:10

**shirt** 55:15 105:23,24 121:5

**shoes** 105:10,15 121:3

**shoot** 170:20 171:12

**short** 136:12 145:23 168:21 207:19

**shorter** 98:1

**shortly** 135:20 228:7 230:20

**shorts** 105:19,21

**shot** 114:3

**shoulder** 6:10 55:17

**show** 8:8 34:3 43:23 44:4 62:7,8,9, 23 63:7 64:23 109:12 149:21 168:10 194:9 198:12,15 204:25 205:10 207:11

**showed** 13:25 87:18 168:6,20 170:25 171:9 172:11 184:19,21 191:17,24

**showing** 112:3 192:2 194:15

**shown** 109:25

**shrugs** 6:10

**shut** 53:4

**sick** 45:8

**side** 22:10 93:18 138:18

**side-by-side** 225:13

**sides** 57:22 138:11

**sidewalk** 224:23 225:6,10 226:23 227:2,4

**sight** 189:25

**sign** 154:24 155:4,19 156:17 157:2,8,9 202:13

**signature** 8:20,21 154:22 156:1,3, 20 157:2

**signed** 155:6,12 156:8,9,22 157:14

**significant** 166:22

**signifies** 200:10 202:11,19

**signing** 8:25

**silent** 134:2

**similar** 5:13 16:9 65:16 168:18 198:8,11 199:4 203:6

**simple** 67:18

**simply** 221:24

**simultaneously** 6:16 130:1

**singular** 237:17

**sir** 4:13 5:9,12 6:14 7:1,23 8:22 9:1,6,9,23 10:8,22,25 11:9,11,15 12:4,9 15:4,9,12 16:3 17:7,10,14, 19,25 18:3,8,13 19:23 20:1,16 21:10,13,23 22:4,7 23:4,20 24:12 26:25 27:2,5,16 28:4,6,14,25 32:15 33:14,18 35:3,7,25 36:5,8,13

37:14,18 38:23 40:12,20,23,25 41:4,16,25 42:3,10,19 43:3,7,9 44:12,15,18,23 45:2,20 46:3,7,9, 11,20,23 47:3,24 48:8,13,18 49:21, 25 50:4,8,11,16,21 51:6,9,24 52:12,14 53:11,19 54:19,21,23 55:1,4,10 56:4,13,15,17,20,24 57:3,10,13 58:2,24 59:3,5,10,12,14 60:1 61:22 62:6,18,21 63:6,24 64:2,5,8,14,16,21 65:19 68:20,22, 24 69:6,10,18,20,23,25 70:3,6,11, 17,21 71:11 72:5,18 73:4,18 74:22 75:1,5,11 76:19,23 78:22 79:14,23 80:7,12,18,20 81:1,15,18 82:4,10, 22 83:1,3,6,15,23 85:5,9,21 86:2, 21,22,25 87:4,20 88:3,6,12 89:10, 15 90:10 91:3,6,10,13 92:6,14,19, 22 93:1,5,10,14 94:4,24 95:20 97:15,22 98:5,9,11,13,20,24 99:8, 11,15,18 100:19 101:15,21 102:2 103:12,24 104:4,6,16 105:5 110:22,25 111:3,7 113:4 114:14 115:6 116:3,7,10,25 117:4,8,12,21 118:3,5,10,14,20 119:18,21,25 120:4 121:16,19,21,24 123:1,10 125:5,9,12,17 126:4,8,10,14,19 129:5 130:22 131:23 132:3 135:14 136:17 137:12,16,19,22,24 140:10 141:2,7,9,12,17,21,23,25 142:3 143:3 145:6,9,11,13 146:12 147:2 148:21 150:8,11,16,18,21 151:6, 12,15 152:9,18 153:1,4,15,19,21, 24 154:12,18,20,23 155:7,11,24 156:12 158:5 160:17 175:24 178:12 185:8 187:3

**sit** 12:1,10 31:25 64:9 75:20 76:25 109:14,19 213:16

**site** 234:8

**sitting** 208:16,21

**situation** 49:9 51:14 82:3 92:12 113:6 164:18 187:14

**Sixty-two** 180:8

**size** 239:11

**skipping** 54:24

**slapped** 53:4

**slash** 71:12

**slightly** 23:2

**slurred** 118:6

**small** 191:13

**smell** 166:18,20 187:5

**snap** 215:20

**snow** 80:19

**sobriety** 117:19,24

**social** 179:8

**socks** 105:12,16 121:4

**software** 90:7 154:1 206:24

**sort** 5:18,22 27:6,17 42:5 44:13 82:16 95:7 123:11

**SOS** 69:12,16,21 168:6,15,20 169:1,4,6

**sought** 75:13

**source** 180:14

**sources** 181:13

**south** 17:11 66:16,17 67:4 68:24 69:1,3 74:17,19

**southbound** 70:23 74:5

**space** 82:23 83:10

**speak** 23:1 61:8 85:25 130:23 185:13 188:1 195:14 196:10 209:15 230:23 231:4 233:16

**speaking** 80:24 187:20 220:11 228:18 230:22 236:15

**specific** 13:20 16:24 18:18 19:1 20:23 75:21 77:2 78:17 97:6 100:8 142:1 155:16 181:6 220:22 222:22

**specifically** 11:21 16:17,19 18:24 75:16 77:2 98:10 99:3 102:3,16 105:2,23 107:19 125:20,22 127:20 168:10 169:17 171:2 186:16 187:8, 15 188:8 190:8 209:7 221:1,7,10 233:21,23

**specifics** 12:16 52:18

**speculation** 107:12 122:7 124:11

**speech** 118:7

**speeding** 54:22

**spell** 4:13

**spit** 137:21

**spoke** 24:10 25:25 85:23 219:20 227:22

**spoken** 29:24 108:9,10

**spot** 57:22 113:12

**spouse** 23:14,16 179:10 181:20, 22

DOMINIC BATES, 09/04/2019

**spray** 55:20 56:5

**squad** 34:18 58:5,10,11,20 81:17,
19 83:17 85:15 111:21 112:16
142:14,15,17,18,25 143:1,5,8,10,
16,17 144:1,4,6,11,19,23 145:22
184:18 202:12 223:17 226:7,12

**Sr** 38:25 39:3 185:18 186:4,12,16,
22 187:8 188:4

**stamp** 200:6 201:19 202:19 203:3

**stamps** 201:15

**stand** 144:11 181:2 206:22

**standard** 117:24 126:24 127:17

**standing** 69:12 83:13 94:19,22
103:21 104:2,3,21,24 106:1 109:9,
10 110:18 115:21 118:21 144:12

**stands** 60:17 70:23 110:14 160:5
206:19

**star** 9:19 12:12,21 40:24 41:1
56:16 63:12 202:14 209:19

**start** 59:16 60:7 101:20 158:15,19
214:8

**started** 59:24 134:16 228:8

**starting** 185:1

**starts** 168:4

**state** 4:13 12:17 15:2,22 16:10,17,
19 17:3 19:3,16 20:7,25 21:8,11,16
33:13,15,22 60:17 61:7,14 65:22,
24 66:4,10,25 68:12 69:4,11,13,17
72:12 84:19 85:1 99:1,9 109:3
130:16 149:5 159:24 160:14
162:18 168:11 171:9 193:22
194:17,22 195:4,14,20 197:10
209:14,23 223:4 226:5 230:18
236:23

**stated** 84:5,21,24,25 99:22 111:20,
21 136:24 148:15 165:13 169:17
171:3 186:22 189:12 211:4 221:23
223:6 229:16 236:13

**statement** 32:3,6 134:24 171:10
207:13 209:9 210:6 221:18

**statements** 14:1,5 134:23 170:25
171:7

**states** 202:23

**stating** 23:4 100:14 236:19

**station** 189:19,21 190:5,15 218:22
220:5,15,24

**status** 42:9 157:4 179:16

**statute** 19:2

**statutes** 45:22

**step** 111:11,16 112:15 119:4
123:16,22 125:1 147:14,15 163:24
211:3

**step-by-step** 133:18 214:9

**stepped** 119:20 120:6,10,17,20
121:11 123:15 124:4 129:18 132:2,
9,19 133:16,20 134:15 135:18
167:5

**stepping** 135:18,19

**steps** 136:2 226:23

**stipulated** 180:18

**stocks** 183:24

**stood** 107:8 227:12

**stop** 14:25 15:8,11 20:9 22:11,15,
17 23:7,9 51:22 62:2,4 75:10 84:3,
20,23 86:7,24 88:16,19 91:22 92:4
99:25 111:17 112:3,8 113:14
114:12 118:17 125:25 126:2,6
130:2,3 160:16 165:15 174:6,13
177:24 178:3

**stopped** 123:19 237:4

**stories** 27:25 196:9

**storm** 94:14 230:2

**straight** 27:25 82:19 132:14
133:15 196:10

**strangers** 15:25

**streamline** 35:14

**street** 71:2 82:19 225:7 226:25

**strike** 127:14 136:25 137:20 141:5

**student** 109:3

**stuff** 44:16 76:1 184:1

**stutter** 123:15,16,22 124:4 125:1

**subject** 160:15 167:10 168:18,22
216:16 219:21,23

**subjected** 117:19

**subjects** 53:1

**subpoena** 155:16

**subpoenaed** 26:19,20

**subsequent** 74:6 78:10

**substantial** 146:23

**substantially** 198:8

**substantive** 196:25

**suburb** 17:8 82:21

**suburbs** 17:11

**successfully** 42:6,11,14

**suddenly** 124:4

**sued** 11:5 25:3,4 33:2,3 177:10

**suffering** 7:19

**suggest** 105:7 177:23 205:23
214:13

**suggested** 101:3,5 212:24 231:20
232:3

**suggesting** 181:8 186:12 216:21

**suggests** 211:14 213:6

**summarization** 152:4

**summarize** 44:1

**summary** 152:8,12 160:4 223:10

**summons** 11:14 25:13,16

**Sunday** 60:13

**superior** 156:9 157:24 218:4

**supervising** 162:4

**supervisor** 32:7,9 156:15 157:1,
16,21 158:11 222:1

**supplied** 151:10 165:21

**supposed** 5:17 204:11

**Supreme** 48:4,5

**suspect** 77:16,21 161:7 163:12,21

**suspected** 77:12 163:7 198:2,10

**switch** 88:18

**sworn** 4:10

**system** 66:24 154:2 206:16

**T**

**t-shirt** 105:20

**tab** 54:25 204:10

**taking** 7:19 62:13 98:19,21 115:25
116:24 117:1 135:25 136:2 140:14
148:18 191:13

DOMINIC BATES, 09/04/2019

**talk** 6:16 28:11 30:23 32:17 37:23 38:5,18 40:13 85:18,22 125:21 188:14,18 224:8 225:23 237:1

**talked** 23:17 24:24 85:16,19 191:21

**talking** 27:7 30:19 32:21 33:19,21 87:10 98:22 102:22 116:2 117:1 136:7 144:24 145:12,16,18,19,20 172:20 174:4,22 186:6 187:13,14, 17 188:22

**talks** 192:13

**taser** 55:23 57:2,4

**tasks** 43:21,23,25

**taught** 46:1 126:23

**taxpayer** 236:19

**teach** 43:24

**technique** 127:18 140:25

**techniques** 129:7

**Technology** 73:15

**telephone** 24:18,19,20 177:6

**telling** 30:13 75:22 86:9 87:9 163:17 170:5 173:5 176:2

**temperature** 81:2

**temperatures** 80:25

**temporal** 38:12

**ten** 136:14 164:3,5

**terminal** 65:17,18,23 66:11

**terminals** 66:7,14 67:4 68:13

**terms** 18:21 35:21 115:25 180:7

**test** 117:23

**testified** 5:11 28:9

**testifies** 4:10

**testify** 210:25

**testimony** 5:13,14 7:18 34:9 43:18 64:10 66:9 76:20 80:4 89:11 94:25 101:22 107:25 111:14,24 112:10, 21,25 113:5 120:5,18 121:10,14 127:15 129:21 134:12 135:9,13 136:18 137:11 140:4,11 151:16 159:15 186:11 195:23 199:11 208:15 210:5 221:19 222:10 223:6 231:20 234:13

**tests** 117:20,25

**thing** 6:15 96:20 102:20 152:6

**things** 11:19 13:20 27:4,14 28:12 36:20 40:18 44:10 45:23 47:6 93:19 109:4 117:2,14 136:3 151:13 152:4 179:3,4,11 181:21 183:24 184:9 217:14,19

**thought** 30:15 46:10 53:6,8,12 87:6 88:10 89:12 92:5 114:20 166:7

**threaten** 98:10

**threatened** 98:7 235:5,9

**threatening** 114:8 235:8 238:7

**three-page** 150:3

**threshold** 104:3 114:23 115:1 120:10

**Thursday** 60:9,13

**tickets** 54:18,22

**time** 4:25 6:19 7:2 14:22,23 15:20 18:9,10 24:4,23 25:6,7,24 30:23 34:16,21,25 38:19 41:9 42:25 44:8, 25 49:24 52:15,17 58:8 59:15,25 60:7 61:24 63:7 72:6 80:11 98:6 103:17 104:13,20 107:6 113:3 117:9 119:23 120:1 123:5 129:25 133:25 134:10 136:13 141:3 142:20,23 145:24 146:7 149:18 160:4 163:1,2 172:15 176:14 184:7 192:9 196:20 198:14 199:25 200:6 201:15,19 202:18,23 203:3 207:23, 25 216:4 219:3 222:1,17 226:5 227:16,18,19 229:5 233:9

**time/date** 201:23 202:4

**timeframe** 172:16

**times** 24:2 52:14 96:24 238:18

**timestamp** 70:13

**title** 208:7

**Tobacco** 10:20 46:18

**today** 6:1,3 7:18 8:1 9:8 11:8,12 12:1,10 64:9 75:20 77:1 109:14,20 129:10 210:5 213:16

**today's** 19:12 20:19 21:19,22

**told** 22:8,14,16,20 23:6 27:3 28:17 30:7 61:23 76:3,4 77:2,4,7 86:23 87:1 88:1 89:12 100:12 112:1,6 113:16 129:17 130:11 136:21 137:1,6 148:17,21 151:11 161:6 162:19 163:6 164:2,4,10 165:4 166:7 174:12 176:3,15 178:2 189:5

192:8,25 193:11 194:3 210:20 219:11,18 226:11 233:20,21,23

**Tony** 43:15

**top** 29:15 57:23 68:17 69:16 83:13 150:13 203:16,18

**totality** 49:19 53:7

**touch** 35:1,8 127:23

**tough** 61:4 71:23 95:24 139:1

**town** 71:7 78:18 159:5

**traditional** 76:1 184:1

**traditionally** 158:8,12 201:8 221:25

**traffic** 14:25 15:8,10 20:9,15 22:11,15,17 23:7,8 62:2,4 75:9 84:3,20 86:24 88:15 91:21 92:4 99:25 112:3,8 113:14 114:12 118:17 160:16 165:15 174:6,13 177:24 178:3 219:22

**train** 45:3

**trained** 45:4 48:15 49:23

**training** 29:21 41:15,17 42:7,12,15 43:2,6,8,9,13,19 44:3,14,21,24 45:10,11,12,14,16 50:23 57:6,7 63:4 88:17 215:4

**transcribes** 72:12

**transcript** 86:14 239:5,8

**translate** 6:11

**transmit** 66:13

**transmitted** 72:17 73:2

**transpired** 22:9 33:25 151:20 152:25 163:16 218:19

**Transportation** 118:1

**treatment** 192:15

**trooper** 12:18,20 15:2,22 16:10,19 17:3 22:13,20 23:6,24 24:1,5,10, 14,21,23 25:23,25 26:6,11,16 28:8, 18 32:21 33:10,13,16,22,23,24 34:1,3,11,18 35:1,4,8 73:24 79:22 81:24 83:17,21,24 84:9,18,19 85:3, 6,23 86:3,10,17,20,21,23 87:1,5,8, 18 88:7 89:9,11 90:2 91:11,25 92:3 93:7,22 94:5,16,18,19,22,25 95:12, 21 96:13,14 97:2,13 98:18,21,25 99:1,9,10,12,19 100:2,9,11,25 101:23 102:10,21 103:7,14,15,20, 22 106:5,7,10,11,13,16,22 107:2,4, 7,14,21 108:1,5,12,16,22,25

109:11,25 111:15,17,21 112:2,6,13
113:6,24 115:24 116:5,23 118:16
119:11,15 120:1,15,21 121:7
122:3,11,15 123:5 125:7,10,14,15,
21 126:21 127:4,6,11,13,16,22
128:2,5,7,9,12,15,21,25 129:3,7,
15,19,22,25 130:8 131:17,24
132:6,8,20,21 133:8,20,22 134:3,6,
15 135:12 137:17 140:12,21
141:10,20,24 142:11,13,17,24,25
143:1,4,8,10,25 144:4,10,15,18,21
145:17,21 146:18 147:3,6,9,23,24
148:4,6,9,15,17,22 149:2,4,11,14,
17 151:20 161:24 162:19 166:2,6
167:9,13,20 168:5,10,19 170:20
171:23 172:3,5,9,19 173:9 174:3,4,
9 175:3,7,15 176:12,14 184:18
186:1,21 187:17 195:7 196:6,13,23
197:6,11,13,16,25 198:7 209:23
210:18 212:3,13 213:20 214:12
219:19 223:25 224:1,4 231:25
232:5,13,17,22,25 233:5,13,17,18,
23 236:24

**trooper's** 20:7,25 21:8,11,17
146:20 185:10

**troopers** 16:17 19:21 173:2 185:1
223:4,14 226:6 227:23 229:3
230:21 236:15

**trouble** 66:20

**true** 64:4,6 89:23

**trustee** 31:12

**truthfully** 7:22

**tuition** 183:12

**turn** 66:13 185:2 222:17,19

**turned** 127:5 128:7 224:5

**turning** 135:25

**tussle** 139:10

**twisted** 168:25 169:3

**twisting** 135:24 136:4 137:2,25
138:1,2

**type** 39:18 40:1 41:11 51:25 75:13
77:20 85:7 199:7 230:14

**types** 45:23 54:8,9

**typewritten** 72:21

**typically** 5:23 18:14 57:17 60:2
222:6

**U**

**U.S.** 48:5

**uh-huh** 6:10 153:13

**unable** 7:17

**uncle** 184:9

**understand** 5:23 6:25 7:21 8:2
20:6,10 40:10 51:3,10 66:9 73:20
74:23 76:17,25 86:13 112:20
118:15 131:16 148:13 161:21
181:8,9 195:18 211:19 213:4,15
232:11

**understanding** 66:3,24 72:10
92:12 113:3 154:1 218:9 232:16,21
233:4 234:1

**understood** 7:10,11 92:8,10 93:2
134:12 175:22

**uniform** 55:9,13,24 99:7,10

**union** 217:14

**unique** 181:10

**unit** 31:10 200:1 202:4,10,11,12,15

**universal** 5:24

**unknown** 167:7,8,10 168:18

**unmarked** 57:14

**upload** 156:22

**upright** 168:24

**utter** 134:16

**uttered** 108:12

**V**

**vacation** 45:7

**vague** 125:18

**Vasquez** 43:15

**vehicle** 20:8 57:8,9,15,16,19,24
58:6,20 59:6 60:23 61:21 70:8
72:3,23 74:4,10 75:13 79:10,11
80:4 84:2,7 85:3 86:7 87:12 88:8,
20 90:6,16 92:9,11 123:21 144:9,
16,19 147:4,6,9,13,14,21 165:1
172:17 174:17,19 176:16,17
177:24 182:10 210:2 212:14 224:6
232:1,18 233:10

**vehicle's** 61:16 73:8

**vehicles** 57:21 60:25 61:1,2,3,5,6,
12 79:16 224:2

**verbal** 6:7 124:13 130:8

**verbally** 23:6 72:19

**verbatim** 152:10,13,15 193:16
219:13,16

**verbiage** 236:8

**verified** 166:3

**version** 30:14 32:4 153:2 154:6
155:6,12,18,22 156:14,19 157:14

**versions** 153:5

**versus** 88:9 237:24

**vest** 55:18 56:6,7

**VHIN** 200:11

**video** 20:7,12,15,24 21:1,21 22:10,
11,18,19 62:1,5 84:23 111:18
112:3,11,14,23 119:16 120:22
121:8

**view** 230:4 234:7

**village** 4:21 10:12,13 17:5,7,8,23
19:2 21:2 28:23 29:1,8,11 30:12,25
31:6,7,8,12,15 39:24 41:2,7,13,22
42:4,17 44:19 48:2 52:4,9 55:13,16
57:5,15,18 58:5,14 61:2,11 62:11,
25 63:21,23 64:11,18,19 65:14
66:12 67:9,11 69:4,8 71:5,8 73:6
74:15,18,21 75:22 76:21 78:21
90:6 99:4 114:7 149:25 159:21
207:14 208:8 209:2,4 236:20

**villages** 17:12

**violations** 54:20

**voice** 66:21 130:20

**voices** 187:22,24

**voluntarily** 64:11 111:10,13
120:6,24 121:6,10 148:15 167:5

**voluntary** 18:1 64:7,14,15

**W**

**waist** 142:10

**wait** 6:23 185:15 232:9

**waiting** 83:17

**waive** 239:2,3

**walk** 82:2 111:5,8,10 114:23 115:1
138:3 211:21 224:16 226:2

DOMINIC BATES, 09/04/2019

**walked** 111:25 142:13 167:6 191:19

**walking** 84:5 96:17 97:3 101:6,9 102:14 122:22,23 123:20 126:5,6, 13 166:4,5 190:1 224:6 225:2,10, 18 227:7 229:21 230:11

**walkway** 103:23 139:12 224:21

**wanted** 70:18 73:13 82:1 111:20 155:12 215:7 227:24 233:13

**wanting** 122:16

**warrant** 51:1,4 52:11 53:21 93:8, 11 114:18 115:4 167:2 238:21

**warrants** 50:23

**watch** 20:12 21:21 62:1 111:22 112:18,22 119:16 120:22 121:7 162:2

**watched** 20:15 62:4

**waving** 225:24

**ways** 72:17 126:2

**weapon** 54:3 56:22,23,25

**wear** 124:23

**wearing** 55:9 105:1,8,9,10,12,14, 16,17,19,21 121:2,3,4,5

**weather** 80:14,16

**week** 59:17,21 60:5,8 159:8,9

**weeks** 159:9,11

**whatsoever** 129:12

**When's** 25:24

**whereabouts** 212:20 215:6

**white** 57:21 164:5,6,19

**wife** 28:17 182:5 183:2,14,20

**windfall** 184:10

**winding** 184:15

**window** 190:2

**windows** 96:4,7

**winning** 184:6

**witnessed** 52:6

**woman** 12:21,23 98:4,7,14,22 99:13,21 100:2,12 102:7,22,23 103:10,14,15 104:2 110:18 120:12

**wonderful** 6:17

**word** 63:16 106:12 125:19 154:22

235:1,3

**words** 86:9 108:5,8,12 134:17 135:15,21 136:22 139:20 144:22 152:7 169:24 170:18 173:5 174:1 177:14 188:24 236:9

**work** 19:3 155:9,10 172:1 195:19

**worked** 10:10 29:20

**working** 11:1 39:23 73:9 181:14

**works** 8:6 66:24

**worn** 56:2 85:7

**Worth** 70:25 71:4,5,7,8

**wrap** 198:14

**wrapping** 184:15

**wrist** 127:1,13 128:18,19,23 129:1, 23

**write** 156:24 162:8 167:11 192:4 237:9,19

**writing** 154:2 162:11

**written** 19:17 37:2 72:20

**wrong** 205:8

**wrote** 152:6,8 160:4 195:24,25 196:6 237:20

**Y**

**year** 26:2,11 42:22 90:25 91:1 180:8

**yelled** 238:17

**yelling** 169:24 188:10 224:17 225:19,20,21 236:17 237:6,9,11, 13,15,20,21,24,25 238:6,20

**young** 104:12,19,25 105:25 106:10 107:2,5,8,15,21 108:6,13, 17,23 109:1,12,24 110:23 111:4 114:21 117:6,9 118:13,21 120:19 122:23,24,25 123:6,7,11 125:3,7, 13,16 126:17,22 133:6

**Z**

**zone** 78:14,16,19 79:2,3,6 200:2 202:5

Exhibit G